**FILED**

**OCT 1 2 2012**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Steven Jude Hoffenberg
Prison Number 35601-054
Fort Dix Prison
P.O. Box 2000
Fort Dix, New Jersey 08640
**Plaintiff Pro se**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Case: 1:12-cv-01682
Assigned To : Unassigned
Assign. Date : 10/12/2012
Description: Pro Se Gen. Civil

---

| | | |
|---|---|---|
| Steven Jude Hoffenberg acting in his over 200,000 restitution investor victims included in state pension fund victims constructive trust collections posted on Towers investors Dot Com. website<br>        **PLAINTIFF** | " " " " " " " " " " | **Federal Tort Claims Act**<br>    **Law suit**<br><br>**Judge:** _____<br><br>**CASE   NUMBER**<br><br>_____ |
| VS | " | |
| UNITED STATES on behalf of the BOP prison Washington, DC office central inmate monitoring staff continuous tort doctrine tort injury,<br>        **DEFENDANT.** | " " " " " " | **ALLTORT INJURY OCCURRED ONLY IN THE BOP CENTRAL INMATE MONITORING STAFF OFFICE IN THE WASHINGTON, DC BOP CIM OFFICE VENUE** |

---

**COMPLAINT**

**RECEIVED**

**SEP 1 3 2012**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

INTRODUCTION IN THE DEFENDANT UNITED STATES BOP STAFF TORT INJURY
TO THE PLAINTIFF IN THE BOP STAFF SCOPE OF EMPLOYMENT NON DISCRET-
IONARY BEHAVIOR THAT DID BREACH THE DUTIES OF CARE OWED THE
PLAINTIFF UNDER THE CONTINUOUS TORT DOCTRINE CONSTANT BOP STAFF
TORTIOUS CONDUCT THAT OCCURRED ONLY AT THE BOP WASHINGTON, D.C.
STAFF OFFICE VENUES IN THECIM STAFF MANUALSECTION.

1.      Plaintiff did complete both the FTCA exhaustion and the
        BOP multi level exhaustions points under the prison litiga-
        tion reform act in the below allegations.

1(a)    The BOP Tort in jury confirmed document in this FTCA suit
        number TRT BOP 201202054, dated March 27, 2012 demand in
        the sum of $20 billion Dollars in this tort injury suit
        is attached in the next page.

2.      The BOP Staff central inmate monitoring, herein after CIM
        staff did the continuous tort doctrine tortious conduct
        injury damages to the plaintiff, in the CIM Manual staff
        section that only operates from the BOP Washington, DC
        staff office venue, in the entire time frame, of this
        complaint, from January 2002,     at this suit docketing in 2012.

3.      On March 27, 2012 the BOP Associate General Counsel Joyce
        Zoldak conceded in writing to the plaintiff, that this
        $20 Billion Dollar BOP Tort claim number TRT BOP 2012
        02054, was exhausted and denied by the BOP.

3(a).   Resulting in this suit, the CIM staff claims, that were included in
        the exhaustion non stop FTCA, injury.

4.      The above exhausted BOP Tort claims did cover the below
        discerned CIM staff injury constant FTCA allegations,
        from January 2002, non stop up to the docketing in this law
        suit in 2012.

5.      The plaintiff did meet the points of law, in the prison
        litigation Reform Act 28 USC 1997 ea, under in prison
        Un available exhaustions in the end point BOP Remedy statutory
        purpose. Discerned below.

6.      Said plaintiff action in prison remedy exhaustion points
        statutory purpose are well discerned in the below allegations,
        showing the plaintiff did comply with the BOP exhaustion law,
        in this FTCA suit allegations(s). Whereby the prison CIM
        Staff, breached the duties of care, in the below BOP staff
        violations of the exhaustion mandate.

7.      The Detroit fire and police pension fund was deprived the



**U.S. Department of Justice**

Federal Bureau of Prisons

_Washington, D.C. 20534_

March 27, 2012

**Certified Mail - Return Receipt Requested**

Mr. Steven Jude Hoffenberg
Reg. No. 35601-054
FCI Fort Dix
P.O. Box 2000
Fort Dix, NJ 08640

Re:  Tort Claim Number TRT-BOP-2012-02054

Dear Mr. Hoffenberg:

    The Bureau of Prisons (BOP) has considered your administrative claim under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680.  You claim that Office of General Counsel staff rejected or failed to respond to multiple FTCA claims.  You seek $20 billion in damages.

    After an investigation, we find no evidence of injury or governmental negligence.  We are restricted from paying claims filed under the FTCA unless there is negligence on the part of the agency or BOP staff.  Consequently, we are unable to pay your claim under the Federal Tort Claims Act.

    This letter should be considered a final denial of your claim against the BOP or its staff.  You may bring suit in the appropriate United States District Court not later than six months after the date of this notification.  See 28 C.F.R. § 14.9.

    Please direct any further correspondence regarding this matter to Renée Brinker Fornshill, Assistant General Counsel or Marli J.P. Kerrigan, Assistant General Counsel.

                        Sincerely,

                        Joyce A. Zoldak
                        Associate General Counsel
                        Litigation Branch

plaintiffs $50 Million Dollar restitution constructive trust repayment, from the plaintiff in prison, discerned below. See exhibits 1 and 4, 9,

7(a).   By the CIM section staff, breach of all duties of care non stop, caused US Congress, *EXHIBIT 1 EVIDENCE.*

8.   The Honorable John Conyers JR, on the **Judiciary committee** acted in this suit, in order to have the plaintiff repay his $50 Million Dollar constructive trust financial obligation from prison, to the Detroit fire and police pension, based on the US Congress House, March 2010 ethic(s) committee approved vote, discerned below. **See Exhibit 1.**

9.   The exhibit 1 evidence attached hereto show(s) part of the above United States Congress action in this suit. Discerned Below, in the CIM staff non stop, breach of all duties of care, FTCA constant plaintiff Tort injury.

10.   The defendants continuous tort doctrine        FTCA Tort *INJURY* tortious conduct, in the US Department of Justice BOP Washington, DC Prison office, respondeat superior, and CIM staff, breached all duites of care, and failed to follow the United States Congress, Exhibit 1 evidence request, discerned below.

11.   **Eric Holder Jr., the US Attorney General,** had actual direct respondeat superior participation, in the United States Congress time frame of the exhibit 1 evidence request, discerned below.

12.   Eric Holder Jr. the US Attorney General, acted on point with his fast and furious vote misconduct, in the US Congress request, in the exhibit 1 evidence, time frame discerned below.

13.   The defendant CIM staff, understood the plaintiffs law suit statutory mandate, in BOP restitution on going, in the plainiffs $80 Billion Dollar **Hedge Fund** asset investment constructive trust partnership court ordered plaintiff tort injury restitution, discerned below, in the time frame from January 2002, to the docketing in this suit in 2012.

14.   **Exhibit 2** evidence attached hereto show(s) the introduction, in the plaintiffs major constructive trust suit Jeff Epstein partnership whereby the plaintiff was the restitution first Funding partner, in the $80 Billion Dollar Hedge Fund plaintiff ongoing constructive trust major investment asset, discerned below.

15.   Plaintiff is the ongoing funding equity original partner in the $80 Billion Dollar restitution owned hedge fund in the exhibit 1, 2, 3, trust evidence.

16.     The Billionaire Jeff Epstein, who has been the Ceo at the plaintiffs constructive trust, $80 Billion Dollars Hedge Fund, in the entire time frame of the plaintiffs BOP detention, was first employed by the plaintiff, at Towers Financial Corporation TFC. **See Exhibit 2, 3, and 4.**

17.     The Exhibit 2 evidence the vanity fair March 2003 nine page story regarding the Billionaire Jeff Epstein and the plinatiff crimes at TFC, provide(s) the introduction, in the plaintiffs ownership in the $80 Billion Dollar Hedge Fund, ongoing operations Constructive trust.

18.     TFC was one of the **largest ponzi scheme** major wall street crime(s), that had the TFC body of case law, showing the ponzi scheme, TFC crime(s) with the plaintiff participation. **See Exhibits 2 and 4.**

19.     **The Exhibit 4** evidence attached here to, show(s) the five page introduction, in the TFC and plaintiff $1\frac{1}{2}$ Billion Dollar depositing, national collection agency, and factoring operations(s).

19(a).  The plaintiff was the controlling share holder in TFC.

20.     **Towers Investors Dot Com**, victim(s) website show(s), the plaintiffs TFC Public stock ownership, controlling interest, in the TFC $1\frac{1}{2}$ Billion Dollar depositing national collection agency and factor, in exhibit 4.

21.     The $80 Billion Dollar Hedge Fund ongoing world wide operations, are the major plaintiff investment suit asset, in the plaintiff tort injury massive restitution constructive trust damaged by the named BOP Staff constant tort injury.

21(a).  Evidence in exhibits 1, 2, 3, 4, 5, and 9 are discerned below in the BOP         tort injury.

22.     The $80 Billion Dollar Hedge Fund Epstein crime(s) introduction are discerned in the exhibit 3 evidence provided to DOJ, attached hereto starting on July 1, 2011. **Jeff Epstein Ponzi scheme presumption crime(s).**

23.     The $80 Billion Dollar hedge fund Epstein crime(s), are far higher in amount, compared to the major Bernie Madoff crime(s). See exhibit 3, evidence the ponzi scheme presumption Epstein crime(s).

24.     The plaintiffs was in BOP detention since July 19, 2001, under the prison law central inmate monitoring, CIM Law 28 CTR 534.71 et seq mandate.

24(a).  The CIM staff, breached all of the duties of care, in each allegation in this complaint.

25.     The CIM staff manual law 28 CTR 524.70 et seq. demand(s) *THE*

3

THE WALL STREET JOURNAL.    TUESDAY, JANUARY 28, 2003    C7

# SEC Aims to Make Violators Pay Up

By Deborah Solomon

WASHINGTON—Securities regulators say state laws and the time-consuming effort involved in forcing securities-law violators to pay their debts are hampering efforts to collect monies to repay defrauded investors, and they need help in securing the funds.

In the wake of corporate scandals that have cost investors hundreds of billions of dollars, the Securities and Exchange Commission is asking Congress for the authority to hire private-collection attorneys and to exclude securities cases from state laws that often shield property assets. The SEC also wants monetary penalties that violators pay to go toward compensating investors.

The Sarbanes-Oxley Act, which proposed new regulations to improve corporate accountability and financial reporting, directed the SEC to put ill-gotten gains that it collects into restitution funds to aid victims of securities fraud. In the past, most funds the SEC collects have gone into the U.S. Treasury.

The SEC said in a report on compensation funds required under Sarbanes-Oxley that its efforts to collect money had been hampered by legal limitations and complex financial transactions that often shield the true value of a defendant's assets.

The collection of illegal gains has long been an issue for the SEC, which was faulted last year by the General Accounting Office for failing to collect much of the money that securities-law violators were ordered to pay.

The SEC orders "disgorgement" from those who are found to have violated certain securities laws. The money is supposed to refund investors and recover "ill-gotten gains" so violators don't profit from breaking the law.

The report, released yesterday, outlined how most of the disgorgement that was ordered comes from just a handful of defendants—many of whom don't pay. Of the 207 defendants who were found to have committed fraud during securities offerings, four were ordered to pay $529 million— just under half of all disgorgement ordered by the SEC. None of the four have paid, according to the report.

The SEC said it could hire private collection attorneys, who could devote the time needed to collecting the debts.

prison staff reporting on the plaintiff injury, to the BOP respondeat superior assistant director, at the BOP Washington DC supervisor staff CIM Office, ongoing. Under the CIM staff law manual points of fact, customs, methods, practice, and rules.

26.   over **3000** three thousand tort FTCA CIM staff injury plaintiff notices, claims, were filed, at the BOP Washington, DC respondeat superior assistant directors CIM staff office, from January 2002, to docketing of this suit, in 2012.

27.   The BOP assistant Director at the BOP Washington, DC Office incharge of the CIM staff, law prison notice(s), had the over 3000 three thousand plaintiff tort injury FTCA claim notice(s), whereby the CIM Prison staff assistant director, breached all of the duties of care, in the CIM staff law, Manual, owed the plaintiff. Failed to stop and remedy the plaintiff tort FTCA INJURY.

28.   The above introduction points of the plaintiff tort injury law and fact, are well discerned in the plaintiffs over 3000 filed FTCA notices, with the BOP staff named below, and in ❶ the below CIM staff allegations. The time frame in this suit starts in January 2002 and proceeded ongoing to the docketing of this suit in 2012.

28(a).  The time frame in this complaint plaintiff tort injury proceeds ongoing in post prison plaintiffs time frame tort injury

## JURISDICTION

29.   Plaintiff invokes this district of Columbia District court jurisdiction under 28 USC 1331 and 1408(b), the FTCA statutory law. **Moorehead v. District of Columbia** 747A. 2d 138, 142 (DC 2000)

30.   Jurisdiction in this court against the defendant the United States come(s) from the FTCA statutory purpose, under the continuous tort doctrine, whereby the defendant is held liable in the same points of fact compared with the private employer, master servant relationship.

31.   The defendant United States is held liable in the FTCA points plaintiff in jury in law and fact under the BOP CIM staff and respondeat superior nonstop trotious conduct, that occurred full time daily at the BOP Washington, DC Office under the continuous breach of all duties of care owed the plaintiff in plaintiff constant FTCA below injury allegation(s) in plaintiff constant FTCA CIM staff injuries.

32.   The below FTCA CIM staff, respondeat superior staff continuing tortious conduct, witnesses, and parties are only located at , the BOP supervisor CIM staff Washington , DC office venue. In the plaintiffs constant complaint tort injury.

33. Other FTCA respondeat superior BOP CIM staff tortious conduct were ordered by the Washington, DC supervisor staff and occurred in the District of Mass, and New Jersey jurisdiction.

**VENUE UNDER THE FTCA STATUTORY LAW 28 USC 1402(b) in the DC**

**DISTRICT COURT VENUE UNDER THE CIM STAFF LAW MANUAL CONSTANT**

**STAFF ACTIVITIES BY BOP WASHINGTON, DC CIM STAFF.**

34. Plaintiff invokes the DC District court venue under the FTCA injury by CIM staff under statutory law 28 USC 1402(b). All CIM staff section are employed only at the BOP Wahington, DC office.

35. The defendant BOP respondeat FTCA superior CIM staff tortious conduct, occured under the continuous tort doctrine, in BOP Washington, DC CIM staff supervisors tort injury office venue.

36. The staff crime(s) venue did take place in the District of New Jersey and District of Mass with massive civil rights crimes hurting the plaintiff.

37. BOP staff crime(s) investigations and criminal proceedings are moving forward in the District of New Jersey, in the below allegations.

38. The crimes venue in the BOP staff cime(s) investigations(s) are in the District of New Jersey, and are not the same tort injury venue, in the points of law and fact, in this tort injury FTCA venue law suit.

39. Over 3000 three thousand plaintiff CIM staff law continuing FTCA respondeat  superior CIM staff tortious conduct, notices, in the plaintiff constant tort injury ongoing were filed at the CIM staff Washington, DC CIM Staff section office.

40. Venue is joined in this FTCA suit, when the BOP CIM staff supervisors had any of the over 3000 three thousand prison tort injury notice(s), CIM staff law claims, plaintiff FTCA Tortious staff misconduct notice(s).

40(a). BOP Washington, DC respondeat superior office CIM staff, **Failed to remedy and stop, the noticed plaintiff claims. Under the continous tort doctrine FTCA plaintiff injuries daily, in the DC District court venue, BOP central Washington, DC staff CIM section office.**

**DC DISTRICT COURT MANDATED STATUTORY CRIME VICTIMS REFORM ACT**

**18 USC 3771 COURT PROTECTION FOR THE PLAINTIFF 200,000 VICTIM(s)**

**INCLUDING THE STATE PENSION FUNDS VICTIMS COURT PROTECTION IN**

**THE PLAINTIFFS MULTI BILLION DOLLAR TORT .INJURY RESTITUTION**

**CONSTRUCTIVE TRUST DAMAGE(S) DISCERNED IN THE BELOW**

**ALLEGATIONS**

41.  The crime victims Reform Act, 18 USC 3771, mandates this
     DC District court **protection,** for the plaintiffs tort
     injury 200,000 restitution victim(s) in this lawsuit,
     in the plaintiffs **debt** that must be paid to state pension
     funds, and victims.

42.  The plaintiffs major restitution tort injury asset invest-
     ments, in the plaintiff major constructive trust, below
     allegations, have authority in this DC District court
     **victim(s) protection, under the crime victims Reform Act,
     18 USC 3771.**

42(a) All of the defendant prison CIM staff section, are employed
     only, at the BOP staff Washington, DC office.

43.  The defendant was mandated under the **crime victims Reform**
     act, to stop the THE BOP supervisor CIM staff, at the BOP
     Washington, DC staff office, continous tort doctrine tortious
     conduct, that breached all of the non discretionary behavior,
     staff duties of care, _ _ to the plaintiff.

44.  The plaintiffs crime victim(s) tort injury evidence in
     exhibits attached hereto show(s) the victim(s), at **Towers
     Investors Dot Com#,** full time non stop actual direct **tort**
     injury participation, in support of the plaintiff in the
     below allegations. Under the crime victims reform act,
     18 USC 3771.

45.  The restitution crime victim(s) formed their mandated
     joint tort injury effort with the plaintiff, in order
     to collect the plaintiffs major constructive trust restitution
     assets, in the below allegations.

46.  From January 2002 to the docketing of this suit, over
     3000 three thousand plaintiff continuing notices CIM staff
     tort injury claim letter(s) and joined BOP plaintiff claim
     injury documents, were filed under the prison law CIM
     manual staff reporting notice(s) with the BOP assistant
     director in charge of all of the national prison CIM staff
     section in the BOP Washington, DC CIM staff office. See
     **CIM staff law manual,** customs, practice, methods, and rules.

47.  **No remedy, with no stopping, of the plaintiff tort injury,
     recorded in the over 3000** three thousand FTCA CIM staff
     documented plaintiff tort injury  claim letters notice(s),
     occurred at the BOP Washington, DC staff CIM section,
     supervisors office, from January 2002, to the docketing
     of this suit. That caused constant CIM staff tort injury.

## FACTUAL ALLEGATIONS

**1ST CAUSE OF ACTION SHOWING THE PLAINTIFF DAILY FTCA TORT INJURY DETAILING EACH BOP STAFF TORTIOUS DAILY MISCONDUCT, WITH TORT INJURY IN THE PLAINTIFF OVER 3000 THREE THOUSAND CIM STAFF PRION NOTICES FILED IN FTCA TORT CLAIMS WITH CIM STAFF SECTION AT THE BOP STAFF WASHINGTON, DC OFFICE.**

48.   Plaintiff incorporates all of the above allegations in this cause of action.

49.   Under Federal Civil r ule 8, the constant tort injury notices to the defendant BOP staff filed by the plaintiff are now incorporated by reference, in the below detailed tort injury, daily FTCA evidence, in the plaintiff CIM staff, tort injury claims, in this suit. over 3000 tort injury claims, were filed under the CIM staff law reporting.

50.   Plaintiff incorporates by reference in this complaint, the defendants CIM BOP staff detailed plaintiff daily Tort injury claim evidence, filed from January 2002, to the docketing of this suit, in the over 3000, three thousand, CIM staff plaintiff evidence FTCA claims.

51.   **ABHE + SVOBODA, INC V. CHAO** 508 F.3d 1052, 1059, 378 US APP DC 355 (DC Cir 2007) authority affirms the instant plaintiff tort injury, in the over 3000 three thousand documented FTCA CIM BOP staff plaintiff injury claim tort notice(s), to the CIM staff, that are incorporated by reference, in this complaint. Showing the plaintiff daily detailed BOP CIM staff FTCA Constant tort injury.

52.   The defendants below named BOP respondeat superior CIM staff, were mandated to hold and maintain, the plaintiffs over 3000 three thousand FTCA filed tort CIM staff claim(s) tort injury notice(s), from January 2002, to the docketing of this suit. See the prison CIM staff law CIM 119 page manual, practice, customs, methods, and rules.

53.   The below named BOP staff were supervisors, who had actual direct tort injury participation, in the plaintiff FTCA CIM staff continuous tort doctrine injury, claims notices, by the named below Titled BOP staff, from January 2002, to the docketing of this suit in 2012.

54.   The below named BOP staff had tort injury notices claims, from January 2002, to the docketing of this suit, that the plaintiff did file in BOP law suits, discerned in the instant over 3000 three thousand FTCA documented plaintiff BOP tort staff injury noticed tort claims.

55.   Federal Law mandated and demanded that the below named
      BOP executive staff and unnamed BOP CIM staff, had to
      maintain, the plaintiffs over 3000 FTCA tort injury BOP
      staff tort injury notice(s),claims,of the constiouous
      tort doctrine, injury filed with the named below BOP staff
      by the plaintiff,

56.   The plaintiffs over 3000 three thousand documented prison CIM
      staff manual claims tort injury notice(s), discerns tort injury,
      the date, name of BOP staff,who caused the plaintiffs tortious
      injury conduct, that did **not cease**, from January 2002,to the
      docketing of this suit in 2012.

56(a) The plaintiffs post prison release tort injury claims, are
      joined in this complaint allegations.

57.   The continuous tort doctrine injury applies in this complaint
      based on the below named and unnamed BOP staff continuing
      tortious conduct, where no single incident can fairly be
      identified as the plaintiffs non stop BOP tort CIM staff injury
      from January 2002,to the docketing of this suit in 2012.

57(a) With the plaintiffs post prison tort injury claims, that are
      joined in this complaint allegations.

58.   **Discovery** in this suit, will be needed to show the detailed
      CIM staff tort injury points of fact, plaintiffs continuous
      tort doctrine staff CIM section injury from January 2002,to
      the docketing of this suit, that will fairly show what each
      named and unnamed below BOP CIM section staff performed daily,
      in the plaintiffs documented, over 3000 three thousand tort
      injury claim letters.

59.   The BOP staff named and unnamed below, were mandated and
      demanded under the BOP Plaintiff CIM staff law Manual **28 CFR
      524.70 et seq., CIM staff section Law,**that deleagated the
      BOP Washington, DC office respondeat superior staff CIM
      Assistant Director of correctional programs division, to be
      incharge of the plaintiffs CIM staff continous tort doctrine
      BOP staff tortious injury staff misconduct that damaged the
      plaintiff from January 2002,to the docketing of this suit.

60.   The following named and unnamed below BOP staff, and referenced
      BOP **job** staff Title(s), had actual direct tort injury
      participation, in the repeated plaintiff noticed claim CIM
      staff letters injury documents, from January 2002,to the
      docketing of this suit, at the BOP Washington, DC staff
      supervisors office venue in this suit time frame.

61.   Each BOP Director, including Ms. Hawk, Mr. Lappin, Mr.
      Samuels., Jr.

62.   Each BOP law CIM staff prison CIM staff manual section
      assistant director and the prison CIM staff section employee(s).

63.   Each BOP General counsel.

64.   Each BOP General counsel, with Attorney staff and associate
      BOP General counsel staff and Attorney staff with paralegal
      staff, in the BOP General counsel Washington, DC staff
      supervisor office venue.

65.   Each chief of the BOP Office of internal affairs, and staff,
      in the office of internal affairs, in the Washington, DC BOP
      staff office venue.

66.   Other BOP Assistant Directors, who were joined by the above
      named BOP Supervisor(s) staff, in the BOP Washington, DC staff
      office venue.

67.   All BOP office Washington, DC staff incharge of the inmate
      plaintiff restitution repaymants for the plaintiff.

68.   All BOP Attorney and paralegal staff, who participated in the
      plaintiffs over 3000 three thousand tort injury claim letters,
      documented tortious conduct BOP Noticed CIM staff, caused
      plaintiff tort injury, from January 2002, to the docketing of
      this suit

68(a) **Including the health care staff supervisor tort injury.**

69.   All other BOP Supervisor staff at the BOP Washington, DC staff
      office, that had notice, in plaintiff tort injury claims, and
      did participate, in the plaintiffs over 3000 three thousand,
      tort injury plaintiff claim letters, constant BOP tort injury
      CIM staff notice(s), from January 2002, to the suit docketing.

70.   The BOP Prison CIM Manual staff law demands, the higher level
      in monitoring of the plaintiff, at the BOP CIM section staff,
      at the Washington, DC CIM staff supervisor CIM section office,
      venue, in each of this complaint allegations, in the plaintiffs
      constant tort injury.

71.   The plaintiff presented **special CIM Staff section need(s),**
      under the prison CIM Manual staff law, that mandated the
      Washington, DC CIM supervisor staff named above, central DC
      office inmate plaintiff full time BOP CIM staff management,
      special monitoring, in the total time frame in this complaint.

72.   The plaintiff points of fact, in CIM staff law, in this
      complaint, demanded greater CIM staff BOP Washington, DC
      supervisor CIM staff manual effort monitoring plaintiff BOP
      Management CIM Law, in this complaint time frame, at the prison
      CIM section staff operations.

73.   The BOP CIM staff law manual assistant  CIM Director, in the time
      frame of this complaint, breached all of the duties of care owed
      the plaintiff, in each allegation, in this complaint, in the
      Washington, DC BOP CIM staff supervisor CIM section office
      venue.

9

74.   All of the above named BOP staff, breached all of the duties of
      care owed the plaintiff, under the BOP Prison CIM staff law
      section manual, in the entire time frame of this complaint.

74(A) See the CIM staff manual, customs, practice, methods, and rules,
      in the plaintiff CIM staff special monitor ing.

75.   The BOP Prison CIM staff section manual demanded, the plaintiffs
      special CIM staff monitoring, that was breached, in all of the
      duties of care, by all of the above named BOP staff, in this entire
      complaint, at the BOP Washington, DC staff supervisor office.

76.   The CIM staff prison law 28 CFR 524.76 et seq. staff manual,
      mandates that the BOP Washington, DC CIM staff supervisor office
      in the BOP prison CIM staff inmate manual monitoring section, can
      waive the statutory purpose in the prison litigationreform act
      plaintiff remedy exhaustions.

77.   The plaintiffs **multi Billion Dollar** tort injury restitution assets
      constructive trust, demanded the prison CIM staff CIM Manual
      staff section, special management undertaking, in the plaintiff
      BOP CIM staff monitoring need(s), by the above named BOP CIM staff,
      Supervisor(s), Washington, DC CIM staff section, in this entire
      complaint time frame.

78.   The above named BOP CIM staff, in the BOP Washington DC CIM staff
      office, knew that the plaintiff had filed over 1000, one thousand
      bop remedy claims exhaustion(s), regarding the details daily in
      the plaintiffs continuous tort doctrine plaintiff tort injuries,
      in this entire complaint time frame.

79.   The prison CIM staff manual, established the mandated plaintiffs(s)
      special CIM section staff monitoring oversight, 28 CFR 524.71 et
      seq responsibility at (c), whereby the plaintiff met the CIM
      staff manual mandate, under **28 CFR 524.72(c)**. et seq.

80.   The planitiff met the prison **special CIM staf manual monitoring
      staff need(s),** under the following CIM manual staff law 28 CFR
      524.72, at (c), set forth below.

81.   28 CFR 524.72 CIM staff law, manual mandates at (c);

      **BROAD PUBLICITY INMATES WHO HAVE RECEIVED WIDESPREAD PUBLICITY**

      **AS A RESULT OF THEIR CRIMINAL CASE.**

82.   The plaintiffs criminal case had National major **media** coverage
      discerned by the plaintiff(s) largest ponzi scheme in america
      at that time frame.

A.    Over 2000 two thousand media plaintiff national stories on TV,
      radio, and the printed published plaintiff media coverage
                  occurred in the plaintiffs criminal case time frame.

83. The plaintiff major **media** coverage, showed how the plaintiff took over and **saved, the New York Post News Paper,** from going out of business, in the palintiffs criminal case, time frame.

84. The plaintiffs criminal case major media coverage, had over **2000 two thousand national media stories, when the plaintiff and TFC, took control from** Bankers Trust, in all of the **New York Post Newspaper, Financing Loans. The plaintiff saved the New York Post Newspaper, from going out of business.**

85. The plainitff and TFC purchased all of the bankers trust, lines of credit, that financed the entire **New York Post Newspaper,** in the plaintiffs criminal case time frame.

86. The internet show(s) page(s), of the above major plaintiff CRIMINAL CASE MEDIA COVERAGE, IN THE THE PLAINTIFFS CRIMINAL CASE TIME FRAME.

87. The plaintiffs criminal case media coverage show(s), the plaint- iff and the plaintiffs partner ABE Hirshfeld selling, the New York Post Newspaper, to the Newscorp, and Rupert Murdoch, the current **New York Post Newpaper ownership.**

88. The prison CIM staff law manual staff monitoring, had the mandate in the plaintiff CIM staff law, 28 CFR 524,72 at (c), Broad Publicity inmates, that demanded the above BOP CIM staff law section staff, special full time CIM Monitoring, of the plaintiff, from the BOP Washington, DC CIM staff supervisor office, in this lawsuit time frame.

89. The plainitffs investment assets resitituion show(s) the plaintiffs ongoing ownership of the corporation named, New York Post Publi- shing Corporation.

90. The plaintiff did not sell his ownership in the corporate resitut- ion asset name **New York Post Publishing Corporation,** to **Rupert Murdoch at News Corp.,** when the plaintiff went to Federal prison. The New York state corporate records confirms same.

91. The plaintiff filed with the above named BOP General counsel and associate BOP General counsel staff, over 900 nine hundred, plaintiff tort injury claim letters, notices, showing each ongoing BOP staff in the tort injury, that the staff misconduct injury caused, the plaintiff ongoing, in this suit time frame.

91(a) The BOP General counsel and staff failed to stop, the plaintiff constant tort injury, with the 900 claims filed.

92. The plaintiff was held in BOP detention, from January 2002, to February 2008 at Devens prison. In breach of the BOP CIM staff constant tort injury CIM Manual rules, methods, customs, and plicy, special CIM staff section monitoring of the plaintiff.

93.     From March 2008 to the docketing of this suit, the plaintiff was
        held in BOP detention at the Fort Dix prison.  In breach the BOP
        CIM staff constant tort injury, CIM manual, rules, methods, coustoms,
        and policy, in the plaintiff special CIM monitoring.

94.     From January 2002, to the docketing of this case, the plaintiff
        filed constant CIM staff over 3000 three thousand BOP tort
        injury detailed tortious conduct plaintiff tort injury notice(s),
        claims, showing the constant BOP staff misconduct, discerned in
        this complaint allegations time frame.

94(a)   The CIM staff section failed to stop, the plaintiff constant
        tort injury.

95.     The prison CIM staff section manual demanded the BOP Washington,
        office CIM manual section staff, to maintain the plaintiff
        constant filed over 3000 three thousand detailed tort injury
        claim notices.

95(a)   Whereby the CIM section staff, failed to stop, the plaintiff
        constant tort injury, in the over 300 injury notices,

96.     The CIM staff manual cover(s), the BOP staff supervisor
        Washington, DC office CIM section staff methods, customs,
        practice, rules, that mandated the CIM special CIM staff
        monitoring, of the very high profile plaintiff. In this suit
        allegations.

97.     The CIM staff section manual, staff methods, coustoms, practice,
        rules, in the prison office in Washington, DC CIM Law staff section,
        shows the CIM staff section employees, breached in all of the
        duties of care, owned the plaintiff, under the mandate, in the
        prison CIM section staff special monitoring, CIM staff manual,
        in the plaintiff tort injury, in the time frame, of this complaint
        allegations.

98.     The CIM staff manual operations, are operated and located for
        the plaintiff, at the BOP Washington, DC staff office venue
        prison CIM staff manual section, for the entire plaintiff BOP
        detention, in this        COMPLAINT.

99.     The breach of all the duties of care owned the plaintiff, from
        January 2002, to this suit docketing, in 2012, shows constant
        tortious conduct, FTCA Plaintiff tort injury, at the BOP
        Washington, DC, supervisors, staff CIM staff section office.

100.    The prison CIM staff section, are mandated to follow the detailed
        CIM staff section manual, customs, methods, practice, rules, in
        the special constant monitoring, of the very high profile plaintiff.

100 A   That was breached in all duties of care non stop, from January
        2002, to the docketing of this suit. Causing the full time daily
        continuing tort injury breach, of all the duties of care, owed
        the plaintiff, by the defendant United States, at  only the
        BOP Washington DC staff CIM manual section, that operates, only
        from Washington DC venue.

101.   Each above and below allegation are joined in the continuous
       tort doctrine, plaintiff non stop tort injury caused at the CIM
       staff manual section CIM staff national operations, located at
       the BOP Washington, DC CIM staff sectionoffice, in the entire
       time frame of this complaint.

101(a) All CIM staff section operations, are located at the BOP
       Washington, DC staff office.

102.   The prison COM staff law section 119 page manual staff, are only
       based and located, at the BOP Washington, DC staff office venue,
       in this suit.

103.   The plaintiff filed over 250 two hundred and fifty plaintiff
       BOP staff tortious conduct tort injury notice(s), claim letters,
       at the **BOP Directors Office**, in Washington,DC office, in this suit
       allegations time frame.

104.   The plaintiff filed over **500** five hundred BOP staff tortious
       conduct tort injury notice(s), plaintiff claim letters, at the
       BOP office of internal affair, at the Washington, DC BOP staff
       operations venue, in the time frame of this suit allegations.

105.   The plaintiff over 3000 three thousand filed notice(s), in
       plaintiff claim CIM staff tort injury claim letters, show that
       each above named BOP Staff at the prison Washington, DC
       executive staff office, had ongoing constant personal
       knowledge, in the plaintiff(s) total BOP CIM staff, caused tort
       injury, in this entire suit time frame, in each of this complaint
       allegations.

106.   All of the over 3000 three thousand plaintiff CIM staff notice(s),
       in the continuous tort doctrine plaintiff tort injury, CIM staff
       claim letters, detailed each day, and location, and discerned, the
       BOP staff misconduct, tort injury, to the plaintiff. And over
       3000 three  thousand plaintiff tort injury claim letters, were
       mandated under the prison CIM staff law staff section, CIM staff
       manual, to be part in the CIM law staff continuous special
       high profile CIM staff manual special section monitoring, that
       was breached in the duties of care owed this plaintiff, in
       each complaint allegation.

107.   All of the FTCA breached duties of care owed the plaintiff,
       occurred at the BOP staff Washington, DC CIM staff office section
       authority, In this suit entire time frame. Under the **below** and
       above allegations.

       **2ND CAUSE OF ACTION IN THE PLAINTIFFS CONSTANT TORT INJURY**

       **CAUSED BY THE BOP WAHINGTON, DC CIM STAFF SECTION AND THE BOP**

       **WASHINGTON, DC EXECUTIVE STAFF WHO MADE THE PLAINTIFFS FILED**

       **OVER 3000 THREE THOUSAND TORT INJURY NOTICES CLAIM LETTERS**

**UNAVAILABLE FOR BOP EXHAUSTION IN THIS SUIT TIME FRAME IN**

**BREACH OF THE PRISON LITIGATION REFORM ACT.**

108. The plaintiff incorporates all of the above allegations in this cause of action.

109. The plaintiff claims he exhausted the end point BOP exhaustions, in the BOP staff making the plaintiffs exhaustions unavailable.

110. The plaintiff claims that the prison litigation Reform Act 42 USC 1997 eQ demanded, and mandated, that the plaintiff statutory right allowed the plaintiff to exhaust, the above over 3000 three thousand, plaintiff tort injury BOP exhaustions, in the time frame of this complaint.

111. The plaintiff claims that the defendant is demanded to **Concede**, that the plaintiff had the statutory right exhaust, the above over 3000 three thousand tort injury BOP remedy exhaustions, that were made **unavailable ongoing**, in the plaintiff demanded BOP staff unit team exhaustions(s), at Devens, and Fort Dix prisons, in this suit allegations.

112. Plaintiff claims(s) that the above named BOP Washington, DC CIM staff office section executive(s), decided to breach the duties of care owed the plaintiff, by making the plaintiffs demanded remedy exhaustion(s) in the plaintiff(s) over 3000 three thousand constant filed notice(s), tort injury claim letters in the plaintiff tort claims injury unavailable, under the BOP remedy exhaustion statutory purpose, at Fort Dix, and Deverns prisons, in this suit allegations.

113. Plaintiff demanded the unit team BOP staff at Devens, and Fort Dix prisons, to allow and make available to the plaintiff the BOP exhaustions, in over 3000 exhaustions, that were made unavailable, in the suit allegations.

114. Every plaintiff tort notice injury claim showing the BOP staff misconduct, in the plaintiffs filed over 3000 three thousand plaintiff BOP injury tort claim letters, notices, were demanded for BOP remedy exhaustion, at Devens, and Fort Dix prisons. By the plaintiff request to the unit team staff, ongoing fulltime in this suit allegations.

114(a) The CIM staff had filed constant tort injury claims, notices, saying the plaintiff exhaustions were unavailable.

115. Plaintiff claims that the BOP CIM staff, and Devens, and Fort Dix staff, acted in the constant **denied** statutory plaintiff right, in the plaintiffs demanded BOP remedy exhaustion(s), in the filed over 3000 three thousand, plaintiff filed tortious conduct, CIM staff tort injury claims, written notices, in this complaint.

116.    Plaintiff claims that the plaintiff filed repeated **notice(s)**, tort injury letters Devens, and Fort Dix prison, staff offices, and at the BOP North east staff regional office, and with the BOP Washington, DC staff office, by the plaintiff claim tort letters demanding the staff, to stop making the plaintiff BOP exhaustions unavailable, in this suit allegations.

117.    Plaintiff claims that the BOP northeast regional counsel Henry J. Sadowski, was requested to retire from his BOP employment in 2012, based on the allegations in this complaint.

118.    Plaintiff claims that the Fort Dix prison staff unit MRG. Richard Herbik, who was incharge of the plaintiff daily BOP detention from March 2008, to May 2011, reached the staff Mr. Herbik agreement with DOJ to plead guilty to crimes, based on the on the plaintiff filing of the tort injury claims, on the BOP staff unit Mgr. Richard Herbik, discerned below, non stop tort injury, BOP staff Mr. Herbik hate crimes, constant damage tort injury to the plaintiff.

119.    Plaintiff claims that the BOP are conducting their Fort Dix prison staff criminal staff investigations now, based on the plaintiffs allegations in this complaint.

120.    Plaintiff claims that the BOP staff above named BOP General counsel, and general counsel staff, did constant tort injury below, in the BOP staff continuous plaintiff tort injury, in the plaintiff allegations(s), in this complaint entire time frame.

121.    Plaintiff claims that in his Devens and Fort Dix entire prison detention, form January 2002 to the docketing of this suit, that the BOP Washington, DC General counsel, and General counsel staff had constant notices, in the plaintiffs demand to exhaust the over 3000, plaintiff tort injury claim letters, notices, under the prison litigation reform act, BOP exhaustions statutory purpose.

121(a) That were deprived non stop, in this suit time frame.

122.    Plaintiff claims that starting in January 2002, ongoing the plaintiff tort injury time frame occurred, up to the docketing of this suit in 2012.

122(a) That the BOP General counsel and General counsel staff decided to limit and restrict, the plaintiffs BOP remedy tort injury exhaustions, in the plaintiff constant demand for BOP Exhaustions.

123.    Plaintiff claims that the unit team staff at Devens and Fort Dix prisons, conceded to the plaintiff ongoing, that the plaintiffs demands in BOP exhaustions, were limited, and restricted, whereby the plaintiffs BOP exhaustions were deprived, made unavailable ongoing up to the docketing of this suit.

124.    Plaintiff claims that the BOP Fort Dix prison executive assistant

to Warden Zickefoose, named Mr. Jenkens, had some 10 ten conversations with the plaintiff in 2011 and 2012 ongoing, in each month.

125.   Therein the BOP executive staff Mr. Jenkens, confirmed to the plaintiff, that the BOP executive staff, in Washington, DC restricted, and limited, the plaintiffs constant demand, for BOP exhaustions, in the **exhibit 6 evidence, in this suit allegations.**

126.   Plaintiff claims that in April, May, June 2008, the Unit team BOP staff case Mgr. Ms. Adonas, at the Fort Dix building 5812, met with the plaintiff ongoing some 20 twenty times.

127.   Plaintiff claims in the above unit team fort dix staff meeting with the BOP unit case Mgr. Ms. Adonas, that staff Ms. Adonas, confirmed to the plaintiff, that the Fort Dix executive staff, did limit, and retrict, the plaintiffs demand for constant BOP Exhaustions.

127(a)  That made the over 3000 plaintiff demand for BOP Exhaustions un available.

128.   Plaintiff claims that the BOP exhaustion statutory mandate demanded that the plaintiff had the right to exhaust the the above over 3000 three thousand plaintiff filed BOP tort injury notices claim letters.

128(a)  That were impeded fulltime from January 2002, to this suit docketing BELOW,

129.   By BOP staff in the CIM Staff manual section, in the BOP Washignton, DC prison CIM staff section office, from BOP exhaustions in the plaintiff filed with the BOP Over 3000 three thousand, plaintiff tort injury claim letters, notices, in this suit entire allegations.

130.   Plaintiff claims that the Devens unit team staff at Devens prison under the unit Mgr. Mr. Collabro informed the plaintiff, that the BOP staff classified the plaintiff under the BOP discernment of constant exhaustion inmate filer. That demanded the staff to restrict the plaintiff tort injury exhaustions.

(a).    Plaintiff claims that the BOP unit team staff told the plaintiff ongoing, from January 2002, to February 2008, that the BOP staff would not allow the plaintiffs constant tort injury exhaustion(s), filing(s), fulltime, nonstop, that caused the unit team staff, constant deprivations, of the plaintiff demand tort injury, BOPSTAFF exhaustions.

131.   Plaintiff claims that the Devens unit team prison staff,
       told the plaintiff from January 2002 to February 2008, that
       the  plaintiff was classified under the unit team BOP staff
       exhaustion restriction, Title, as the BOP constant inmate
       exhaustion plaintiff problem.  That restricted the plaintiffs
       filing of the tort injury over 3000 exhaustion ongoing.

132.   Plaintiff claims that in the time frame of this complaint,
       the BOP CIM staff section, were liable in the plaintiffs
       constant tort injury, breach of the duties of care, restricting
       the plaintiffs demanded, BOP staff unit team exhaustions, in
       the plaintiff filed over 3000 tort injury, plaintiff tort LETTER
       injury claim notices.

132(a) Letters that CIM staff, breached the duties of care, by not
       stopping, the plaintiff constant unit team staff remedy
       obstruction.

133.   Plaintiff claims that the BOP unit team staff at Devens, and
       Fort Dix prison, both did confirm, to the plaintiff ongoing,
       that the BOP executive staff, in Washington, DC, set up, the
       custom, rule, method, to limit, prevent, the plaintiff constant
       demand on staff, in exhaustions.

134.   Plaintiff claims from January 2002, to the docketing in this
       suit, in 2012, the BOP confirmed in exhaustion number 657306,
       that the BOP CIM staff manual section operations, in the
       Washington, DC BOP CIM staff office venue, were incharge of
       the special oversight management, attention and special
       monitor ing, of the plaintiffs, constant BOP detention, in
       the **Exhibit 7 evidence**.

135.   Plaintiff claims that the BOP CIM staff manual section, were
       the mandated BOP oversight management incharge of the
       plaintiffs daily staff BOP special monitoring, in detention
       in the allegations in this suit.

136.   Plaintiff claims the BOP CIM staff manual section, breached
       the duties of care, that limited, restricted, and impeded,
       the plaintiffs constant staff demand at Devens, and Fort Dix
       prisons, whereby the plaintiff BOP exhaustions, in the
       plaintiff filed BOP over 3000 three thousand plaintiff tort
       injury claim letters, notices, were made unavailable, under
       the mandated BOP statutory exhaustion remedy purpose, that
       the plaintiff demanded fulltime, from January 2002 to this
       case docketing, on the unit team staff.

137.   Plaintiff claims he filed over 700 seven hundred sensitive
       ten BOP exhaustions, in the above constant plaintiff tort
       injury claim letters, time frame, whereby said over 700 seven
       hundred sensitive ten BOP plaintiff exhaustions, were mandated
       for the BOP CIM staff section special monitoring, of the plain-
       tiff.

137(a) The plaintiff demanded the BOP unit team staff exhaustions in
the plaintiffs ongoing tort injury claim letters, in the time
frame of this suit. Over 3000 plaintiff tort injury claim
notices, letters, in BOP exhaustions, were deprived nonstop.

138.   Plaintiff claims that in the entire time frame of this complaint,
the BOP unit team staff at Devens, and Fort Dix prison, with-
held, and restricted, from the plaintiff, the plaintiff
requested from the unit team staff, turnover, to the plaintiff,
of the BOP exhaustion forms, ongoing.

139.   Plaintiff claims that well settled BOP law shows, the BOP
staff unit teams, staff with-holding, and concealing from
the inmates, the BOP staff obstructed turn over to the inmates,
of the BOP Inmate requested exhaustion forms, on point, in
the staff misconduct, with the plaintiff.

140.   Plaintiff claims that the BOP executive staff, at both Devens
and Fort Dix prisons, engaged in the constant plaintiff
staff exhaustion obstruction scheme, in the entire time
frame, in this complaint allegations, above and below.

141.   Plaintiff claims that the above Devens and Fort Dix executive
staff exhaustion obstruction scheme, operated in the following
executive staff, method, practice, policy, custom, rule, in
the plaintiffs over 3000 tort injury exhaustions, in this
complaint time frame, that exhaustions, were made unavailable
fulltime, in every complaint allegation.

142.   Plaintiff claims that the BOP CIM staff manual section, breached
all of the duties of care, in the plaintiff filed following
BOP tort injury claim letters notices, from January 2002,
nonstop to this suit docketing.

143.   Over 700 seven hundred, plaintiff BOP filed sensive ten
exhaustions, in the constant plaintiff tort injury BOP claims
letter notices, were filed, at the BOP northeast regional
office.

144.   Plaintiff claims that over 3000 three thousand plaintiff
filed tort injury notice claim letters, were filed with the
BOP staff at Devens, Fort Dix, the BOP northeast Regional
office, and the BOP Washington, DC office CIM STAFF office.

145.   Plaintiff claims he filed over 900 nine hundred tort injury
notices claim letter, with the BOP General counsel office,
and support staff at the BOP Washington, DC office showing
the constant staff misconduct, with the plaintiff tort
injury, that damaged the plaintiff ongoing in this suit
allegations.

146.   Plaintiff claims that the BOP 119 page CIM staff manual, office,
Demanded the CIM staff section, full time daily special
monitoring, of the plaintiff in each allegation, in this
complaint.

146(a) That was the CIM staff breach of duties of care nonstop.

147.   Plaintiff claims that the BOP 119 page CIM staff manual,
       demanded the method, custom, rules, paractice, in the CIM
       staff section daily plaintiff special monitoring, that
       had to stop, the BOP staff constant tort injury, in the plain-
       tiff filed with the BOP staff over 3000 three thousand,
       contiuing plaintiff tort injury notices, claim letters,
       in this suit allegations.

147(a) Whereby the CIM staff section, Breached the duties of care,
       and did not stop, the plaintiff constant tort injury.

148.   Plaintiff claims that the BOP CIM staff section, breached
       the duties of care, in the plaintiffs constant filed with
       the BOP staff below over 3000 three thousand tort injury
       plaintiff notices, claim letters, in this complaint
       allegations.

148(a) Whereby the CIM staff section special monitoring of the
       plaintiff, failed to stop, the discerned constant plaintiff
       tort injury.

149.   Plaintiff claims that the BOP CIM manual staff section, had
       the following plaintiff exhaustions, showing points in the
       constant plaintiff tort injury, that prevented, impeded, and
       stopped, the plaintiffs BOP exhaustions unavailable nonstop.

150.   The plaintiff claims that the fort Dix prison Wardens staff
       executies operated the BOP remedy obstruction rejection
       scheme, that included the plaintiffs following rejected
       and obstructed BOP Wardens exhaustions, fulltime from March
       2008, to this complaint docketing.

151.   Plaintiff claims that he had constant tort injury claims,
       in the following obstructed and rejected Fort Dix Wardens
       prison staff plaintiff exhaustion numbers, in rejected
       exhaustions, staff misconduct.

151(a) 679349, 679353, 681018, 680283, 670970, 688778, 688768,
       669416, 689764, 661033, shows the constant staff misconduct
       at Fort Dix, in the Wardens office, constant illegal exhaustion
       rejections.

152.   Plaintiff claims that the above Wardens Fort Dix prison staff,
       remedy rejection obstruction scheme, _ ten exhaustion numbers,
       illegal Wardens remedy rejections, had over 150 one hundred
       and fifty, additional Wardens exhaustion(s), included the
       plaintiff remedy rejections, Wardens level plaintiff remedy
       claims, that were filed at the Wardens office, and rejected
       ongoing in years 2011, and 2012.

153.   Plaintiff claims that the above BOP Wardens staff Fort Dix
       remedy rejection scheme, had over 500 five hundred plaintiff

demanded BP-9 Wardens level exhaustions, that were obstructed from March 2008 to this suit docketing.

154.   Plaintiff claims that the following staff BOP plaintiff exhaustion claims, at the Devens prison, Wardens office, confirmed the plaintiffs constant tort injury staff misconduct, fulltime daily illegal staff activities, staff crimes, under BOP staff investigations.

155.   452020, F1, 45202 R1, 44920. , 445339, **445339** R1, 445344, 445344 R1, 452025, 452025 R1, 452025 A1, **445305, 445305** R1. All above plaintiff Wardens exhaustion BOP response said the staff misconduct in the plaintiffs filed exhaustion were under BOP investigation.

156.   Plaintiff claims that at Devens prison, from January 2002, to 2008, the plaintiff was prevented fulltime, from the plaintiffs demanded BOP exhaustions, by the unit team staff, and Wardens executive staff.

156(a)  Obstruction in exhaustion filing forms, and not processed filed exhaustion, with the Wardens.

157.   Plaintiff claims that at Devens prison, the United States Department of Justice, office of inspector General, Special Attorney Agent Thomas M. Hopkins, at the Boston Mass. US Attorneys office, in the Exhibit 8 evidence, did hire the plaintiff, to investigate, the Devens prison staff crimes, in 2006. **Further discerned below.**

158.   **Plaintiff claims that the evidence in Exhibit 8, shows the card from the United States Department of Justice, inspector Gereral Attorney Special Agent Thomas M. Hopkins,** that Mr. Hopkins handed to the plaintiff, when DOJ Hired the plaintiff to investigate, the BOP Devens staff crimes, in 2006. **Further discerned below.**

**3rd CAUSE OF ACTION SHOWING THE PLAINTIFF TORT INJURY CAUSED BY THE BOP STAFF AT THE CIM MANUAL STAFF SECTION UNDER THE CONTINUOUS TORT DOCTRINE THAT MUST BE INCORPORATED IN THIS COMPLAINT REFERENCE UNDER FEDERAL CIVIL RULE 8(2) IN THE PLAINTIFFS FILED WITH THE DEFENDANT UNITED STATES BOP STAFF BOP STAFF OVER 3000 THREE THOUSAND PLAINTIFF STATEMENT OF CLAIMS EVIDENCE TORT INJURY CLAIM NOTICE LETTERS, IN SUPPORT OF EACH CAUSE OF ACTION CLAIM IN THIS COMPLAINT SHOWING THE**

**DATE AND EACH TORT INJURY BOP STAFF MISCONDUCT IN THIS**

**COMPLAINT THAT MUST NOW BE INCLUDED IN THE PLAINTIFF**

**FILED TORT INJURY CLAIMS**

159.   Plaintiff incorporates all of the above allegations in this
       cause of action.

160.   The plaintiff filed with the named BOP staff over 3000 three
       thousand plaintiff constant tort injury statement of claims,
       by the plaintiff tort injury notices, claim letters, in this
       suit allegations.

161.   Each over 3000 three thousand plaintiff filed tort injury
       notices, statement of claims, shows the relief from the BOP *STAFF*
       constant tort injury, that the plaintiff was entitled to, in
       constant plaintiff tort injury damages.

162.   Each plaintiff filed over 3000 three thousand tort injury
       continuing claim letter notices, shows the named BOP staff,
       date of the tort injury, what the tort injury tortious conduct
       staff acted out, and location of the tort injury, point of
       fact, statement of plaintiff claims, in this suit allegations.

163.   Each plaintiff filed with the BOP staff over 3000, three
       thousand, plaintiff statement of claim, tort injury notices,
       claim letters, were mandated to be forwarded by each BOP staff
       served with the over 3000 plaintiff claims to the BOP CIM *OFFICE*
       staff Washington, DC staff *CIM* Manual section, under the 119 page
       CIM staff special monitoring manual, practice, method, rule
       of law.

164.   Plaintiff claims that the BOP central inmate monitoring CIM *OFFICE*
       staff manual section, had to follow the CIM staff manual
       119 pages, in customs, methods, practice, rule of law, in the
       CIM staff section special plaintiff monitoring, in the plaintiff
       filed BOP staff over 3000 plaintiff tort injury notices, claim
       letters, in this suit allegations.

164(a) That the CIM staff *OFFICE* section, breached the duties of care, in *NOT*
       stopping, the above plaintiff constant tort injury claims.

165.   Plaintiff claims that the *CIM* BOP staff office Washington, DC
       located CIM staff manual section, did breach the duties of
       care, with the plaintiffs continuing tort injury, filed plaintiff
       tort injury over 3000 notices claim letters, in this suit
       allegations.

166.   Plaintiff claims that this complaint, must incorporate all
       of the plaintiffs over 3000 three thousand, tort injury constant
       filed plaintiff tort injury notices, claim letters, in support
       of the joined complaint allegations, under federal civil rules *8*,

167.   Plaintiff claims that the law does not mandate the plaintiffs attachment, in this complaint, of the plaintiff over 3000 three thousand filed with the BOP named staff plaintiff tort injury notices, claim letters, that are joined, and part of this complaint allegations, under federal civil rule 8 et. seq.

168.   Plaintiff claims that the BOP staff named in the over plaintiff 3000 tort injury notices, claim letters, were served by the plaintiff, with the over 3000 three thousand tort injury notices, claim letters, ongoing, in this suit allegations.

169.   Plaintiff claims his wife Lisa Hoffenberg did serve, the BOP staff, with additional plaintiff tort injury constant notices, claim letters, that are joined in this complaint allegations, as evidence, under federal Civil Rules 8.

170.   Plaintiff claims the following BOP named staff, were served with the plaintiffs, constant over 3000 tort injury notices, claim letters.

171.   Plaintiff claims he did serve from January 2002, to February 2008, the following named BOP staff, at Devens prison, with the plaintiff tort injury notices, continuing plaintiff claim letters.

172.   Warden Winn, and Warden Sabol.

173.   The executive prison staff assisting Warden Winn and Warden Sabol including Captain Bollinger, Lt Duplesis, SIS Mr. Brown.

174.   The unit team staff counselors, case Mgr(s), and unit team Mgr(s).

175.   The investigative BOP staff section, in both Washington, DC and at Devens prison under the BOP office of internal affairs staff sections.

176.   The BOP northeast Regional office Director and counsel, with their support staff, from January 2002, to February 2008, when the plaintiff was held at the Devens prison.

177.   Plaintiff claims he did serve the following BOP staff, at Fort Dix prison, with the plaintiffs tort injury notices, claim letters, from March 2008, ongoing to this case docketing, in 2012.

178.   Warden Grondowsky, and Warden Zickefoose.

179.   The Warden Grondowsky and Warden Zickefoose, executive staff assisting both above named Wardens.

180.   The unit team staff that included the unit Mgr., case Mgr., and counselors.

181. The BOP northeast Regional Director, and counsel, with support staff, from March 2008 to this case docketing in 2012.

182. The Fort Dix prison staff attorneys Ms. Clark, and Ms. McFarland.

183. The Fort Dix prison staff paralegal named Tara Moran.

184. Plaintiff claims that the Federal Civil Rule 8, in parts, mandates,    the BOP staff over 3000 three thousand plaintiff tort injury constant notices, tort claim letters, are evidence, in this complaint allegations, that are joined in the plaintiffs continuing tort injury, from January 2002, to this suit docketing, in this complaint allegations.

185. Plaintiff claims that over 700 seven hundred sensitive ten exhaustions evidence, tort injury claims, attached and joined in the allegations in this complaint, was served on the BOP Regional Northeast Directors office, at Phila, PA 19106, located in the US customs house, in this suit allegtions, and are now evidence, against the defendant United States.

186. Plaintiff claims that the above over 700 seven hundred tort injury filed sensitive ten remedy claims evidence, BOP documents, were mandated under the central inmate monitoring office CIM staff section 119 page manual, to be sent from the BOP Northeast Regional Directors Phila, PA office, to the BOP Washington DC office central inmate monitoring staff section office manual, in order to stop, the plaintiffs constant tort injury, in the filed exhaustions, in this complaint allegations.

187. Plaintiff claims that all of the plaintiffs filed BOP exhaustions, must be incorporated evidence, that are held by the named BOP staff, and joined consolidated, in the allegations, in the instant complaint, under the plaintiff tort injury, in the continuous tort doctrine, whereby each plaintiff filed BOP exhaustion, discerns the plaintiff tort injury, staff misconduct, and  staff location, and staff misconduct time frame, in the complaint allegations, under Federal Civil Rules 8.

188. Plaintiff claims the named BOP staff in this complaint are holding over 4000 four thousand documents, showing the plaintiffs constant tort injury, and discerned BOP staff misconduct, with staff misconduct location, and time frame, that must be consolidated, and incorporated evidence, in support of each allegation, in this complaint, under Federal Civil Rule 8.

189. Plaintiff claims that the over 4000 four thousand plaintiff BOP tort injury documents, showing the constant discerned tort injury staff misconduct, in this complaint allegations, were mandated under the 119 page CIM staff section manual, office practice, customs, methods, rule of law, to be forwarded

to the CIM staff section office in Washington, DC in order to stop the plaintiffs constant tort injury, in this complaint allegations.

189(a) The above 4000 plaintiff tort injury BOP claims are all now evidence in the complaint allegations.

**4TH CAUSE OF ACTION SHOWING THE PLAINTIFF TORT INJURY UNDER THE BOP NAMED STAFF CONTINUOUS TORT DOCTRINE TORTIOUS CONDUCT CAUSING CONSTANT TORT DAMAGES AND INJURY IN THE PLAINTIFFS TFC CONSTRUCTIVE TRUST MAJOR RESTITUTION ASSET DAMAGES IN OVER $20 BILLION DOLLARS THAT THE DEFENDANT MUST NOW PAY TO THE PLAINTIFFS OVER 200,000 TFC RESTITUTION WALL STREET INVESTOR TFC VICTIMS THAT INCLUDE STATE PENSION FUND VICTIMS AND TFC SHARE HOLERS**

190. Plaintiff incorporates all of the above allegations in this cause of action.

191. The NYS constructive trust law, must apply in the plaintiffs constant tort injury discerned in this complaint regarding the plaintiffs TFC continuous constructive trust damages, tort injury caused by the named BOP staff in this complaint.

192. In the entire time frame in this complaint January 2002, to to the suit docketing in 2012, the plaintiff claims he was acting daily full time, under the mandated TFC constructive trust points of fact and law. In the plaintiffs court ordered financial obligations, TFC multi Billion Dollar restitution owed to all of the TFC victims.

193. The evidence in **Exhibits 1, 2, 3, 4,** show(s) the plaintiffs very high profile, major multi Billion Dollar corporate Wall Street TFC plaintiffs business history introduction.

194. Towers Financial Corporation TFC, in the evidence **Exhibits 1, 2, 3, 4,** shows the plaintiff started TFC at the TFC inception in year 1975.

195. Plaintiff formed TFC at inception in the year 1975, whereby the plaintiff did control all of the TFC stock, up to the time in 1986, when TFC became the Wall Street Public Corporation in 1986, in the evidence in Exhibit 4.

196. TFC MERGED Operating public corporation, OJ COnsultiong, Corp., that the plaintiff took over ownership in, the OJ Consulting public stock, in professional business brokers inc, that was owned by the Hoffenberg family trust.

197.    Professional Business brokers,Inc,hereinafter **PBB, in 1986, did**
        take over, the public trading stock corporation, OJ Consulting
        Corp., that in 1986,Consolidated all of the TFC plaintiff
        business operations, in the public Wall Street Trading Corportion,
        TFC institution, controlled stock ownership, by the HOffenberg
        family trust, via the PBB Corporate ownership.

198.    The United States securities and exchange commission, has the
        major TFC Public, and private securities filings, in the plaintiff
        tfc multi Billion Dollar constructive trust, in this complaint,
        constant tort injury, by the BOP staff misconduct.

199.    The TFC plaintiff constructive trust law, are joined in the
        BOP staff restitution statutes law, in the exhibit 9 evidence.

200.    The evidence in exhibit 9, shows the statutory mandate, in the
        BOP restitution points of fact, and law, under the plaintiffs
        major TFC Constructive trust, constant tort injury, cased by the
        named BOP staff, in this complaint allegations.

201.    The evidence in exhibit 9, is named, the BOP Financial responsibity
        Policy for inmates, number 5380.08.

202.    The evidence in exhibit 9, the BOP inmate Financial responsibility
        program number 5380.08, operates under the following BOP
        inmate victims restitution statutory purpose.

203.    The victim and witness protection act of 1984.

204.    The victims of crime act of 1984.

205.    The comprehensive crime control act of 1984.

206.    The Federal debt collection procedures act of 1990.

207     The statutory mandate established for the named BOP staff scope
        of employment, in acting with the plaintiff in this complaint,
        demands, the **diligent effort,**on the part of law enforcement
        staff agencies, to collect court ordered financial obligations,
        in this complaint allegations.

208.    The below well settled law mandate, burden, in the named BOP
        staff constant tort injury to the plaintiff, in this complaint,
        shows the following BOP staff, scope of employment requirement,
        with the plaintiffs, major multi Billion Dollar TFC constructive
        trust, in the entire time frame of this complaint allegations.

209.    **US VS. Phillips,** 303 f.3d 548 (5th Cir. 2002), at page 551, that
        was reaffirmed, in all of the United States Federal appeals
        courts, in the below opinion mandate.

210.    **US V. Phillips,** 303 F.3d at page 551 mandates the follwoing
        **points, in the named BOP staff scope of employment activities,**
        **with the plaintiff.**

210(a)  **US V. Phillips,** 303 F.3d at page 551, 18 USC 3812(c) Congress

**Directed the Attorney General, to Aggressicely** enforce restitution orders, with the intent, that the department of justice, would commit the resources necessary to ensure that the rights of victims are enforced.

211.   Plaintiff claims each named BOP staff member in this complaint, were bound in the scope of employment points, non discretionary behavior, with the plaintiff, Under the above **US V. Phillips,** 303 f.3d at page 551, BOP staff points, mandated constant activities, with the plaintiff.

212.   Plaintiff claims that the law, in the prison CIM staff manual *OFFICE* section activities, demanded that each CIM prison staff section person, was bound under, the above **US V. Phillips,** 303 F.3d at page 551, points in activities, with the plaintiff, in this entire complaint allegations time frame, in the CIM staff manual section, special monitoring of the plaintiff, in BOP detention, in the plaintiff constant tort injury, in this complaint allegations.

213.   Plaintiff claims that the prison CIM sections staff manual *OFFICE,* BOP employees, at the BOP Washington, DC staff CIM office, breached the duties of care, under the restitution plaintiff mandated BOP statutory law, in **US V. Phillips,** 303 F.3d at page 551, discerned above, in entire time frame of this complaint, allegations, causing the plaintiffs constant tort injury damages, in the over $20 Billion Dollar plaintiff constructive trust.

214.   Plaintiff claims that the BOP General Counsel, including the BOP General counsel staff attorneys, at the BOP Washington, DC office, were respondeat superior, BOP staff, with actual direct participation, with the BOP CIM staff, failing to remedy, the constant plaintiff tort injury damages, in the continous tort doctrine, BOP CIM staff continious tort doctrine, BOP CIM staff *OFFICE* tortious conduct, under the law, in **US V. PHillips,** 303 F.3d at page 551 above.

215.   Plaintiff claims each BOP restitution statutes named on the BOP restitution policy cover page in the exhibit 9 evidence, demanded each named BOP staff employee, in this complaint, to comply in the BOP Staff scope of employment activities, and participation with the plaintiffs over 4000 four thousand filed BOP plaintiff constant tort injury notices, claim letters, and BOP exhaustion claims, whereby each named BOP staff, in this complaint, did breach the duties of care, under the BOP restitution statutory mandate, causing the plaintiff constant tort injury damages, in this complaint $ 20● Billion Dollar plaintiff constructive trust, constant BOP staff damages.

216.   Plaintiff claims that in the entire time frame of this complaint allegations, January 2002, to this suit docketing in 2012, that the plaintiff was bound under the New York constructive trust restitution law, in the plaintiff $20 Billion Dollar constructive trust, constant BOP staff tort injury.

217.   Plaintiff invokes the courts authority in this complaint under

the well settled New York law in constructive trust.

218.   Plaintiff claims that the evidence in exhibit 4, the TFC $1\frac{1}{2}$ Billion Dollar depositing national collection agency and factor, plaintiffs controlling stock ownership, invokes the New York York constructive trust law, in this complaint allegations.

219.   Plaintiff claims that the exhibit 4 evidence showing the TFC $1\frac{1}{2}$ Billion Dollar depositing national collection agency and factor, discerns the TFC Introduction, in the over $675 Six hundred and seventy five Million Dollars'^, securities sold to the TFC wall Street investor victims, securities owners, under the New Yok constructive trust law, in this complaint, in the plaintiffs damaged by BOP staff, $20 Billion Dollar constructive trust.

220.   Plaintiff claims that the following constructive trust law, points dicerns, the plaintiffs constant activities, with all of the TFC owners in securities since 1986, in the plaintiffs continuous constructive trust mandate up to this suit docketing in 2012.

221.   The plaintiff claims the New York constructive trust points of fact and law, are the plaintiffs binding authority, in the following constructive trust law points elements, in this entire complaint, allegations, regarding the TFC and plaintiff restitution investor victims constructive trust, constant BOP staff tort injury.

222(1) The plaintiff did benefit in the TFC restitution victims assets.

223(2) Said plaintiffs above and below benefits, were at the expense of the plaintiffs restitution victims in the TFC exhitbit 1, 2, 3, 4, evidence.

224(3) That equity and good conscience, required the plaintiffs full time victims restitution in the plaintiffs major constructive trust assets in the evidence in **Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9.**

225(4) The plaintiff had full time continuous unjust enrichment, in the constant plaintiff restitution victims constructive trust assets.

226(5) Plaintiff had the fulltime constructive trust restitution assets Title, that were the equity law benefits, for the plaintiff constructive trust turnover, and collection consideration, for the plaintiffs restitution victims.

227(6) Plaintiff was the collection expert fulltime, in the vital information, evidence, understanding under the New York constructive trust law, assets, that equity mandated had to benefit the plaintiffs restitution victims.

228(7) The BOP restitution statutes, on the cover page, in the BOP restitution statutory evidence policy in the exhibit 9 BOP statutory evidence, demanded the BOP staff named in this complaint, had to comply, in the staff scope of employment, under the above settled law ponts, in us v. pHillips 303 F.3d at page 551, in the plaintiffs constructive trust New York law restitution assets, in the entire time frame of this complaints allegations, in the plaintiffs restitution law points, victims mandated BOP staff activities, with the plaintiff fulltime non stop, in the BOP plaintiff detention, from January 2002, to this suit docketing in 2012.

229. Plaintiff claims he filed with the BOP staff named in this compliant, the following plaintiff tort injury claims, in this complaint time frame allegations.

230. Over 3000 three thousand plaintiff tort injury notices claim letters.

231. Over 1000 one thousand BOP tort injury exhaustion claims.

232. The BOP General counsel and BOP General counsel staff had over **900 nine hundred Plaintiff filed tort injury notices claim letters.**

233. Over **700 seven hundred** plaintiff tort injury, filed BOP exhaustions, under the BOP sensitive ten discernment notices.

234 Over **500 five hundred** plaintiff filed plaintiff tort injury notices, claim letters, with the BOP Washington, DC staff office of internal affairs.

235. Over 250 two hundred *Fifty* plaintiff BOP tort injury claim notices, letters, filed with the BOP Directors office, in the Washington, DC, BOP executive staff venue.

236. The defendant United States, BOP staff named in this complaint allegations, were served by the plaintiff, in this complaint time frame, with the above plaintiff tort injury evidence .

**5TH CAUSE OF ACTION SHOWING CONSTANT TORT INJURY IN THE PLAINTIFF CONSTRUCTIVE TRUST DAMAGED ASSETS OVER $20 BILLION DOLLARS IN THE BOP STAFF CONTINUOUS TORT DOCTRINE TORT INJURY WHEREBY THE BOP STAFF TORTIOUS CONDUCT NEVER CEASED IN THE PLAINTIFF CONSTRUCTIVE TRUST CONSTANT BOP STAFF TORT INJURY FROM JANUARY 2002 TO THIS SUIT DOCKETING IN 2012 AND THEREAFTER PLAINTIFF POST PRISON RELEASE TORT INJURY FROM THIS COMPLAINT ALLEGATIONS IN THE PLAINTIFF $20 BILLION DOLLAR RESTITUTION ASSET CONSTRUCTIVE TRUST**

ATTORNEY CLIENT

INMATE LEGAL CALLS

28 CFR
540.103

The Warden may not apply frequency limitations on inmate telephone calls to attorneys when an inmate demonstrates regular correspondence, visiting, or normal telephone use is inadequate. 28 CFR § 540.103.

ALL COMPLEX ATTORNEY CLIENT INMATE LEGAL CALLS, INVOLVING ONE BILLION DOLLAR RESTITUTION, → DENIED, ONGOING.

EXHIBIT 8

237.   Plaintiff incorporates all of the above allegations in this cause of action.

238.   The defendant United States have personal knowledge by DOJ executive staff, direct actual participation, in the DOJ staff activities, with the BOP named staff above, at the BOP staff Washington, DC staff office venue, in the          staff Sof office venue, in the plaintiffs evidence, in the **exhibits 1, 2, 3, 4, 9.**

239.   The evidence in **exhibits 1, 2, 3, 4, 9, makes the introduction in the plaintiff $9Billion Dollars constructive trust assets,** with the Billionaire Jeff Epstein partnership, in the plaintiffs ongoing $80 Billion Dollar world wide Hedge Fund operations, at the time of the plaintiff in BOP detention, In this cause or action.

240.   The defendant United states BOP staff named in this complaint, are holding the plaintiffs criminal case judgment, in the plaintiff BOP records, regarding the plaintiffs CIM staff section manual activities, special monitoring, by the CIM staff section, of the plaintiff, in all of the allegations in this complaint.

241.   The plaintiff claims that the CIM staff manual section, at 28 CFR 524.72 heading (c) demanded the named BOP staff below activities.

242.   The plaintiff claims that the CIM staff section special monitoring of the plaintiff, did include the CIM Law mandated points under the law 28 CFR 524.72 heading letter (c), mandating the following BOP CIM staff section documention, regarding the plaintiff special CIM staff section monitoring, in this cause of action.

243.   28 CFR 524.72 CIM staff section law at heading (c), shows the following, broad publicity inmates, who have received widespread publicity, as the result of their criminal activity or notoreety as public figures.

243(a) The above CIM staff law, applies to the plaintiff in this complaint.

244.   Plaintiff claims the defendant United States named above BOP staff CIM staff section, plaintiff BOP documents, ~~shows the plaintiff $ 20 Billion Dollar~~, shows the plaintiff $ 20 Billion Dollar constructive trust assets, with the plaintiffs partner, the Billionaire Jeff Epstein in this cause of action.

245.   Plaintiff claims that the BOP CIM staff section documents, shows the palintiff criminal case judgment, that includes the charges in the plaintiff funding of the $20 Billion Dollar constructive trust Hedge Fund assets, by the plaintiff and his billionaire partner Jeff epstein, over $80 Billion Dollar Hedge Fund world wide ongoing operations, in the evidence in **exhibit 1, 2, 3, 4, 9, In this cause of action.**

246.   Plaintiff claims that the defendant United States DOJ staff, have
actual direct documents, showing the plaintiff and the Billionaire
Jeff Epstein, $20 Billion Dollar world wide Hedge Fund ongoing
operations, in the evidence exhibit 1, 2, 3, 4, 9, DOJ defendant
materials, held by the United States staff.

247.   The plaintiff claims that the defendant United States DOJ staff,
have taken evidence, documents, records, e-mails, wore taps, and
all kinds of other joined related papers, and recordings, showing
the plaintiff, and the Billionaire Jeff Epstein, $80 Billion Dollar
Hedge Fund world wide ongoing operations, in the evidence, in
exhibits 1, 2, 3, 4, 9.

247(a) The above materials shows the plaintiff points in the damaged $20
Billion Dollar Hedge Fund at bar.

248.   Plaintiff claims that the defendant United States DOJ staff, have
personal knowledge, and actual direct participation, in the
evidence exhibit 1, 2, 3, 4, 9.  That shows the plaintiffs points
in the $ 20 Billion Dollar plaintiff tort injury constructive
trust assets, that had the constant BOP staff caused tort injury,
in this complaint allegations, and this cause of action.

249.   The plaintiff claims that the defendant DOJ United States staff,
have removed from the BOP, staff, taken control of the above named
BOP staff evidence, in this complaint, records, evidence, tapes,
e-mails, papers, in the plaintiff tort injury evidence, in the
exhibits 1, 2, 3, 4, 9. showing the plaintiff $20 Billion Dollar
constructive trust assets, tort injury, that are joined in the
plaintiff ongoing partnership, with the Billionaire Jeff Epstein,
$80 Billion Dollar ongoing world wide Hedge fund operations, in
this cause of action, and complaint.

250.   The plaintiff claim that all of the above named BOP executives,
and the discerned BOP staff in the BOP staff CIM section office,
located only at the BOP Washington DC staff office, from January
2002, to this case docketing in 2012, breached all of the duties
of care, with the evidence exhibit 1,2,3,4,9, intent, under the BOP
Statutory restitution BOP cover page, listed following restitution
BOP statutes, in the evidence in exhibit 9, BOP restitution cover
page policy number 5380.08. In this cause of action.

251.   Plaintiff claims that the above named BOP executive staff, named
includes the above BOP staff named Titles, with the BOP CIM staff
section, located only at the BOP Washington DC staff office, did
the constant January 2002, to this case docketing, breach of all
the duties of care, owed the plaintiff, in the following retitution
exhibit 9 evidence, BOP cover page statutory policy purpose. In
this cause of action.

252.   The breach of all the duties of care, in the above paragraph, by
the BOP staff, at the BOP Washington DC CIM staff office, in the
following BOP restitution policy, listed named below, BOP
restitution statutes, in the evidence in exhibit 9, caused the
plaintiff continuing CIM staff tort injury.

(A). The victims and witness protection act of 1982.

(B). The victims of crime act of 1984.

(C). The comprehensive crime control act of 1984.

(D). The Federal debt collection procedures act of 1990.

253. The plaintiff claims that the allegations in this complaint C/M staff tort injury, at the CIM staff office, in the plaintiffs restitution **Exhibit 9** evidence, BOP restitution statutory intent, are joined in the constant BOP CIM staff tort injury, in the plaintiffs $20 Billion Dollar restitution constructive trust, damaged by the BOP CIM staff, in this complaint, from January 2002, to this suit docketing, further discerned below, in this complaint, and in this cause of action, nonstop constant CIM staff tort injury.

6TH CAUSE OF ACTION SHOWING THE PLAINTIFF CONTINUOUS TORT

DOCTRINE TORT INJURY BY THE CIM SECTION STAFF AND GENERAL

COUNSEL STAFF BREACH OF ALL    THE DUTIES OF CARE THAT CAUSED

THE TORT INJURY IN THE PLAINTIFF$20 Billion Dollar restitution

assets constructive trust non stop from JANUARY 2002 TO THIS

SUIT DOCKETING IN 2012 IN THE BOP EVIDENCE BELOW DOCUMENTS IN

TORT INJURY UNDER THE CONTINUOUS TORT DOCTRINE DISCERNED

BELOW AT THE CIM STAFF OFFICE

254. **The plaintiff incorporates all of the above allegations in this cause of action.**

255. The following are BOP documents evidence, in the above 6th cause of action, constant BOP General counsel, and CIM staff section tort injury.

256. The following BOP documents are evidence, that joins the BOP evidence in exhibit 9 the BOP restitution statutory intent, and purpose, in the plaintiffs constant above 6th cause of action tort injury, showing the BOP CIM staff section, joined with the BOP Washington DC General counsel staff, breach of all the duties of care, in the plaintiffs $20 Billion Dollar restitution constructive trust, by the BOP staff, below contininous tort doctrine, BOP  staff tort injury, at the CIM staff office, in the Washington, DC BOP staff office, non stop tort injury, in this complaint, and this cause of action.

257. The evidence in the exhibit 10 BOP exhaustion response, and plaintiff claim in the end point remedy restitution constructive

trust, above 6th cause of action, constant BOP staff tort injury,
in the BOP exhaustion number 654698 A1, in the BOP Washington
DC staff response, in the exhaustion, prepared by the BOP General
counsel staff attorney, who signed the remedy response, by three
letters, at the end of the wording in the right response, page
last line, after the wording national inmate appeals, then
attorney three letters, who prepared the above BOP evidence
exhaustion response, dated May 29, 2012, in the constant tort
injury, in this complaint, and this cause of action.

258.  The evidence in exhibit 10, the BOP Prepared document violated,
the BOP exhibit 9 evidence, BOP restitution statutory mandate,
in constant BOP staff tort injury.

259.  The evidence in the above exhibit 10 BOP exhaustion, dated May
29, 2012, shows the constant BOP staff violations tort injury, in
the BOP restitution statutory purpose, and intent, in the BOP
evidence in the exhibit 9, BOP restitution statutory purpose
evidence, in this 6th cause of action, constant plaintiff tort
injury, caused by the BOP CIM section, staff, breach in all the
duties of care, joined with the BOP General counsel staff, breach
in all the duties of care ongoing, in the BOP restitution statutes
in the BOP evidence in exhibit 9, constant below discerned,
plaintiff tort injury, evidence documents.

260.  The plaintiff claims that the following evidence shows the same
on point, BOP staff tort injury, in the constant breach of all
the duties of care, in the above paragraph, plaintiff tort injury,
that shows the constant BOP staff below breach in all the duties
of care, by violations, in the BOP restitution statutes, caused
by the CIM staff, in this entire complaint, and this cause of
action.

261.  The plaintiff claims that the BOP CIM staff constant tort injury,
shows the failure to comply with, the BOP evidence in exhibit
9, the BOP restitution statutory purpose, and intent, with the
plaintiff non stop, in this complaint, and this cause of action.

262.  The plaintiff claims that the CIM staff BOP evidence in exhibit
10, plaintiff remedy records, shows the continuous tort doctrine
BOP COIM staff tort injury, in the below BOP evidence, that the
CIM staff, failed to comply with, non stop, in the BOP Ehibit 9
evidence, restitution statutory purpose, from January 2002,
ongoing, this suit docketing in 2012.

263.  The plaintiff claims that the evidence in the BOP document
exhibit 10, shows that from January 2002, to this suit docketing,
the CIM staff, and BOP unit team staff, incharge of the plaintiffs
constant BOP detention, at both Devens, and Fort Dix prisons,
failed to follow, and comply, with, the BOP restitution statutory
intent, in the BOP evidence in exhibit 9, in the second paragraph,
mandating the CIM BOP staff, diligent restitution collection
effort, with the plaintiff,      in this complaint, and this cause
of action, CIM staff constant tort injury.

263. The plaintiff claims that the BOP constant CIM staff tort injury, in the exhibit 10 BOP evidence, shows the BOP CIM staff constant evidence in tort injury, charged in the exhibit 10 remedy, plaintiff claim, showing on August 29, 2011, the Fort Dix BOP unit team staff case manager, Ms A. Haney, and the BOP Unit team staff were <u>not bound,</u> in following the BOP restitution <u>statutory intent</u>, and <u>purpose,</u> in the BOP evidence exhibit 9 restitution <u>statutes,</u> that caused the plaintiffs constant tort injury, in the 6th cause of action, and in this entire complaint time frame, with all of the BOP CIM staff tort injury.

264. The plaintiff claims that the BOP evidence in exhibit 10, are joined and attached in the plaintiffs 2011, and 2012, BOP Exhaustions, in the same remedy number 654698, filed with the FFort Dix Warden Zickefoose, and thereafter, the BOP Northeast Regional Director, whereby each above constant BOP exhaustion, in the three exhaustion responses, each failed to follow, and comply, with the BOP evidence in exhibit 9, the BOP restitution <u>statutory intent,</u> and <u>purpose,</u> that caused the plaintiffs <u>constant CIM staff tort injury,</u> in this 6th cause of action, in *This* suit, entire time *FRAME*.

265. The evidence exhibit 11 dated September 12, 2008, by the Fort Dix prison Warden Grondolsky, letter written to the plaintiffs attorney R Lawrence Barbuto, shows the on point 6th cause of action, plaointiff constant CIM staff tort injury, staff failing to follow, and comply with, the BOP evidence, in exhibit 9 the BOP restitution <u>statutory intent</u> and <u>purpose,</u> in this entire complaint, continuing CIM staff tort injury.

266. The plaintiff claims that the following BOP evidence documents, shows the BOP CIM staff continuous tort doctrine, plaintiff tort injury, on point, in the above paragraph, in this complaint entire time frame allegations.

267. The evidence exhibit 12, the August 31, 2001 letter by the BOP General counsel Christopher Erlewine written to the US Senator Charles E. Schumer.

268. The evidence exhibit 13 the February 6, 2001 letter by the bop general counsel Christopher Erlewine written to the US Senator Charles E. Schumer.

269. THe evidence exhibit 14 the September 12, 2001 letter by the BOP Warden John Nash, written to the plaintiffs attorney Gary H. Baise.

270. The evidence in exhibit 15 the May 23, 2000 letter by the BOP General counsel Christopher Erlewine written to the plaintiffs Attorney Michael Formica.

271. The evidence in exhibit 16 the September 29, 2000 letter by the BOP General counsel Christopher Erlewine written to the US Congressman Paul Kanjorski.

272. The evidence in exhibit 17 the September 13, 2000 letter by
the BOP General counsel Christopher Erlewine written to the
US Congresswoman Carolyn Maloney.

273. The evidence in exhibit 18 the April 4, 2000 letter by the BOP
General counsel Christopher Erlwine written to the plaintiffs
restitution victim William Burnside.

274. The evidence exhibit 19 the April 18, 2008 letter by the
plaintiff attorney R. Lawrence Barbuto written to the Fort Dix
prison attorney Nicole McFarland.

275. The evidence exhibit 20 the September 23, 2008 letter by the
plaintiffs attorney R. Lawrence Barbuto written to the Fort
Dix Warden Grondolsky.

276. The evidence exhibit 21 the October 17, 2008 letter by the
plaintiff law firm mintz and Fraade written to the Fort Dix
prison Attorney Nicole McFarland.

277. The plaintiff claims that the above evidence exhibits, are
charged under the continuous tort doctrine, plaintiff non stop
BOP CIM staff tort injury, that this lawsuit discovery,
will show, are joined and attached, in the above plaintiff
constant tort injury, in this 6th cause of action, and
addegations against, the constant CIM staff tort injury.

278. The plaintiff claims that the BOP CIM staff section, joined with
the BOP General counsel staff office, are holding over 200 two
hundred, third party evidence letters, written by US GOvernment
executive officials, attorneys, law firms, for and from the
plaintiffs restitution victims, in making claims, in the BOP
CIM Staff constant tort injury, in this 6th cause of action.

279. the palintiff claims that he filed over 2000 two thousand tort
injury BOP staff continuous tort doctrine tortious conduct
plaintiffs notices claim letters, and BOP exhaustions, showing
the plaintiff constant BOP CIM staff tort injury, in the 6th
cause of action.

280. The plaintiff claims that the extraordinary egregious BOP staff
msiconduct, in the evidence above exhibits 12, 13, 14, 15, 16,
17, 18, caused the BOP CIM staff, continuous tort doctrne, non stop
tort injury, in the 6th cause of action.

281. Whereby the BOP General counsel staff, joined with the BOP CIM
staff office section, breached all the duties of care, in the BOP
evidence **exhibit 9** restitution statutory, prevented intent, and
purpose, in this entire complaint time frame.

282. The plaintiff claims that the US Court of appeals rulings, that
have authority, in this district court, shows repeated appeals,
court opinions, in the above BOP staff, method, custom, practice,
constant, BOP staff, extraordinary, egregious, staff misconduct.

283. The plaintiff claims that this district court, did issue opinions, in the above BOP staff, extraordinary, egregious, staff misconduct, that are the Same type of staff misconduct, in the plaintiffs BOP staff constant tort injury, in that entire complaint allegations, caused in the BOP CIM staff misconduct tort injury, in the BOP Documented evidence above, in the exhibits 12, 13, 14, 15, 16, 17, 18, 19, 21,

284. The plaintiff claims that the BOP staff extraordinary, egregious, constant tort injury, staff misconduct, that are recorded in, the evidence exhibit 12, 13, 14, 15, 16, 17, 18, are the CIM BOP staff, methods, customs, practice, rules, policy, in treating the plaintiff, other BOP inmates.

285. The plaintiff claims that the defendant United States department of Justice, hereinafter DOJ, allows the BOP CIM staff misconduct, in the evidence **Exhibits 12, 13, 14, 15, 16, 17, 18,** that are the BOP CIM staff, office, method, customs, practice, rules, policy, used against the plaintiff, in the plaintiffs constant BOP CIM staff tort injury, by the CIM staff scetion, in this cause of action tort injury.

286. The plaintiff claims he filed over 3000 three thousand constant tort injury notices, claim letters, showing the detailed evidence, in each act, in staff tort injury, location, of the staff tort injury, date and time of the tort injury, in the allegations in this complaint, that were filed at the CIM staff office, under the CIM staff manual mandate.

287. The plaintiff claims that the CIM staff office section, joined with the BOP General counsel staff, knew about, and had, the above 3000 three thousand plaintiff tort injury notices, claim letters, whereby, the above CIM staff, breached all the duties of care, in the constant filed plaintiffs 3000 claim notices.

7TH CAUSE OF ACTION SHOWING THE PLAINTIFFS CONTINUOUS TORT

DOCTRINE TORT INJURY BY THE FORT DIX PRISON BOP STAFF UNIT

MANAGER RICHARD HERBIK ETAL CRIMES FROM MARCH 2008 to MAY

2011 WHEREBY THE CIM SECTION OFFICE STAFF BREACHED ALL THE

DUTIES OF CARE BY NOT STOPPING THE PLAINTIFFS DAMAGED

$20 BILLION DOLLAR RESTITUTION  CONSTRUCTIVE TRUST ASSETS

AND THE PLAINTIFFS DENIED 4 FOUR HABEAS CORPUS LITIGATIONS

BY NOT STOPPING THE CONSTANT STAFF HERBIK CRIMES WITH OTHER BOP

STAFF MISCONDUCT.

# LAW OFFICE OF ROBIN C. SMITH, ESQ.

H. Marshall Jarrett
Counsel Office of Professional Responsibility
950 Pennsylvania Avenue, N.W., Suite 3266
Washington, D.C. 20530

November 27, 2006

Re:    *Hoffenberg v. USA*
       *Docket No. 00-1686-cv*

Dear Mr. Jarrett:

## Introduction

I represent Steven Hoffenberg, in the post-conviction proceedings of his convictions for securities fraud in 1997. I have information which we believe demonstrates that the United States Attorney handling Mr. Hoffenberg's case, Daniel Nardello was prosecuting Mr. Hoffenberg while acting in violation of 18 U.S.C. § 208.

## Background

From 1975 through April 1993, Mr. Hoffenberg was the chief executive officer, president and chairman of the board of Towers Financial Corporation ("Towers"). In 1993, the Securities and Exchange Commission ("SEC") filed an action in the Southern District of New York against Mr. Hoffenberg and others, stemming from an investigation that had commenced in 1991. Later in 1993, the United States Attorney for the Southern District of New York commenced a criminal investigation against Mr. Hoffenberg and others for conspiracy to obstruct the SEC's investigation during 1991 and 1992 and for various other criminal violations of the securities laws. Daniel Nardello was the lead prosecutor in Mr. Hoffenberg's case. In March 1993, Mr. Hoffenberg and the United States Attorney's Office for the Southern District of New York entered into a verbal agreement that Mr. Hoffenberg would speak to representatives of the United States Attorney's Office for the Southern District of New York, the United States Attorney's Office for the Northern District of Illinois, the FBI and the SEC. In return, Mr. Hoffenberg received limited immunity for each of his proffers.

On September 23, 1993, Mr. Hoffenberg and the government entered into a cooperation agreement which provided that Mr. Hoffenberg would be charged with four felony counts in the Southern District information: conspiracy to violate 15 U.S.C. § § 78j and 78ff by fraudulently selling securities, in violation of 18 U.S.C. § 371; mail fraud, in violation of 18 U.S.C. §§ 1341, 1342; conspiracy to obstruct justice, in violation of 18 U.S.C. § 371; tax evasion, in violation of 26 U.S.C. § 7201; mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1342 and an additional charge of mail fraud in violation of 18 U.S.C. §§ 1341 for Towers' activities in Chicago. In return, the United States Attorney's Office for the

Southern District of New York agreed to, in the event Mr. Hoffenberg provided substantial assistance to the government and otherwise complied with the cooperation agreement, submit a motion pursuant to 5K1.1 of the Sentencing Guidelines requesting that Mr. Hoffenberg be sentenced in light of the factors set forth in Section 5K1.1(a)(1)-(5).

In January of 1994, the Government, represented by AUSA Nardello, notified Mr. Hoffenberg that it believed he had violated the agreement by misrepresenting his role and interest in a company called Diversified Credit Corporation ("DCC"), suborning perjury to conceal his role at DCC and lying about his participation in another company called Stratford. On February 17, 1994, the United States Attorney's Office for the Southern District of New York, by AUSA Nardello, advised Mr. Hoffenberg that the cooperation agreement was terminated and that he would be arrested. Mr. Hoffenberg filed a motion to enforce the plea agreement and hearings were held at which various employees of DCC testified concerning Mr. Hoffenberg's alleged activities there, many of whom were under indictment for their fraudulent activities at DCC in state court in Suffolk County.

On July 21, 1994, the district court found that the government had properly revoked the plea agreement and denied Mr. Hoffenberg's motion for specific performance. On reargument, the District Court again denied Mr. Hoffenberg's motion to specifically enforce the cooperation agreement by a decision dated January 11, 1995.

On April 20, 1995, Mr. Hoffenberg pleaded guilty to (1) conspiracy to violate 15 U.S.C. §§ 78j and 78ff by fraudulently selling securities, in violation of 18 U.S.C. § 371; (ii) mail fraud, in violation of 18 U.S.C. §§ 1341, 1342; (iii) conspiracy to obstruct justice, in violation of 18 U.S.C. § 371; (iv) tax evasion, in violation of 26 U.S.C. § 7201; and (v) mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1342. On March 7, 1997, Mr. Hoffenberg was sentenced to 240 months of imprisonment.

Probable Conflict of Interest

AUSA Nardello, upon information and belief, violated 18 U.S.C. § 208, by negotiating employment with an investigations firm, Decision Strategies, now named Nardello Schwartz & Co., who was employed by Towers' Bankrupcy Trustee, Alan Cohen, to conduct investigations work, while at the same time prosecuting Mr. Hoffenberg's case. *See* Billing Documents from Towers' Bankrupcy and Nardello Schwartz & Co., website documents, *attached.*

18 U.S.C. § 208 prohibits government employees from negotiating employment with any firm with a financial interest in a matter in which the government employee, in his/her position as government employee is involved.

Mr. Hoffenberg has long claimed that Alan Cohen, the bankruptcy trustee, was responsible for Towers' Collapse and the loss to investors.

That Mr. Nardello was contemporaneously prosecuting Mr. Hoffenberg and negotiating employment with a firm who collected money from Towers estate by way of Mr. Cohen demonstrates that Mr. Nardello was prosecuting Mr. Hoffenberg in violation of 18 U.S.C. § 208.

I have attached documents that demonstrate that Mr. Nardello was probably acting under a conflict of

interest.  Please advise me at your convenience your position on this potential investigation.

Very truly yours,

Robin C. Smith

c:      Steven Hoffenberg



**U.S. Department of Justice**

Office of Professional Responsibility

*950 Pennsylvania Avenue, N.W., Suite 3266*
*Washington, D.C. 20530*

FEB 1 2 2007

Robin C. Smith, Esq.
44 Court Street, Suite 917
Brooklyn, New York   11201

Dear Ms. Smith:

We have completed our review of your November 27, 2006 correspondence to the Office of Professional Responsibility (OPR), in which you alleged misconduct on the part of a former Assistant United States Attorney for the Southern District of New York in connection with the federal prosecution of Steven Hoffenberg, whom you represent in post-conviction proceedings.

OPR has jurisdiction to investigate allegations of misconduct involving Department of Justice (DOJ) attorneys that relate to the exercise of their authority to investigate, litigate or provide legal advice, as well as allegations of misconduct against DOJ law enforcement personnel when they are related to allegations of attorney misconduct within the jurisdiction of OPR.  However, it is the policy of this Office to refrain from investigating issues or allegations that were addressed or that could have been addressed in the course of litigation, unless a court has made a specific finding of misconduct by a DOJ attorney or law enforcement agent or there are present other extraordinary circumstances.  Based on our review of your correspondence, we have determined that your allegations fall into this category, that your client has raised the misconduct allegations with the court, and that the court has made no finding of misconduct.   Accordingly, there is no basis on which action by this Office would be warranted.  If in the future the court makes a finding of prosecutorial misconduct in this matter, please provide us with a copy of the court's ruling.

We regret that we are unable to be of further assistance to you at this time.

Sincerely,

Annie Wong
Program Analyst

288. The plaintiff incorporates all of the above allegations in this cause of action.

289. The plaintiff did exhaust the repeated BOP end point exhaustions, in this casue of action, and the FTCA exhaustion was completed in this cause of action.

290. The plaintiff claims he filed with the BOP General counsel staff, joined with the CIM staff office section staff, over 800 eight hundred, plaintiff tort injury constant notices, claim letters, in this cause of action, tort injury, that were joined with, the other allegations, in this complaint, tort injury, from March 2008, to May 2011, time frame, regarding the unit Mgr. staff Rechard Herbik, constant tort injury, staff misconduct.

290(a) The above filed over 800 eight hundred, plaintiff notice, tort injury claim letters, filed at the CIM staff section, showing how the Fort Dix unit manager Mr. Herbik, acted daily, in damage to, the plaintiffs restitution constructive trust, in this 7th cause of action.

291. The plaintiff claims that the BOP General counsel staff, joined with the CIM section staff, breached all the duties of care, under the 7th cause of action time frame, from March 2008, to May 2011. By not stopping, the constant crimes, by the Fort Dix unit manager Richard Herbik, fulltime damages to the plaintiff.

292. The plaintiff claims that the Fort Dix prison unit manager Rickard Herbik, was the BOP staff employee, incharge of the plaintiff daily BOP detention, at Fort Dix prison, from March 2008, to May 2011, who acted in constant staff misconduct, crimes, damages, to the plaintiff, in the 7th cause of action.

293. The plaintiff claims that the BOP General counsel staff, and CIM staff office section BOP employees, knew that staff Herbik, Civil and criminal investigations were ongoing.

294. The plaintiff claims that from March 2008, to May 2011, the following extraordinary egregious crimes, staff misconduct, were acted out daily, non stop, by the Fort Dix prison unit manager staff Mr. Richard Herbik, that damaged the plaintiff ongoing, and not stopped tort injury, by the CIM staff section 119 page manual mandate..

295. The staff Richard Herbik seized and locked up, all of the plaintiffs restitution legal papers, from March 2008, to May 2011, fulltime non stop. The CIM staff section knew, and failed to stop, the staff Herbik constant misconduct.

296. Staff Richard Herbik denied the plaintiffs constant request, seeking access, to the above seized all of plaintiff restitution legal papers, from March 2008, to May 2011, fulltime non stop. The CIM staff section failed to stop this Herbik staff misconduct

297.   Staff Richard Herbik, destroyed 3 three large cartons, of the
       plaintiffs restitution, and 4 four habeas corpus suit legal
       papers, that were seized, from March 2008, to May 2011, based on the
       CIM staff section, failing to stop, the constant staff Herbik
       misconduct.

298.   Staff Richard Herbik was removed from the plaintiff detention
       staff, by the BOP, under Civil, and criminal investigation, in May
       2011,.

299.   The staff Richard Herbik, obstructed, prevented, and denied, from
       March 2008, to May 2011, all of the plaintiffs restitution,
       collection attorney demanded inmate legal calls, in constant
       violation, of the BOP inmate legal calls law 28 CFR 540.103.

299(a) The CIM staff section failed to stop,   the Mr. Herbik
       constant staff misconduct.

300.   Staff Richard Herbik acted in constant staff misconduct, in the
       above and below 7th cause of action, whereby the CIM staff office
       section, had constant plaintiff notice, over 800 eight hundred tort
       injury constant notices, plaintiff claim letters, whereby the
       CIM staff section, failed to stop, the constant staff misconduct,
       by staff Richard Herbik, from March 2008, to May 2011, in this
       cause of action.

301.   The CIM staff section, breached all the duties of care, in the
       CIM staff section, 119 page manual mandate, by not stopping, the
       plaintiffs constant 7th cause of action tort injury, by the staff
       Richard Herbik, in the constant following staff misconduct, from
       March 2008, to May 2011.

302    Seizure of all of the plaintiff restitution constructive trust
       legal papers, every day, non stop. In March 2008 to May 2011.

303    Staff Richard Herbik stopped, and prevented, the all access, to
       the plaintiffs BOP seized all legal papers, in the plaintiffs
       restitution constructive trust, and the plaintiffs pending four
       criminal case habeas corpus, all legal papers, in litigations,
       full time from March 2008, to May 2011.

304.   Staff Richard Herbik the Fort Dix prison unit manager, destroyed
       3 three large cartons, of the plaintiffs legal papers, in the
       plaintiffs restitution constructive trust evidence, and habeas
       corpus pending 4 four litigations, legal papers, from March 2008,
       to May 2011.

305.   Staff Richard Herbik denied, stopped, and obstructed, all of the
       plaintiffs attorneys, constant request, for the plaintiffs complex
       restitution collection attorney legal calls, in violation of, the
       BOP legal call inmate law, 28 CFR 540.103, fulltime, non stop from
       March 2008, to May 2011.

454

106 FEDERAL REPORTER, 3d SERIES

ing) areas of disagreement—whether the type of error, the degree of certainty required for finding an error harmless, or the methodology for determining if the constitutional error is harmless.

A. *Structural Error versus Trial Error*

[1] The first task for a court in deciding a case involving a federal constitutional error is to determine if the error is "structural error" or "trial error." Structural errors are fundamental defects in the "framework within which the trial proceeds," rather than simply an error in the trial process itself. *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991). Examples include the total deprivation of the right to counsel at trial, *see Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), or the presence of a biased judge, *see Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). *See Fulminante*, 499 U.S. at 309–10, 111 S.Ct. at 1264–66 (discussing five constitutional errors that are structural errors), *and, Sullivan v. Louisiana*, 508 U.S. 275, 282, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182 (1993) (adding a sixth). We made clear in *Yarborough v. Keane*, 101 F.3d 894 (2d Cir.1996), that the determination whether an error is structural turns not so much on the particular rule violated, as on whether the error was of sufficient consequence that the criminal process "cannot reliably serve its function as a vehicle for determination of guilt or innocence." *Fulminante*, 499 U.S. at 310, 111 S.Ct. at 1265 (quoting *Rose v. Clark*, 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3105–06 (1986)).

[4] If a reviewing court determines that the error is of the structural variety, the court's task is at an end. Structural errors "defy analysis by harmless error standards" and "infect the entire trial process." *Brecht*, 507 U.S. at 1717 (quoting *Fulminante*, 499 U.S. at 1264–65). *Therefore*,

B. *The Applicable Harmless Error Standard: Direct versus Collateral Review*

[2] If the error is the more common "trial error," the applicable harmless error standard for constitutional error differs depending on the procedural posture of the case. On direct review, the applicable standard for reviewing a constitutional error is whether the error "contributed[d] to the verdict." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

On collateral review, as the Court explained in *Brecht*, considerations of finality, federalism, and comity warrant the applicability of a less-onerous harmless error standard. 507 U.S. at 635–37, 113 S.Ct. at 1720–22. In *Brecht*, the Court held that the appropriate standard applied on collateral review of federal constitutional error is the one that we adopted on direct review of non-constitutional error, namely, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637, 113 S.Ct. at 1722 (quoting *Kotteakos*, 328 U.S. at 776, 66 S.Ct. at 1253).

C. *The Degree of Certainty*

[3] The degree of certainty required—that is, how convinced a reviewing court must be before it can declare a federal constitutional error harmless—also differs depending on whether the review is direct or collateral. On direct review, the reviewing court must be convinced that the error is "harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828. On collateral review, the court should be resolved the issue for the circumstances presented in this case.

---

PECK v. U.S.
Cite as 106 F.3d 450 (2nd Cir. 1997)

455

himself in virtual equipoise as to the harmlessness of the error." *Id.* at ___, 115 S.Ct. at 994.

D. *Methodology*

The usual methodology for determining whether the harmlessness of a constitutional trial error is established with the requisite degree of certainty is to examine the trial record as a whole to determine if a rational jury, absent the error, would have arrived at the same verdict whether the standard is that of *Chapman* (direct review) or *Brecht* (collateral review). However, prior to the Supreme Court's decision in *Roy*, courts were unsure as to the appropriate harmless error methodology to apply on habeas review of error in instructing the jury on the elements of the offense. It was this uncertainty that gave rise to our disagreement in *Peck I*. Supreme Court cases could be read to support the view of the panel majority in *Peck I*, and the view of the First Circuit in *Roy v. Gomez*, 81 F.3d 863, 867 (9th Cir.1996) (en banc) that the proper methodology for applying *Brecht*, based on the facts found by this Court in *Carella v. California*, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989), is to determine if an actual jury finding resolved the missing or misdescribed instructional element. *See Peck I*, 73 F.3d at 1230–33 (Walker, J., dissenting); *Roy*, 81 F.3d at 869–70 (Wallace, J., dissenting); *Whiting*, 28 F.3d at 1309 & n. 12 (1st Cir.1994).

There was also support for the view, based on the Court's decision in *Brecht*, that a reviewing court should examine the record to determine whether a properly instructed, rational jury would have found the missing element. *See Peck I*, 73 F.3d at 1230–33 (Walker, J., dissenting); *Roy*, 81 F.3d at 869–70 (Wallace, J., dissenting); *Murder*, 48 F.3d at 1309 & n. 12; *Murder*, 48 F.3d at 573. The Supreme Court's decision in *Roy* resolved the issue for the circumstances presented in this case.

The respondent in *Roy* was a habeas petitioner pursuing a collateral attack upon a state court conviction for first-degree murder and robbery. At the trial in *Roy*, the jury charge correctly stated, under then-governing California law, that a person could be convicted of first-degree murder if, *inter*

*alia*, a defendant had *knowledge* of his accomplice's unlawful purpose and *assisted* in the accomplishment of the crime. — U.S. at ___, 117 S.Ct. at 337–38. A California Supreme Court decision after Roy's trial heightened the government's scienter burden by requiring that a jury find that a defendant had the *intent or purpose* of assisting in the accomplice's crime in order to convict a person of first-degree murder. *Id.* at ___, 117 S.Ct. at 338. Upon habeas review, the Ninth Circuit held that the instructional error at the respondent's trial was not harmless. *See Roy*, 81 F.3d at 868.

The methodology used by the Ninth Circuit for determining if the error was harmless was substantially similar to the methodology employed in *Peck I*. The Ninth Circuit held that "the omission is harmless only if the jury *necessarily* found the omitted element." *Roy*, 81 F.3d at 867. The Ninth Circuit based its opinion [on] a concurring opinion in *Carella*, a case that dealt with legal presumptions." *Roy*, — U.S. at ___, 117 S.Ct. at 338.

In *Roy*, the Supreme Court reversed the Ninth Circuit, rejecting the *Carella* concurrence's methodology for instructional error of the type present in *Roy*. The Court stated that, subsequent to its decision in *Carella*, *Brecht* held that in habeas proceedings, courts "ordinarily should apply the harmless error standard that the Court had previously enunciated in *Kotteakos*." *Roy*, — U.S. at ___, 117 S.Ct. at 338 (internal quotations omitted). The Court noted that although the *Carella* concurrence erroneously applied by the Ninth Circuit was "certainly consistent with the standard" subsequently articulated in *Brecht*, it was not the precisely described as concerning the appropriate methodology for determining harmlessness of an error. Indeed, the Ninth Circuit correctly applied the *Brecht* standard and the *O'Neal* 'grave doubt' test, *see Roy*,

Although the Court discusses the issue in terms of "standards," we think the dispute in *Roy*, like the dispute in *Peck I*, can be more precisely described as concerning the appropriate methodology for determining harmlessness of an error. Indeed, the Ninth Circuit correctly applied the *Brecht* standard and the *O'Neal* 'grave doubt' test, *see Roy*, — U.S. at ___, 117

306. The evidence in exhibit 11, BOP letter shows the Constant
     violation staff misconduct, in the plaintiffs attorneys
     demanded inmate legal calls, 28 CFR 540.103, to collect the
     plaintiffs complex restitution constructive trust assets, non
     stop, from March 2008, to this suit docketing, that shows the
     constant CIM staff tort injury, in violation, of the lagal call
     inmate law 28 CFR 540.103, causing the plaintiff, constant tort
     injury, in this case of action.

307. The BOP evidence in exhibit 11, shows the plaintiffs constant
     tort injury, in this cause of action, whereby the CIM staff section
     office, did monitor, the BOP exhibit 11 constant evidence, in
     staff misconduct, and the BOP CIM office section staff, failed
     to stop, this constant staff misconduct, in the plaintiff constant
     tort injury, from March 2008, to this suit docketing, caused by
     the CIM staff constant tort injury.

308. The evidence in exhibit 11, shows the BOP letter in the plaintiff
     constant tort injury, in the plaintiffs restitution complex
     constructive trust damages, whereby the exhibit 11 letter evidence,
     shows how the staff misconduct, by Richard herbik, Warden
     Grondolsky, and Warden Zickefoose, violated, every restitution
     statute, in the BOP exhibit 9 evidence, statutes, under the
     mandated restitution statutes, collection suit, attorney inmate
     legal calls, under the legal calls inmate law, 28 CFR 540.103,
     everyday, from March 2008 to this suit docketing.

308(a) No legal calls were allowed, from March 2008, to this suit
     docketing.

309. The plaintiff points in constant tort injury, by the CIM staff
     office, comes from the prima facie staff misconduct evidence,
     in the exhibit 9 statutes, in the BOP evidence, that prevented,
     stopped, all of the plaintiffs attorneys demanded, restitution
     collection complex litigation, plaintiff attorney mandated legal
     calls, violating, the legal call inmate law, 28 CFR 540.103.

310. The CIM staff section office, breached all the duties of care,
     when the CIM staff, failed to stop, the plaintiffs contrinuous tort
     doctrine plaintiff full time daily tort injury, in the exhibit
     11 letter, showing staff misconduct, that violated every BOP
     restitution statute activities, by the staff misconduct, in the
     BOP staff restitution exhibit 9 statutes activities, in the
     plaintiff restitution statutory purpose, every day, from March
     2008, to this case docketing, in the constaNT BOP CIM staff tort
     injury.

311. The above on point staff misconduct, in the BOP evidnece exhibit 11,
     BOP Letter, prevented all of the plaintiffs demanded, and mandated,
     4 four habeas corpus plaintiff suit attorney legal calls, that
     damaged, and caused the plaintiffs denied suits, 4 four habeas
     corpus litigations denials, from March 2008, to May 2011, in
     violation, of the inmate legal call law, 28 CFR 540.103 everyday.

312. The well settled law, in Lewis Vcasey, 135 L.Ed 2d 606 (1996),
     was reaffirmed, in every Federal appeals court, that mandated

ATTORNEY CLIENT

INMATE LEGAL CALLS

28 CFR
540.103

The Warden may not apply frequency limitations on inmate telephone calls to attorneys when an inmate demonstrates regular correspondence, visiting, or normal telephone use is inadequate. 28 CFR § 540.103.

ALL COMPLEX ATTORNEY CLIENT INMATE

LEGAL CALLS, INVOLVING ONE BILLION

DOLLAR RESTITUTION, → DENIED,

ONGOING.

EXHIBIT 9

ATTORNEY CLIENT

INMATE LEGAL CALLS

28 CFR
540.103

The Warden may not apply frequency limitations on inmate telephone calls to attorneys when an inmate demonstrates regular correspondence, visiting, or normal telephone use is inadequate. 28 CFR § 540.103.

ALL COMPLEX ATTORNEY CLIENT INMATE LEGAL CALLS, IN ONE BILLION DOLLAR RESTITUTION, → DENIED, ONGOING.

EXHIBIT 9

and demanded, the the BOP staff misconduct, in this 7th cause of action, was constant CIM staff plaintiff tort injury, by the CIM staff office section, from March 2008, to this suit docketing, under the exhibit 11 evidence, BOP staff constant staff misconduct.

313. The CIM staff section office, monitoring of the plaintiff, from March 2008, to this suit docketing, when the plaintiff was in BOP detention at Fort Dix prison, shows the CIM staff section office constant tort injury, by not stopping the continuous tort doctrine, Fort Dix prison staff misconduct, that violated every day, the BOP evidence restitution <u>statutory</u> intent, and purpose, in the BOP restitution <u>statutes</u> in the exhibit 9 restitution law BOP evidence, whereby, staff stopped, obstructed, all of the plaintiffs attorney assistance, in collecting, the plaintiffs restitution complex constructive trust major assets.

314. The CIM staff section office tort injury, breached all the duties of care, in this 7th cause of action, from March 2008, to this suit docketing, in the constant failing to stop, the following Fort Dix prison staff misconduct.

315. The Fort Dix prison staff misconduct, was acted out above and below, in this 7th cause of action, by the following named Fort Dix staff, daily direct, actual participatation, in the continuing staff misconduct.

316. Warden Grondolsky, Warden Zickefoose, executive assistant to the Warden PHD Jenkens, unit manager Richard Herbik, unit team case manager Ms. A. Haney, unit team counselor Mr. Watson, and conselor Ms. Hood, unit team case manager Ms. Adonas, paralegal Tara Moran, prison attorneys at Fort Dix, Nicloe McFarland, and Ms. Clark, with the other unnamed Wardens executive staff, and other unnamed Fort Dix prison unit team staff non stop.

317. The unit team counselors Mr. Reyes, and Ms. Hood, in this constant plaintiff tort injury, at Fort Dix prison, shows the BOP ending the employment, of the unit team counselors Ms. Hood, and Mr. Reyes, in the plaintiffs constant tort injury, in this cause of action

318. The above Fort Dix BOP staff, had actual direct participation, in the constant Fort Dix prison staff misconduct, hurting the plaintiff, in the nonstop staff misconduct, in this cause of action.

319. That seized all of the plaintiff restitution constructive trust legal papers, form March 2008, to May 2011.

320. That obstructed all of the plaintiff requested access, to all of the seized plaintiff constructive trust restitution legal papers, from March 2008, to May 2011.

321. The seized all of the plaintiffs pending Habeas Copus legal
     papers, and obstructed the plaintiffs requested access, in
     all of the seized plaintiff Habeas Corpus legal papers, non
     stop from March 2008, to May 2011.

322. The staff misconduct caused the denials, in the plaintiffs
     4 four Habeas Corpus 28 USC 2255 denied litigations, under
     structural error violations, bad faith, prosecutor
     misconduct, bribes paid to the prosecutor.

323. The staff misconduct, destroyed 3 three large cartons, of the
     plaintiff legal papers, in the seized all restitution
     constructive trust legal papers evidence, and the plaintiffs
     Habeas Corpu 28 USC 2255 suit legal papers, from March 2008,
     to May 2011.

324. That denied, and obstructed, all of the plaintiff attorney
     inmate legal assistance legal calls, violating the inmate
     legal call law, 28 CFR 540.103, in the restitution, and
     Habeas Corpus 28 USC 2255 private paid plaintiff attorney,
     mandated private attorney needed litigation assistance, by
     legal calls non stop. All legal calls, were obstructed, from
     March 2008, to this suit docketing.

325. Denied and obstructed, the plaintiff use of the BOP E-mail
     free speech system, when the e-mail, at Fort Dix prison WAS
     INSTALLED, AND ON GOING FOR 1 1/2 YEARS.

326. The above Fort Dix prison staff, did cover up, this constant
                                        staff misconduct, in this cause
     of action, that the CIM staff office failed to stop.

327. The CIM staff office section tort injury, came from the
     constant actual direct participation, in knowing about, this
     constant Fort Dix prison staff misconduct, and the CIM
     staff not stopping, the constant Fort Dix prison staff
     misconduct, cover up crimes, causing the CIM staff constant
     tort injury, in this entire complaint, allegations nonstop.

8TH CAUSE OF ACTION IN THE PLAINTIFF CONTINUING TORT

DOCTRINE TORT INJURY CAUSED BY THE CIM STAFF OFFICE SECTION

NOT STOPPING THE FORT DIX PRISON STAFF MISCONDUCT CRIMES

COVER UP LOOTING IN THE INMATE TRUST FUND ACCOUNTS BY BOP

STAFF UNJUST ENRICHMENT FRAUD USE BY THE FORT DIX NAMED

ABOVE NAMED STAFF OF THE INMATE TRUST FUND ACCOUNT TO PAY

THE FORT DIX ILLEGAL PRISON BILLS FROM MARCH 2008 TO THIS

SUIT DOCKETING NONSTOP IN CRIMINAL STAFF MISCONDUCT.

328. The plaintiff incorporates all of the above allegations in this cause of action.

329. The above named Fort Dix prison staff, had actual direct participation, in this cause of action nonstop, in the following staff crimes, cover up, whereby, the CIM staff crimes, failed to stop, the constant staff crimes, at For Dix prison.

330. The staff misconduct, made the plaintiffs exhaustion of BOP remedies, nonstop unavailable, in this cause of action, staff crimes cover up, that the CIM statt office, failed to stop.

331. The staff misconduct obstructed, prevented, and stopped, the plaintiffs effort, in the BOP exhaustions, in this cause of action, crimes cover up, at Fort Dix prison, that the CIM staff office, failed to stop.

332. The staff misconduct looted, removed, defrauded, the inmate funds, from the Fort Dix prison inmate trust fund accounts, that was used to pay, the Fort Dix prison illegal General over head bills, in direct violation, of the inmate trust fund agreement, staff crimes cover up.

333. The above named Fort Dix prison staff, had actual direct participation, in the continuing crimes cover up, in the criminal use, of the inmate trust fund account money, that was used by staff, to pay the Fort Dix prison illegal over head, cost, and bills, in direct violation, of the inmate trust fund agreement, from March 2008, to this suit docketing.

333(a) Whereby the CIM staff, failed to stop, the Fort Dix staff, looting, of the inmate trust fund account.

334. The above named Fort Dix prison staff denied, the palintiffs repeated demand, to turn over the inmate trust fund account agreement, to the plaintiff.

334(a) Therein, the Fort Dix staff, acted in cover up crimes, by the Fort Dix staff looting, of the inmate trust fund account, from March 2008, to this action docketing.

**9TH CAUSE OF ACTION IN THE PLAINTIFF CONTINUING TORT DOCTRINE TORT INJURY BY THE CIM OFFICE STAFF SECTION WHEREBY THE FORT DIX PRISON HEALTH CARE STAFF DEPRIVED THE PLAINTIFFS OF THE CONSTANT MANDATED AND PLAINTIFF DEMANDED EXPERT OLD AGE COMMUNITY STANDARD OF CARE OLD AGE TREATMENT FROM MARCH 2008**

**TO THIS SUIT DOCKETING IN THE PLAINTIFFS DOCUMENTED AND RECORDED OLD AGE DAILY FULLTIME CHRONIC SEVERE INJURIES PAIN AND SUFFERING WHEREBY THE CIM OFFICE STAFF SECTION BREACHED THE DUTY OF CARE IN THIS CAUSE OF ACTION FULLTIME NONSTOP**

335.  The plaintiff incorporates the above allegations in this cause of action.

336.  The above complaint allegations tort injury, to the plaintiff, by CIM staff section office continous tort doctrine activities tort injury, occurred on going, in this cause of action.

337.  The plaintiff constant tort injury, by the CIM office staff section, breached all of the duties of care, in the plaintiffs old age constant deprived Fort Dix Prison, expert health care staff daily treatment, that did prevent deny, daily, the plaintiffs continuous mandated, and demanded, health care, old age treatment, in the plaintiffs, following recorded, and documented, 67 year old age, plaintiffs chronic severe full time injuries, daily pain and suffering, in this cause of action.

338.  Plaintiffs 3 three slipped disk, liver, and heart injuries, torn right shoulder rotator cup, heart, pain, injuries, diabetes, hypertenion, high blood pressure, two legs, two hips, two feet, two arms, back, neck, head, two eyes, two kidneys, blatter, teeth, gums, and related additional old age plaintiff constant chronic severe full body injuries, daily pain and suffering.

339.  The Fort Dix prison staff attorney Ms. Clark, wrote the plaintiff on 8-26-2009, in obstruction of the plainitiffs demanded medical, and dental, certificate of merit, whereby the staff attorney clark, obstructed, and deprived the plaintiff, demanded medical, and dental, BOP certificate of merit, in this cause of action.

340   TheFort Dix prison health care staff supervisor Ms. Idle informed the plaintiff, in the years 2008, 2009, and 2010, before the supervisor Ms. Idle left the Fort Dix health services staff, THAT the health care staff, will not issue, the plaintiffs demanded, medical, and dental, BOP certificate of merit, in this cause of action.

341   The plaintiff claims that the Fort Dix health service staff, custom, practice, methods, daily scope of employment, prevent, obstruct, deny, the plaintiffs constant demand, in 2008, 2009, 2010, for the health care staff to turnover to the plaintiff, his demanded, BOP Medical, and dental, certificate of merit, in this cause of action.

342   The plaintiff claims that his constant tort injury evidence, by staff misconduct, fulltime, nonstop, at the Fort Dix health care staff services department, shows the BOP FOrt Dix health care rating of 2 two, in staff treatment, denied for the plaintiff, who was rated above, the health care Fort Dix BOP treatment RATING of TWO.

*Lisa Twardeau Hoffenberg*

*305 East Fortieth Street*
*Apartment 8A*
*New York, N. Y. 10016*

*212 949-1935*
*212 687-6441 fax*

*Answer In writing.*

Date: 8/18/08

To: Harley Lapin

Fax: (202) 514-6878

3 Pages

Message:

Dear Mr. Lapin,

Immediate Medical Attention is needed for my Husband Steven Hoffenberg at Fort Dix.
An M.R.I. is needed immediately in order to evaluate my Husband's massive medical
injuries ( 3 Spinal Slipped Discs, Right Shoulder Torn Rotator Cup, Hips and Legs ) that
must diagnosed by M.R.I..
Not only that, your Fort Dix Warden Grondolsky, full knowing of the above and my
Husband's other health vulnerabilities confirmed by your Physian ( High Blood Pressure
that is in Stage 1 -2 of Hypertension) told your Doctor ( against his will ) to illegally clear
Steven to work in the kitchen.
At 4:00 a.m. this morning they got Steven out of his bed at put him to work in the kitchen
wherein Steven suffered more injuries and was taken to the medical office.
My husband is in need of immediate medical attention and to be left alone by your
retaliating Warden.

Mrs. Lisa Hoffenberg

Cc.: Eleanor Jackson Piel, Esq.
    Richard Barbuto, Esq.
    The NewYork Times
    Congresswoman Carolyn B. Maloney
    Senator Charles Schumer

# Bureau of Prisons
# Health Services
## Medical Duty Status

| Reg #: 35601-054 | Inmate Name: HOFFENBERG, STEVEN |
|---|---|

### Housing Status

__ confined to the living quarters except   __meals   __pill line   __treatments   Exp. Date: _____

__ on complete bed rest:   __bathroom privileges only   Exp. Date: _____

X cell:   X cell on first floor   __single cell   X lower bunk   __airborne infection isolation   Exp. Date: 04/16/2013

__ other: _____   Exp. Date: _____

### Physical Limitation/Restriction

__ all sports   Exp. Date: _____

__ weightlifting:   __upper body   __lower body   Exp. Date: _____

__ cardiovascular exercise:   __running   __jogging   __walking   __softball   Exp. Date: _____
__football   __basketball   __handball   __stationary equipment

__ other: _____   Exp. Date: _____

### May have the following equipment in his / her possession:

### Work Restriction / Limitation:

Cleared for Food Service:   No

| Restriction | Expiration Date |
|---|---|
| No Ladders/No Upper Bunk | 04/16/2013 |
| No Bending at Waist | 04/16/2013 |
| No Lifting More Than 15 Pounds | 04/16/2013 |
| No Prolonged Standing | 04/16/2013 |
| No Squatting | 04/16/2013 |

**Comments:**   N/A

| Lopez de Lasalle, Abigail MD CD | 04/16/2012 |
|---|---|
| Health Services Staff | Date |

Inmate Name:   **HOFFENBERG, STEVEN**   Reg #:   **35601-054**   Quarters:   **Q01**

Lisa Hoffenberg
305 East 40 Street
Apartment 8A
New York, New York 10016
Phone: (212) 949-1935
Fax: (212) 687-6441

January 7, 2010


B.O.P. Director Hartey Lappin
Washington, D.C. 20534

By Fax to (202) 514-6878


Re: RETALIATION HARMING STEVEN JUDE HOFFENBERG, #35601-054, ON 1-7-2010, BY THE FORT DIX PRISON EXECUTIVE STAFF MOTIVATED BY THE PENDING PRISON LITIGATION WITH SOME (800) EIGHT HUNDRED FILED CLAIM(S) AGAINST B.O.P. EXECUTIVE STAFF SHOWING FURTHER TORT AND RETALIATION MASSIVE DAMAGE(S) TO MR. HOFFENBERG

     1. **RETALIATION** by the Fort Dix Prison **EXECUTIVE STAFF** on 1-7-2010, caused **ADDITIONAL INJURY** to Mr. Hoffenberg.

     2. Executive Fort Dix B.O.P. Staff **ORDERED** Mr. Williams, the B.O.P. Fort Dix Prison Building (40) Food Service Administrator, to **VIOLATE** and **BREACH** all of the B.O.P. well documented medical **RESTRICTION(S)**, established for Mr. Hoffenberg. Emergency Medical Clinic Treatment was required.

     3. Retaliation was motivated by the pending prison litigation **HOFFENBERG V. GRONDOLSKY ET AL**, 09CV4784 DNJ 2009. B.O.P. D.O.J. Civil Rights investigation must proceed now.


               Please reply.

               By   *SIGNED*
               Lisa Hoffenberg

# Bureau of Prisons
# Health Services
# Medical Duty Status

Reg #:  35601-054                    Inmate Name:   HOFFENBERG, STEVEN

## Housing Status

__ confined to the living quarters except __meals    __pill line    __treatments    Exp. Date: _____

__ on complete bed rest: _____bathroom privileges only                         Exp. Date: _____

X cell:   X cell on first floor   __single cell   X lower bunk   __airborne infection isolation   Exp. Date: 04/16/2013

__ other: _____   Exp. Date: _____

## Physical Limitation/Restriction

__ all sports                                                          Exp. Date: _____

__ weightlifting:   __upper body   __lower body                         Exp. Date: _____

__ cardiovascular exercise: __running  __jogging  __walking  __softball   Exp. Date: _____
                            __football  __basketball  __handball  __stationary equipment

__ other: _____   Exp. Date: _____

## May have the following equipment in his / her possession:

## Work Restriction / Limitation:

Cleared for Food Service:   No_____

| Restriction | Expiration Date |
|---|---|
| No Ladders/No Upper Bunk | 04/16/2013 |
| No Bending at Waist | 04/16/2013 |
| No Lifting More Than 15 Pounds | 04/16/2013 |
| No Prolonged Standing | 04/16/2013 |
| No Squatting | 04/16/2013 |

**Comments:** N/A

Lopez de Lasalle, Abigail MD CD                              04/16/2012
Health Services Staff                                          Date

Inmate Name: HOFFENBERG, STEVEN _____   Reg #: 35601-054   Quarters: Q01

343.   The plaintiff claims constant tort injury, in the wrongful Fort
       Dix prison detention, whereby the Fort Dix health care staff
       treatment level of 2 two, could not treat, the above old age
       plaintiffs, fulltime daily, documented 67 year old age, plaintiff
       constant chronic severe injuries, pain and suffering, in this
              cause of action.

344.   The plaintiff was informed by the BOP health care staff Ms. Odle
       and other health care staff, including Mr. Ackly, and MD
       Lopez, that the only health care treatment, for the plaintiff
       was medication, and not the expert treatment requested, by the
       67 year old age plaintiff, in this cause of action.

345.   The plaintiff claims that he was old age, 67, 66, 65, 64, when
       the plaintiff was denied, the mandated expert old age community
       standard of care, in this cause of action, from March 2008 to
       this suit docketing.

346.   The plaintiff claims he had chronic old age, severe pain, and
       suffering injuries, that were well documented at the Fort Dix
       health care staff department, in this entire cause of action.

347.   The plaintiff claims that his old age discerned injuries,
       demanded, and mandated, the deprived following Fort Dix old age,
       health care staff expert treatment, of the plaintiff, from
       March 2008, to this suit docketing.

348.   The health care staff deprived, the following mandated old age,
              plaintiff expert treatment.

349.   Chronic pain caused by the side effects, in the massive
       medication, wrongful amount provided to the plaintiff, in this
       cause of action, that caused additional old age constant
       plaintiff injuries.

350.   Chronic fatique,    *ENERGY* /deprivation, constant pain, harm damage
       tort injury, in the plaintiffs documented old age injuries, in
       this cause of action.

351.   Chronic pain, in the above medical documented plaintiff old age
       injuries, constant throbbing, sharp fulltime pain desease,
       that was not treated at all, in the plaintiffs burning, aching,
       stinging, old age pain, in the plaintiffs nerves, and spinal
       cord pain source, that was deprived nonstop health care expert
       old age staff treatment, in this cause of action.

352.   Constant old age plaintiff spinal cord nerve damage, in the
       plaintiffs nervous systems, motor nerves, peripheral nerve
       damage, causing constant anxiety, fear, frustration, injury
       to liver, heart, high blood pressure, constant injury, in the
       old age plaintiff chronic pain, triggered muscle, nerve, and
       tissue constant old age increased plaintiff nonstop injuries,
       in this cause of action.

35*.    Constant inflammation of the joints, and other *Body* parts, nerve
        damage, blood sugar level from diabetes constant damage, to
        heart, the back, neck, legs, hands, feet, disks, hips, eyes,
        head, neuropathic pain, old age damage to the fingers, toes,
        damage to the nerve fibers, nerve tissue, that was deprived
        all health care old age expert treatment, daily fulltime, nonstop,
        in this cause of action, from March 2008, to this suit docketing.

354.    Constant damage to the spine, disk, nerves, vertebre, by bone
        spurs, narrowed disk, cartilage old age injury, constant immune
        system damage, attacking the ___ the joints, constant
        swelling of old age tissues, damage to the tendouns, ligaments,
        joints, elbows, shoulders, heart, hips, knees, neck, jaw, with
        the constant old age loss of motion, in the back, neck, shoulders,
        toes, fingers, in the constant old age injuries, increased
        daily pain + suffering, in this cause of action, March 2008, to
        this suit docketing.

355.    Constant major motion full body daily old age increased injury,
        stopping the body parts named above, requied daily fulltime *TREATment*
        damaged, old age motion, non stop injury, in this cause of
        action.

356.    Constant muscle strain injuries, in the above named body parts,
        old age constant daily injuries, in pain and suffering.

357.    Constant increased daily muscle injury, old age weakness cou*sed*
        by the continued old age fulltime pain, including daily severe
        damage, old age nerve compression progressive, muscle old age
        weakness, injuries fulltime, in the constant old age chronic
        pain, in the above named body injury parts daily. Fulltime
        blat*ter* pain injury. ___ Sharp pain spasms, damage from
        March 2008, to this suit docketing, in this cause of action.

359.    Constant daily fulltime sciatic old age injury pain, in the
        back, buttock,        two legs, increased continuing injuries.

360.    Constant degeneration in the neck, heart, liver, spine di*sk*,
        deep aching pain, in the old age neck, back, spine, legs, feet,
        arms, hands, muscle constant damage, in the above body parts,
        from March 2008, to this suit docketing.

361.    Constant decreased body use, body motion deprivation, and activity
        loss, caused by the old age above constant body injuries pain.

362.    Constant life long old age body injuries, in each discerned
        above plaintiff demaged body parts, post prison old age
        plaintiff release, constant injuries, in this cause of action.

363.    Constant loss of strength, in physical old age body parts,
        above discerned fulltime body parts, increased old age injuries,
        and heart, constant injury damage. Post prison old age release
        constant injury in this cause of action.

364.    Injury by limping, limiting activity, loss, old age decreased
        motion, impeded walking, emotional damage, post prison release
        old age, same above constant injuries.

365. Constant old age disabling serious body parts disease, in the the above named body old age parts constant injury, that had fulltime deprived old age, plaintiff expert treatment, deprived non stop.

366. Constant use in the wrongful old age medications, that increased the old age plaintiff above named body parts continuing injuries, including post prison release, plaintiff old age above discerned injuries.

367. Constant wrongful drug medication, for the old age plaintiff, that worsened the above old age named pain, and body parts, increased non stop daily injuries.

368. Constant deprived health care old age expert treatment, by nerve locks, pain injections, in the above discerned body parts, nonstop injury, major daily pain, of the old age plaintiff.

369. Experts constant deprived trigger point pain old age injections. Directed at the above injuries, named muscles daily damage.

370. Constant additional daily plaintiff old age medical and dental injuries, that the plaintiffs private health care experts, were deprived from providing to the plaintiff, by the defendants cover up, non treatment fulltime, in the plaintiff needed outside, old age, plaintiff health care experts.

371. Constant daily plaintiff life long old age injuries, in all of the above discerned plaintiff injuries, in post prison plaintiff release, in this cause of action.

372. Constant defendant deprived in the mandated outside of prison health care experts, for the old age plaintiff, at age 67, 66, 65, 64, in this cause of action, from March 2008, to this sui t docketing.

373. The plaintiff claims that the Fort Dix prison health care staff, had no expert mandated training, in treating all of the above plaintiff constant injuries, for the old age plaintiff, at age 67, 66, 65, 64, in this cause of action.

374. The plaintiff claims that at the plaintiff old age of 67, 66, 65, 64, at Fort Dix prison, that the prison health care staff misconduct, did deprive the plaintiff, of the mandated old age, outside of prison health care old age experts.

375. The plaintiff claims that the above dicerned health care staff misconduct, injury did cause the plaintiff reduction, in years to live, wrongful death, in this cause of action, and post prison release injuries, wrongful death.

376.  The plaintiff claims that the above old age constant health care staff misconduct, pain continuing inury, did cause the risk, in the plaintiff wrongful death. Including the plaintiffs post prison release, wrongful death risk, in this cause of action.

**10TH CAUSE OF ACTION IN THE DEFENDANT CONSTANT BOP CENTRAL INMATE MONITORING STAFF OFFICE PRISON CIM SECTION WASHINGTON DC BOP STAFF OFFICE TORT INJURY IN THE PLAINTIFFS POST PRISON RELEASE INCOME INJURY INCLUDING THE MAJOR FINANCIAL CONSTANT LOSS DAMAGES TO THE PLAINTIFF AND FAMILY POST PRISON RELEASE FINANCIAL REQUIREMENTS**

377.  The plaintiff incorporates all of the above allegations this cause of action.

378.  The plaintiff claims that the constant tort injury at the prison Washington, DC staff CIM section staff office, breach of all the duties of care, in this complaint, caused the the tort injury, in the plaintiff post prison release, Billions of dollars, in the plaintiff filed restitution judgments, post prison release, unpaid plaintiff restitution payments. Major loss in the plaintiff post prison release, financial requirements, and deprived plaintiff income.

279.  The plaintiff claims that the CIM section staff office, caused the constant unpaid, defaulted, non payment, in the plaintiffs Billions of Dollars, in past due, statutory restitution repayments,  in this cause of action.

380.  The plaintiff claims that the constant CIM section staff office tort injury, caused the ongoing damages, in the plaintiffs past due Billions of Dollars, in the plaintiff restitution constructive trust repayments, and plaintiff DAMAGED financial future income, in this cause of action.

381.  The plaintiff claims that the **exhibit 1 evidence, shows** the US Congress ethics committee, March 2010 approved vote, that requested the US Attorney General, and executive Justice Department staff, to Mitigate, the plaintiffs constant financial future tort injury, in this entire complaint allegation.

381(a)  Whereby the CIM office staff caused this constant tort injury.

382.  The plaintiff claims that the Justice Department Tort Division, had the mandated notice, tort claim act filing, in this tort injury, constant plaintiff financial damages, in the

inception of this tort claim notice filing, by the plaintiff, with the DOJ tort director, in the DOJ Washington, DC office.

383. The plaintiff claims that the plaintiff original filing of this tort claim, at the Justice Department tort directors office, provided the mandated statutory notice, in this constant DOJ BOP tort injury claims, to the plaintiff, in the tort claim nuber TRT BOP 2012 - 02054, in this complaint.

384. The plaintiff claims that DOJ, did breach all the duties of care, when the US Congress staff, filed the **exhibit 1** evidence, with the DOJ executive staff, showing the plaintiffs constant financial tort injury, caused by the prison CIM Staff office venue.

385. The plaintiff claims that the defendant must pay, the plaintiffs claims, that the defendant must pay, the plaintiffs loss of future income, family financial benefits, and consideration, inconstant financial tort injury, post prison release, plaintiff, all income deprivations, loss of income, caused in this complaint allegations.

**11TH CAUSE OF ACTION IN THE PLAINTIFFS CONSTANT TORT INJURY AT DEVENS PRISON FROM JANUARY 2002 TO FEBRUARY 2008 WHEREBY THE CIM OFFICE STAFF BREACHED ALL OF THE DUTIES OF CARE IN THE PLAINTIFFS CONSTANT TORT INJURY IN THIS CAUSE OF ACTION** AND STAFF MISCONDUCT AT FORT DIX PRISON

386. The plaintiff incorporates all of the above allegations in this cause of action.

387. The plaintiff claims that this cause of action are tolled in the statute of limitations, under the continuous tort doctrine, where no single incident, can fairly be identified, as the constant cause of tort injury, by the Washington DC, Prison CIM staff section office, breach of all the duties of care, in this cause of action.

388. The plaintiff claims that the BOP Washington, DC CIM office, staff, had the mandated CIM staff law manual, special monitoring, of the plaintiff, in the constant tort injury, in this cause of action.

389. The plaintiff claims that the prison CIM staff office, breached all of the duties of care, in this cause of action, whereby the CIM staff office, had the constant plaintiff tort injury claims, filed by plaintiff notices, in claims letters, in the over 3000 three thousand plaintiff filed tort injury notices claim letters, in this cause of action constant plaintiff CIM staff tort injury. From January 2002, fultime every day at Devens prison constant staff Misconduct To FEBRUARY 2008 ;



U.S. Department of Justice

Federal Bureau of Prisons

*Federal Medical Center Devens*

*P.O. Box 880*
*Ayer, MA 01432*

June 21, 2002

The Honorable John F. Kerry
One Bowdoin Square
Tenth Floor
Boston, MA 02114
Attn: Roger Lau

*DENIED   INMATE*
*LEGAL CALLS   IN*
*VIOLATION   OF LAW*
*28 CFR 540.103*

Re:   HOFFENBERG, Steven
      Reg. No. 35601-054

Dear Senator Kerry:

This is in response to your letter to Kathleen Hawk Sawyer, Director of the Bureau of Prisons, dated May 24, 2002, which was forwarded to me for response. You received a letter from Attorney David Grossack, dated May 6, 2002, concerning his client, Mr. Steven Hoffenberg. Mr. Hoffenberg is currently incarcerated at the Federal Medical Center (FMC) Devens, Massachusetts. Mr. Grossack claims that his client is forbidden to make any telephone calls to his legal counsel.

Per Program Statement 5264.07, Telephone Regulations for Inmates, dated January 31, 2002, it states, "The Bureau provides each inmate with several methods to maintain confidential contact with his or her attorney. For example: inmate-attorney correspondence is covered under the special mail provisions; private inmate-attorney visits are provided; and the inmate is afforded the opportunity to place an occasional unmonitored call to his or her attorney. Based on these provisions, frequent confidential inmate-attorney calls should be allowed only when an inmate demonstrates that communication with his or her attorney by other means is not adequate."

I have repeatedly communicated the above information with Mr. Grossack through correspondence after he has requested Mr. Hoffenberg be given unlimited legal telephone calls. Specifically, I have advised him that if his client demonstrates that communication with his attorney by correspondence, visiting, or normal telephone use is inadequate, then reasonable telephone access will be granted. Furthermore, inmates at FMC Devens are given 300 minutes per calendar month to make telephone calls that may be used for any purpose at the inmate's discretion. Thus, the inmate may use this time to contact anyone on his telephone list, including his attorney.

*EXHIBIT   11*
*PRO SE PLAINTIFF*

I am aware that Mr. Grossack's client has been provided with three legal telephone calls since his arrival at FMC Devens.  In addition, I am also aware that Mr. Grossack visited Mr. Hoffenberg on May 17, 2002.  As noted above, Mr. Grossack has been advised that he can communicate with his client through other methods.  To date, it has not been shown by Mr. Grossack's client that communication cannot be established by other means.

I trust this information is responsive to your request.  If you have additional questions or concerns. please contact me at (978) 796-1100.

Sincerely,

David L. Winn
Warden

Exhibit H

390.  The plaintiff claims that in the entire time frame in this cause of action, the prison CIM staff office section, acted in the COM staff special monitoring, of the very high profile plaintiff, whereby the CIM staff office section, failed to stop, the Deven prison staff, unit team unit manager, counselor, case manager, fulltime daily violations, in the BOP restitution statutory intent and purpose, in the BOP Evidence in exhibit 9, the restitution statutes, located in second paragraph, at the **exhibit 9, in the BOP evidence document**, from January 2002, to February 2008, in this cause of action.

391.  The plaintiff claims that this cause of action, continuous tort doctrine, plaintiff fulltime daily tort injury, shows the non stop, Devens prison Wardens executive staff, with each prison Devens staff, unit manager, counselor, and case manager, violating the BOP **exhibit 9 restitution statutory purpose, in obstructing the exhibit 9, intent, and purpose** statutes.

392.  The plaintiff claims he filed fulltime notices, tort injury claim letters, in this cause of action, at the Devens prison Wardens executive staff office, and at the BOP Washington, DC staff CIM section office, showing the plaintiffs daily tort injury, in the Devens prison unit team staff, by the staff unit manager, case manager staff, counselor staff, in         the BOP evidence in the **exhibit 9** statutes, plaintiff restitution $20 Billion Dollar constructive trust, fulltime daily trot injury, in this cause of action.

393.  The Plaintiff claims that he filed federal tort, and civil rights, staff litigation, in part, of this cause of action nonstop staff injury.

394.  The plaintiff claims that in the year 2006, the inspector General, Attorney Agent Tom Hopkins, at the us department of Justice, Boston Mass DOJ office, in the **exhibit 8** evidence, hired both the plaintiff, and his wife Lise Hoffenberg, to work for the inspector General, and investigate, the Devens staff crimes, in this cause of action.

395.  The plaintiff claims that the inspector General, DOJ Attorney Agent Tom Hopkins, in the exhibit 8 evidence, hired the plaintiff, and his wife Lisa Hoffenberg, to work for the inspector General, to investigate the constant Devens prison staff crimes, based on the plaintiff filing, constant claims, notices, letters, suit, in the constant Devens prison staff misconduct, in this cause of action.

395(a)  Whereby the CIM staff, failed to stop, the staff misconduct, plaintiff tort injury, at Devens prison Fulltime, Non Stop.

396.  The plaintiff claims that he did turnover, to the inspector general agent, in the exhibit 8 evidence, DOJ Boston Mass office, the actual evidence showing, the Devens prison executive Wardens staff, cover up, in crimes(s), in this cause of action,

that were in the Devens prison staff constant crimes cover up, whereby the CIM staff office, failed to stop, the nonstop tort injury, in this cause of action.

397. The plaintiff claims that he did turnover, in this cause of action, to the BOP Washington, DC CIM staff section office, the copies of the above plaintiff evidence documents, delivered to the inspector general agent, in the exhibit 8 justice Department Boston office, and the inspector general agent in charge Mr. James Tom Minson, at the DOJ office one battery place 29th floor New york City 10004, in all of the plaintiff documents, evidence, showing the constant Devens prison staff crimes, cover up, that are now incorported, by reference, in this cause of action, under federal civil rule 8.

398. The plaintiff claims that in this cause of action, the CIM staff office, had actual direct participation, in the Devens prison Wardens staff cirme(s) cover up, that caused the plaintiff constant staff tort injury, in the Devens executive Wardens staff crimes cover up. IN THIS ENTIRE CAUSE OF AZTION TIME,

399. Whereby, the plaintiff was put in illegal solitary isolation ongoing, from 2006, to February 2008, in order to cover up, the Devens prison Wardens executive staff, illegal crimes evidence, turned over by the plaintiff, to the exhibit 8 DOJ agent Mr. hopkins, the inspector General office, in Boston, Mass, and the CIM staff section office.

400. The plaintiff claims that the CIM staff office, CIM section, staff CIM section staff 119 page manual demanded, the CIM staff office, constant special monitoring, of the plaintiff, in this cause of action, fulltime daily.

401. The plaintiff claims that in this cause of action, the Devens prison heatlth care MD Howard staff, acted on point, in the continuous tort doctrine, plaintiff tort injury, with the same fulltime daily tort injury, that occurred at the the above, Fort Dix prison health care staff tort injury, constant deprivation, in the mandated community standard of care, old age treatment, of the plaintiff, non stop, from January 2002, to February 2008.

402. The plaintiff claims that the CIM staff office CIM section staff, 119 page manual, demanded the CIM staff office, constant special monitoring of the plaintiff, in this cause of action fulltime daily.

403. The plaintiff claims that in this cause of action, the Devens prison health care MD howard staff, acted on point, in the continuous tort doctrine plaintiff tort injury, with the same fulltime daily tort injury, that occurred at the above Fort Dix prison health care staff tort injury, constant deprivation, in the mandated community standard of old age

old age treatment, of the plaintiff, non stop, from January 2002, to February 2008.

404. The plaintiff claims that the Devens health care staff, acted in the crimes cover up, in the plaintiff exhibit 8 evidence turnover, in the dEvens health care staff, MD howard crimes, in this cause of action, that the plaintiff turned over, to the CIM staff office, and the DOJ inspector General agent Tom Hopkins.

405. Whereby the Devens health care MD HOward staff crimes, and bribe evidence, was turned over by the plaintiff, to the inspector general agent Tom Hopkins, to the exhibit 8 Boston DOJ office, and the CIM staff office, in the BOP Washington, DC staff office venue.

406. The plaintiff claims that each prepared plaintiff report, showing the constant Devens prison staff crime(s) cover up, are now incorporated by reference, in this cause of action, under federal civil rule 8, from year 2006, to February 2008.

407. The plaintiff claims that the above Devens staff cover up crime(s), report(s), were prepared by the plaintiff, under the inspector general DOJ Attorney Agent Tom Hopkins hiring of the plaintiff, and his wife Lisa Hoffenberg, to investigate, the constant Devens prison staff crime(s) cover up.

408. The plaintiff claims that he prepared and filed detailed plaintiff investigation reports, with the exhibit 8 inspector general DOJ Agent Tom Hopkins, his supervisors, and with the BOP Washington, DC office, for the CIM Prison office special monitoring, of the plaintiff, in this cause of action.

409. The plaintiff claims that both the prison CIM staff office, and the DOJ Inspector General office Agents, in the exhibit 8 evidence, at the DOJ Boston office, are holding the plaintiffs many filed, Devens prison staff crimes, plaintiff filed reports.

410. The plaintiff claims that the above inspector General DOJ Attorney Agent Tom Hopkins, had direct actual participation, with the following persons, regarding the plaintiffs DOJ investigations, of the Deverns prison staff crime(s), constant cover up, in the fulltime plaintiff tort injury,

(a) Lisa Hoffenberg
(b) Attorney R. Lawrence Barbuto for the plaintiff.
(c) Attorney Robin Smith for the plaintiff.
(d) Supervisors at the inspector General DOJ offices in New York, and Washington, DC.
(e) Supervisors at the BOP executive offices in Washington, DC.
(f) All DOJ inspector General writings, documents, evidence, related papers, in this cause of action, Are now evidence in this suit, and must be saved by DOJ, ANDTHE BoP,

411.    On May 16, 2012, the Fort Dix prison Warden Zickefoose, ordered
        three security staff, to "seize" all of the plaintiffs legal
        papers, that were being used, in drafting this law suit.

412.    The May 16, 2012 Fort Dix Warden Zickefoose above extreme
        staff misconduct, did damage, the plaintiffs legal papers,
        needed to prepare this law suit, by the Wardens malicious,
        intenational, seizure, of all the legal papers, needed by
        the plaintiff, to prepare this lawsuit.

413.    The following week after May 16, 2012, with the extreme
        Warden Zickefoose above staff misconduct, the BOP Director
        Charles Samuels Jr., showed up at Fort Dix prison, and
        stopped the extreme staff misconduct, above by Warden Zickefoose.

414.    The plaintiffs damaged above all seized plaintiffs legal
        papers, for this suit preparation, were returned to the plaintiff.

415.    Warden Zickfoose was ordered to stop her BOP employment
        for one week, with no BOP payment, in the above Fort Dix
        prison visit, by the BOP Director Samuels .Jr.

416.    In July, August 2012, the BOP Director Charles Samuels .Jr.,
        ordered that Warden Zickefoose, will be removed, as the
        Fort Dix Warden, in November 2012.

417.    The Director of the BOP Charles Samuels ,.Jr futher ordered
        in July, August 2012, that Warden Zickefoose, at Fort Dix
        prison, will be removed in November 2012 as the active
        Warden at Fort Dix prison, and not assigned as the Warden,
        in another BOP prison.   That was caused by the staff
        misconduct in this complaint.

418.    The CIM staff office mandate, in the 119 page CIM staff
        manual, ordered the CIM staff office special monitoring,
        of this high profile plaintiff, from January 2002, to this
        suit docketing in 2012.

418(a)  This court must review, the above CIM staff office, 119 page
        manual, under the plaintiffs constant Tort injury.

419.    The CIM staff office, constant breach of all the duties
        of care, mandated  in the CIM staff office, 119 page manual,
        plaintiff continuing tort injury, in this complaint, from
        January 2002, to this suit docketing 2012, had to be stopped,
        by the CIM staff office constant monitoring, of this high
        profile plaintiff.

## WHERE BY THE PLAINTIFF DEMANDS THE FOLLOWING RELIEF

1.      Trial Judgment against the defendant the United States
        in the  amount of up to $20 Billion Dollars in the court
        decided damages in each cause of action, caused by the
        BOP central inmate monitoring CIM staff office tort injury.

2. The courts continuing liberal and reasonable interpretation in the prose plaintiff legal papers.

3. The courts allowed prose plaintiff legal papers that show and fail to CITE Proper legal authority, confusion in the plaintiff papers Syntax, and poor sentence construction, UNDER well settled law.

4. The court deciding that the prison staff did make the plaintiffs over 3000 three thousand tort injury filed notices, and claim letters, were BOP staff made unavailable, for the statutory BOP staff plaintiff exhaustions, by the prison staff constant wrongful staff misconduct, in each of the causes of action.

5. That the prison staff did act in constant TORT INJURY of the BOP statutory exhaustion mandated law, and BOP restitution law statutory mandate daily in this entire complaint.

6. That the plaintiffs filed with the BOP staff over 3000 three thousand notices, claim letters, in the constant plaintiff tort injury, by the prison staff continuous tort doctrine tort injury, in each cause of action, did toll the statute of limitations, in each of the complaint causes of action, in the constant prison staff tort injury misconduct.

7. That the plaintiffs filed with the prison staff over 3000 three thousand plaintiff tort injury notices, and filed plaintiff tort injury claim letters, and the over 1000 one thousand plaintiff filed BOP exhaustions, are all related evidence in each cause of action, that discerns the date, prison staff names, and actual direct staff misconduct, tort injury evidence, in each cause of action.

7(a). That all the witnesses, and parties, in this action, are only located, at the BOP Washington, DC CIM staff office.

8. That the New York constructive trust law controls this law suit.

9. That the plaintiffs constructive trust restitution pension fund victims that includes all the over 200,000 plaintiff share holders, restitution debt victims, will be paid this law suit judgment proceeds, by the defendant the United States States.

10. That the defendant the United States will pay all legal fees, and related fees, and cost in this litigation, and preparation, of this action, with all thereafter litigation cost, and fees, in every stage in this action.

11. That the well settled law demands, and mandates, that this complaint can be supplemented and or amended.

DATED 9-7-2012

Respectfully Submitted

By _____ USE
PLAINTIFF PROSE



**NBLR**
National Black Leadership Roundtable
1112 16th Street, N.W.
Washington, D.C. 20036  Tel: 202-269 5337
info@nblr.us  www.nblr.us

The Honorable Walter E. Fauntroy
*President*
Dr. Dorothy I. Height
*Vice President*
The Honorable Merv M. Dymally
*Secretary*
Joseph E. Madison
*Treasurer*
Eulas Dortch
*Assistant Treasurer*

11 December 2009

*THE UNITED STATES CONGRESS,*

<u>Via FedEx, E-mail and Facsimile</u>

*ETHIC(S) COMMITTEE, IN*

The Hon. John Conyers, Jr.
Chairman, Judiciary Committee
U.S. House of Representatives
2426 Rayburn H.O.B.
Washington, DC 20515

*MARCH 2010 APPROVED,*

**RE:  Steven Jude Hoffenberg**

*THIS DOJ INTERVENTION,*

Dear Mr. Conyers:

*By THE HONORABLE JOHN CONYERS JR.*

Unlike other matters that I have brought to your attention in the past, the one that I bring to your attention now promises to both enable the U.S. Government to recover hundreds of millions of dollars, as well as to bring several notorious criminals to justice.

I write to request your assistance as Chairman of the U.S. House Judiciary Committee to encourage the U.S Department of Justice ("DOJ") to effect the release of Mr. Steven Jude Hoffenberg, who has been improperly incarcerated in federal prison for almost 15 years, and who is eligible for release under the Second Chance Act.

In addition to correcting egregious prosecutorial, defense counsel and Bureau of Prisons misconduct, Mr. Hoffenberg's release will precipitate (1) $500 million restitution to former Towers Financial Corporation investors, (2) DOJ's receipt of $2 billion in restitution, (3) the Ohio US Attorney's receipt of information about the persons responsible for the unsolved murder of a tax attorney, and (4) development of the Christ Assistance Ministry Charter Schools designed by Mr. Hoffenberg.

*EXHIBIT 1*

The following salient facts support my request.

## Mr. Hoffenberg's Age & Health and Release Eligibility under Second Chance Act

Born on 12 January 1945, in less than a month, Mr. Hoffenberg will be 65 years of age, the age at which Federal inmates are eligible for early release for health reasons, pursuant to the Second Chance Act (Public Law 110-199).

After almost 15 years in prison, Mr. Hoffenberg has a number of serious physical maladies that are not being properly addressed at the Fort Dix prison in New Jersey. He suffers from untreated hypertension, diabetes, and a slipped/herniated disc in his back. Almost toothless, he is in need of immediate dental attention, which has been denied him. In addition, he has a torn rotator shoulder cuff on his right shoulder and a skin cancer (also untreated) on his right leg.

A major provision in the Second Chance Act was to allow early release to eligible offenders over the age of 65 who have already served a total of at least 10 years or 75% of their prison sentence, whichever is greater. An eligible offender is defined as an inmate who is not a lifer, has not committed a crime of violence or a sex offense, does not have a history of violence, has not escaped or attempted escape, and that the Federal Government has determined that early release will result in a substantial net reduction of costs to the Federal Government. If you read between the lines, those inmates eligible for early release are those federal prison inmates who are elderly, in bad health, chronically or acutely ill, and are piling up huge medical bills for the Bureau of Prisons.

## Restitution

Mr. Hoffenberg's sentence requires restitution of $500 million dollars for former Towers Financial Corporation investors. Upon receiving an agreement for his release from prison, Mr. Hoffenberg will reveal the location of funds his former business partner and convicted felon Jeffrey Epstein holds within a $15 billion hedge fund. In addition to his tapping this hedge fund as the source for the $500 million restitution, Mr. Hoffenberg will pledge $2 billion for the Justice Department and $50 million for the Detroit Fireman and Policeman State Pension Funds.

In addition, in the style of Michael Milken, upon release, Mr. Hoffenberg will provide further philanthropic restitution by establishing minority community charter secular schools, utilizing the assistance of local church members, collectively organized within a church collaborative effort called the Christ Assistance Ministry.

## Prosecutorial & Defense Counsel Misconduct

The president of Towers Financial Corporation, Mr. Hoffenberg was convicted in the Southern District of New York on his guilty plea entered on 20 April 1995, to conspiracy to violate the securities law by fraudulently selling securities, mail fraud, conspiracy to obstruct justice and tax evasion.

-2-

EXHIBIT   1

Mr. Hoffenberg pleaded guilty to the charges on the understanding that the prosecutor, Michael Nardello, would submit a § 5K1.1 motion for a downward departure from sentencing guidelines, based on Mr. Hoffenberg's substantial assistance to the prosecution. The prosecutor never made the motion, nor did Mr. Hoffenberg receive any favorable consideration at the time of sentencing.

Mr. Hoffenberg was sentenced on 7 March 1997 to 20 years in prison. With his pre-sentence incarceration, he has now been in prison for the past 14 years. He will be 65 years old at his next birthday on 14 January 2010.

Several post-plea attorneys for Mr. Hoffenberg have unearthed facts which have established that in violation of 18 U.S.C. §208 -- which prohibits government employees from negotiating employment with a firm with a financial interest in a matter in which the government employee in his position as government employee is involved -- the prosecutor, Daniel Nardello, at the time he was prosecuting Mr. Hoffenberg, was soliciting employment with Decision Strategies, an enterprise that was doing business with the trustee in bankruptcy for Mr. Hoffenberg's Towers Financial Corporation and billed the bankruptcy trustee for nearly $200,000.

Additionally, Mr. Hoffenberg's pre-conviction defense counsel, Jeffrey Hoffman, also took a $450,000 bribe from the bankruptcy trustee in return for facilitating a guilty plea.

At a hearing on the denial of the § 5K1.1 motion, the prosecutor, Daniel Nardello, was not asked any questions concerning his solicitation of employment with Decision Strategies, at which he was employed immediately after he prosecuted Mr. Hoffenberg. This issue was raised during the appeal of the denial of Mr. Hoffenberg's habeas corpus relief. Since this prosecutorial misconduct had not been reviewed in the initial habeas papers, the issue was not addressed by either the District Court nor the Court of Appeals for the Second Circuit.

Several post-plea counsel for Mr. Hoffenberg have written to the Office of Professional Responsibility in the DOJ concerning this prosecutorial misconduct issue. In the absence of a court ruling, the Office declined to act, or even consider the issue, although the facts asserted were uncontroverted. I find it unusual that when furnished with facts concerning a prosecutor's uncontroverted illegal actions, the DOJ refuses to respond because the issue has not been ruled upon by a court of law.

Therefore, both the prosecutor and pre-plea defense counsel were sullied by improper financial conflict of interests.

## Identification of Murder Perpetrator

Mr. Hoffenberg's former business partner Jeffrey Epstein, has not been forthright with the prosecution in an open murder case in Columbus, Ohio led by United States Attorney Michael Garcia.

EXHIBIT 1

In 1997, Jeffrey Epstein and his partner Leslie Wexner were threatened with black mail from Leslie Wexner's attorney, regarding sex crimes with underage girls, crimes for which Mr. Epstein was eventually convicted in Florida. Mr. Epstein and Mr. Wexner contracted for the murder of Mr. Wexner's attorney. Mr. Hoffenberg is willing to reveal the identity and location of the contract killer, in return for reduced or suspension of his remaining prison time.

Of collateral interest, as part of a work-release program after his conviction as a child sex offender, Mr. Epstein was allowed to leave his cell during the day and work from an "office" in West Palm Beach, work that reportedly involved helping the government build a case against Ralph Cioffi and Matthew Tannin, the Bear Stearns hedge fund managers who misled investors in their subprime mortgage investment fund, which imploded last year and cost Mr. Epstein the $67 million he'd invested in the fund.

*EPSTEIN FIRED BY GOVERNMENT IN THE ABOVE EPSTEIN COOPERATION FRAUD*

**Prayer for Relief**

In sum, I write you now, Congressman Conyers, seeking relief for Mr. Hoffenberg. Whatever his crimes, he has served substantial incarceration time. Using the above information and arguments jointly or severally, please encourage and recommend the U.S. Attorney General Eric Holder to review this case, and in the interests of justice, direct the release of Mr. Hoffenberg from prison in time to spend Christmas with his wife Lisa Twardeau Hoffenberg.

*IN 2010 MRS HOFFENBERG WAS FOUND TO HAVE CANCER.*

At your convenience, I would be pleased to meet with you and your staff to discuss my request and the underlying facts concerning Mr. Hoffenberg's situation.

Thank you for your consideration.

Respectfully yours,

The Honorable Reverend Walter E. Fauntroy
Former Member, U.S. House of Representatives
District of Columbia (1971-1990)

cc:   Mr. Steven Jude Hoffenberg

Ms. Lisa Twardeau Hoffenberg

The Reverend Leonard L. Smalls

Thomas A. Duckenfield III, Esq.

*APPROVED APPLICATION BY THE UNITED STATES CONGRESS ETHICS COMMITTEE IN MARCH 2010*

*EXHIBIT 1*

-4-



# Y FAIR

**Handwritten notes (left column):**

① EPSTEIN WAS "BROKE," WHEN HE JOINED TOWERS FINANCIAL CORP..

② EPSTEIN WORKED FOR TOWERS WITH HOFFENBERG, AS HIS ASSISTANT.

③ HOFFENBERG WITH TOWERS FINANCIAL FINANCED THE "ENTIRE" EPSTEIN BUSINESS "START UP" AS THE "TOWERS EPSTEIN HOFFENBERG PARTNERSHIP"

**Handwritten notes (top right):**

March 2003 — VANITY FAIR MARCH no. 511 2003 — 9 PAGE EPSTEIN STORY

## Features

**SAYING FAREWELL TO A FRIEND: HERB RITTS, 1952–2002** In the cutthroat world of fashion and celebrity photography, Herb Ritts was an anomaly, not only supremely talented but kind and generous as well. With his last shoot on its cover, *V.F.* salutes a man who recognized beauty—of the body, the heart, and the mind ... **275**

**BEN'S OPEN ROAD** Half of the most gossiped-about movie couple since Liz and Dick, Ben Affleck, who hits theaters this month in *Daredevil*, has also become one of Hollywood's most bankable leading men. At Affleck's no-frills L.A. pad, Leslie Bennetts pops the questions everyone's been wanting to ask—about the engagement to J.Lo, Gwyneth's reaction, his stint in rehab, etc.—and gets some surprisingly forthright answers. Photographs by Herb Ritts ... **276**

**CARTIER-BRESSON'S DECISIVE MOMENT** In an exclusive interview at Henri Cartier-Bresson's Paris apartment, David Friend finds the provocative 94-year-old pioneer of photojournalism, who has a major retrospective and a new book, more in tune with the ghosts of Matisse and Cézanne than with the impact of his camera. Portraits by René Burri ... **282**

**IT'S A MAD, MAD MISS WORLD** The decision to take the struggling Miss World Pageant to predominantly Muslim Nigeria during the holy month of Ramadan cost more than anyone could have imagined. In the ensuing riots, 250 people were killed, while for the 90 contestants, as Judy Bachrach reports, the beauty-queen business turned very ugly indeed ... **294**

**THE TALENTED MR. EPSTEIN** Veiling much of his fantastically lavish lifestyle in mystery, Jeffrey Epstein claims to be protecting his billionaire clients. Is he simply protecting himself? Looking beyond the private Boeing 727 (with trading room) and the personal island, Vicky Ward investigates New York's bachelor financier ... **300**

**WINNER LOSE ALL** After successfully manipulating a computerized racetrack betting system, Chris Harn and two of his fraternity brothers thought they'd found the perfect scam. Then a 43-to-1 long shot won the Breeders' Cup Classic, and the odds turned against them. Bryan Burrough charts the fallout from a $3.1 million payday ... **306**

**FOR LOVE OF ASPEN** A tiny mining village has become America's A-list wilderness retreat, populated by enough celebrities to stage an Oscar broadcast. Talking to such Aspenites as Kevin Costner, Hunter Thompson, and Jill St. John, Mark Seal takes a hard but deeply affectionate reading of the town's real-estate boom, its social sets, and its soul. Photographs by Jonathan Becker ... **312**

JONATHAN BECKER

CONTINUED ON PAGE 50

EXHIBIT 2

EXHIBIT
3 ←



# THE TALENTE



TEXT BY JAMES TRACHE; RIGHT, BY DUSTIN CAINE

MR. BIG

Jeffrey Epstein in
New York, 2001. *Left,* Epstein's
nine-floor, 51,000-square-
foot town house. He also owns
a 7,500-acre ranch
in New Mexico, a house
in Palm Beach, and a
Caribbean island.

Lately, Jeffrey Epstein's
high-flying style has been
drawing oohs and aahs: the
bachelor financier lives
in New York's largest
private residence, claims to
take only billionaires as
clients, and flies celebrities
including Bill Clinton and
Kevin Spacey on his Boeing
727. But pierce his air
of mystery and the picture
changes. VICKY WARD
explores Epstein's investment
career, his ties to retail
magnate Leslie Wexner, and
his complicated past

D



**O**n Manhattan's Upper East Side, home to some of the most expensive real estate on earth, exists the crown jewel of the city's residential town houses. With its 15-foot-high oak door, huge arched windows, and *nine* floors, it sits on—or, rather, commands—the block of 71st Street between Fifth and Madison Avenues. Almost ludicrously out of proportion with its four- and five-story neighbors, it seems more like an institution than a house. This is perhaps not surprising—until 1989 it was the Birch Wathen private school. Now it is said to be Manhattan's largest private residence.

Inside, amid the flurry of menservants attired in sober black suits and pristine white gloves, you feel you have stumbled into someone's private Xanadu. This is no mere rich person's home, but a high-walled, eclectic, imperious fantasy that seems to have no boundaries.

The entrance hall is decorated not with paintings but with row upon row of individually framed eyeballs; these, the owner tells people with relish, were imported from England, where they were made for injured soldiers. Next comes a marble foyer, which does have a painting, in the manner of Jean Dubuffet ... but the host coyly refuses to tell visitors who painted it. In any case, guests are like pygmies next to the nearby twice-life-size sculpture of a naked African warrior.

Despite its eccentricity the house is curiously impersonal, the statement of someone who wants to be known for the scale of his possessions. Its occupant, financier Jeffrey Epstein, 50, admits to friends that he likes it when people think of him this way. A good-looking man, resembling Ralph Lauren, with thick gray-white hair and a weathered face, he usually dresses in jeans, knit shirts, and loafers. He tells people he bought the house because he knew he "could never live anywhere bigger." He thinks 51,000 square feet is an appropriately large space for someone like himself, who deals mostly in large concepts—especially large sums of money.

Guests are invited to lunch or dinner at the town house—Epstein usually refers to the former as "tea," since he likes to eat bite-size morsels and drink copious quantities of Earl Grey. (He does not touch alcohol or tobacco.) Tea is served in the "leather room," so called because of the cordovan-colored fabric on the walls. The chairs are covered in a leopard print, and on the wall hangs a huge, Oriental fantasy of a woman holding an opium pipe and caressing a snarling lionskin. Under her gaze, plates of finger sandwiches are delivered to Epstein and guests by the menservants in white gloves.

Upstairs, to the right of a spiral staircase, is the "office," an enormous gallery spanning the width of the house. Strangely, it holds no computer. Computers belong in the "computer room" (a smaller room at the back of the house), Epstein has been known to say. The office features a gilded desk (which Epstein tells people belonged to banker J. P. Morgan), 18th-century black lacquered Portuguese cabinets, and a nine-foot ebony Steinway "D" grand. On the desk, a paperback copy of the Marquis de Sade's *The Misfortunes of Virtue* was recently spotted. Covering the floor, Epstein has explained, "is the largest Persian rug you'll ever see in a private home—so big, it must have come from a mosque." Amid such splendor, much of which reflects the work of the French decorator Alberto Pinto, who has worked for Jacques Chirac and the royal families of Jordan and Saudi Arabia, there is one particularly startling oddity: a stuffed black poodle, standing atop the grand piano. "No decorator would ever tell you to do that," Epstein brags to visitors. "But I want people to think what it means to stuff a dog." People can't help but feel it's Epstein's way of saying that he always has the last word.

In addition to the town house, Epstein lives in what is reputed to be the largest private dwelling in New Mexico, on an $18 million, 7,500-acre ranch which he named "Zorro." "It makes the town house look like a shack," Epstein has said. He also owns Little St. James, a 70-acre island in the U.S. Virgin Islands, where the main house is currently being renovated by Edward Tuttle, a designer of the Amanresorts. There is also a $6.8 million house in Palm Beach, Florida, and a fleet of aircraft: a Gulfstream IV, a helicopter, and a Boeing 727, replete with trading room, on which Epstein recently flew President Clinton, actors Chris Tucker and Kevin Spacey, supermarket magnate Ron Burkle, Lew Wasserman's grandson, Casey Wasserman, and a few others, on a mission to explore the problems of AIDS and economic development in Africa.

Epstein is charming, but he doesn't let the charm slip into his eyes. They are steely and calculating, giving some hint at the steady whir of machinery lurking behind them. "Let's play chess," he said to me, after refusing to give an interview for this article. "You be white. You get the first move." It was an appropriate metaphor for a man who seems to feel he can win no matter what the advantage of the other side. *His* advantage is that no one really seems to know him or his history completely or what his arsenal actually consists of. He has carefully engineered it so that he remains one of the few truly baffling mysteries among New York's moneyed world. People know snippets, but few know the whole.

"He's very enigmatic," says Rosa Monckton, the former C.E.O. of Tiffany & Co. in the U.K. and a close friend since the early 1980s. "You think you know him and then you peel off another ring of the onion skin and there's something else extraordinary underneath. He never reveals his hand. . . . He's a classic iceberg. What you see is not what you get."

**E**ven acquaintances sense a curious dichotomy: Yes, he lives like a "modern maharaja," as Leah Kleman, one of his art dealers, puts it. Yet he is fastidiously, almost obsessively private—he lists himself in the phone book under a pseudonym. He rarely attends society gatherings or weddings or funerals; he considers eating in restaurants like "eating on the subway"—i.e., something he'd never do. There are many women in his life, mostly young, but there is no one of them to whom he has been able to commit. He describes his most public companion of the last decade, Ghislaine Maxwell, 41, the daughter of the late, disgraced media baron Robert Maxwell, as simply his "best friend." He says she is not on his payroll, but she seems to organize much of his life—recently she was making telephone inquiries to find a California-based yoga instructor for him. (Epstein is still close to his two other long-term girlfriends, Paula Heil Fisher, a former associate of his at the brokerage firm Bear Stearns and now an opera producer, and Eva Andersson Dubin, a doctor and onetime model. He tells people that when a relationship is over the girlfriend "moves up, not down," to friendship status.)

Some of the businessmen who dine with him at his home—they include newspaper publisher Mort Zuckerman, banker Louis Ranieri, Revlon chairman Ronald Perelman, real-estate tycoon Leon Black, former Microsoft executive Nathan Myhrvold, Tom Pritzker (of Hyatt Hotels), and real-estate

PAGE 1 OF 8



**O**n Manhattan's Upper East Side, home to some of the most expensive real estate on earth, exists the crown jewel of the city's residential town houses. With its 15-foot-high oak door, huge arched windows, and *nine* floors, it sits on—or, rather, commands—the block of 71st Street between Fifth and Madison Avenues. Almost ludicrously out of proportion with its four- and five-story neighbors, it seems more like an institution than a house. This is perhaps not surprising—until 1989 it was the Birch Wathen private school. Now it is said to be Manhattan's largest private residence.

Inside, amid the flurry of menservants attired in sober black suits and pristine white gloves, you feel you have stumbled into someone's private Xanadu. This is no mere rich person's home, but a high-walled, eclectic, imperious fantasy that seems to have no boundaries.

The entrance hall is decorated not with paintings but with row upon row of individually framed eyeballs; these, the owner tells people with relish, were imported from England, where they were made for injured soldiers. Next comes a marble foyer, which does have a painting, in the manner of Jean Dubuffet ... but the host coyly refuses to tell visitors who painted it. In any case, guests are like pygmies next to the nearby twice-life-size sculpture of a naked African warrior.

Despite its eccentricity the house is curiously impersonal, the statement of someone who wants to be known for the scale of his possessions. Its occupant, financier Jeffrey Epstein, 50, admits to friends that he likes it when people think of him this way. A good-looking man, resembling Ralph Lauren, with thick gray-white hair and a weathered face, he usually dresses in jeans, knit shirts, and loafers. He tells people he bought the house because he knew he "could never live anywhere bigger." He thinks 51,000 square feet is an appropriately large space for someone like himself, who deals mostly in large concepts—especially large sums of money.

Guests are invited to lunch or dinner at the town house—Epstein usually refers to the former as "tea," since he likes to eat bite-size morsels and drink copious quantities of Earl Grey. (He does not touch alcohol or tobacco.) Tea is served in the "leather room," so called because of the cordovan-colored fabric on the walls. The chairs are covered in a leopard print, and on the wall hangs a huge, Oriental fantasy of a woman holding an opium pipe and caressing a snarling lionskin. Under her gaze, plates of finger sandwiches are delivered to Epstein and guests by the menservants in white gloves.

Upstairs, to the right of a spiral staircase, is the "office," an enormous gallery spanning the width of the house. Strangely, it holds no computer. Computers belong in the "computer room" (a smaller room at the back of the house), Epstein has been known to say. The office features a gilded desk (which Epstein tells people belonged to banker J. P. Morgan), 18th-century black lacquered Portuguese cabinets, and a nine-foot ebony Steinway "D" grand. On the desk, a paperback copy of the Marquis de Sade's *The Misfortunes of Virtue* was recently spotted. Covering the floor, Epstein has explained, "is the largest Persian rug you'll ever see in a private home—so big, it must have come from a mosque." Amid such splendor, much of which reflects the work of the French decorator Alberto Pinto, who has worked for Jacques Chirac and the royal families of Jordan and Saudi Arabia, there is one particularly startling oddity: a stuffed black poodle, standing atop the grand piano. "No decorator would ever tell you to do that," Epstein brags to visitors. "But I want people to think what it means to stuff a dog." People can't help but feel it's Epstein's way of saying that he always has the last word.

In addition to the town house, Epstein lives in what is reputed to be the largest private dwelling in New Mexico, on an $18 million, 7,500-acre ranch which he named "Zorro." "It makes the town house look like a shack," Epstein has said. He also owns Little St. James, a 70-acre island in the U.S. Virgin Islands, where the main house is currently being renovated by Edward Tuttle, a designer of the Amanresorts. There is also a $6.8 million house in Palm Beach, Florida, and a fleet of aircraft: a Gulfstream IV, a helicopter, and a Boeing 727, replete with trading room, on which Epstein recently flew President Clinton, actors Chris Tucker and Kevin Spacey, supermarket magnate Ron Burkle, Lew Wasserman's grandson, Casey Wasserman, and a few others, on a mission to explore the problems of AIDS and economic development in Africa.

Epstein is charming, but he doesn't let the charm slip into his eyes. They are steely and calculating, giving some hint at the steady whir of machinery running behind them. "Let's play chess," he said to me, after refusing to give an interview for this article. "You be white. You get the first move." It was an appropriate metaphor for a man who seems to feel he can win no matter what the advantage of the other side. *His* advantage is that no one really seems to know him or his history completely or what his arsenal actually consists of. He has carefully engineered it so that he remains one of the few truly baffling mysteries among New York's moneyed world. People know snippets, but few know the whole.

"He's very enigmatic," says Rosa Monckton, the former C.E.O. of Tiffany & Co. in the U.K. and a close friend since the early 1980s. "You think you know him and then you peel off another ring of the onion skin and there's something else extraordinary underneath. He never reveals his hand.... He's a classic iceberg. What you see is not what you get."

**E**ven acquaintances sense a curious dichotomy: Yes, he lives like a "modern maharaja," as Leah Kleman, one of his art dealers, puts it. Yet he is fastidiously, almost obsessively private—he lists himself in the phone book under a pseudonym. He rarely attends society gatherings or weddings or funerals; he considers eating in restaurants like "eating on the subway"—i.e., something he'd never do. There are many women in his life, mostly young, but there is no one of them to whom he has been able to commit. He describes his most public companion of the last decade, Ghislaine Maxwell, 41, the daughter of the late, disgraced media baron Robert Maxwell, as simply his "best friend." He says she is not on his payroll, but she seems to organize much of his life—recently she was making telephone inquiries to find a California-based yoga instructor for him. (Epstein is still close to his two other long-term girlfriends, Paula Heil Fisher, a former associate of his at the brokerage firm Bear Stearns and now an opera producer, and Eva Andersson Dubin, a doctor and onetime model. He tells people that when a relationship is over the girlfriend "moves up, not down," to friendship status.)

Some of the businessmen who dine with him at his home—they include newspaper publisher Mort Zuckerman, banker Louis Ranieri, Revlon chairman Ronald Perelman, real-estate tycoon Leon Black, former Microsoft executive Nathan Myhrvold, Tom Pritzker (of Hyatt Hotels), and real-estate

MARCH 2003



personality Donald Trump—sometimes seem not all that clear as to what he actually does to earn his millions. Certainly, you won't find Epstein's transactions written about on Bloomberg or talked about in the trading rooms. "The trading desks don't seem to know him. It's unusual for animals *that* big not to leave any footprints in the snow," says a high-level investment manager.

Unlike such fund managers as George Soros and Stanley Druckenmiller, whose client lists and stock maneuverings act as their calling cards, Epstein keeps all his deals and clients secret, bar one client: billionaire Leslie Wexner, the respected chairman of Limited Brands. Epstein insists that ever since he left Bear Stearns in 1981 he has managed money only for billionaires—who depend on him for discretion. "I was the only person crazy enough, or arrogant enough, or misplaced enough, to make my limit a billion dollars or more," he tells people freely. According to him, the flat fees he receives from his clients, combined with his skill at playing the currency markets "with very large sums of money," have afforded him the lifestyle he enjoys today.

Why do billionaires choose him as their trustee? Because the problems of the mega-rich, he tells people, are different from yours and mine, and his unique philosophy is central to understanding those problems: "Very few people need any more money when they have a billion dollars. The key is not to have it do harm more than anything else.... You don't want to lose your money."

"You think you know him and then you peel off another ring of the onion."

H e has likened his job to that of an architect—more specifically, one who specializes in remodeling: "I always describe [a billionaire] as someone who started out in a small home and as he became wealthier had add-ons. He added on another addition, he built a room over the garage . . . until you have a house that is usually a mess.... It's a large house that has been put together over time where no one could foretell the financial future and their accompanying needs."

He makes it sound as though his job combines the roles of real-estate agent, accountant, lawyer, money manager, trustee, and confidant. But, as with Jay Gatsby, myths and rumor swirl around Epstein.

Here are some of the hard facts about Epstein—ones that he doesn't mind people knowing: He grew up middle-class in Brooklyn. His father worked for the city's parks department. His parents viewed education as "the way out" for him and his younger brother, Mark, now working in real estate. Jeffrey started to play the piano—for which he maintains a passion—at five, and he went to Brooklyn's Lafayette High School. He was good at mathematics, and in his early 20s he got a job teaching physics and math at Dalton, the elite Manhattan private school. While there he began tutoring the son of Bear Stearns chairman Ace Greenberg and was friendly with a daughter of Greenberg's. Soon he went to Bear Stearns, where, under the mentorship of both Greenberg and current Bear Stearns C.E.O. James Cayne, he did well enough to become a limited partner—a rung beneath full partner. He abruptly departed in 1981 because, he has said, he wanted to run his own business.

Thereafter the details recede into shadow. A few of the handful of current friends who have known him since the early 1980s recall that he used to tell them he was a

UNREAL ESTATE
*From top:* the "leather room" in Epstein's house, where "tea" is served to guests; Epstein at his Zorro ranch in 1991 with his "best friend," Ghislaine Maxwell; Epstein in 1979.

"bounty hunter," recovering lost or stolen money for the government or for very rich people. He has a license to carry a firearm. For the last 15 years, he's been running his business, J. Epstein & Co.

Since Leslie Wexner appeared in his life—Epstein has said this was in 1986; others say it was in 1989, at the earliest—he has gradually, in a way that has not generally made headlines, come to be accepted by the Establishment. He's a member of various commissions and councils: he is on the Trilateral Commission, the Council on Foreign Relations, the New York Academy of Sciences, and the Institute of International Education.

His current fan club extends to Cayne, Henry Rosovsky, the former dean of Harvard's Faculty of Arts and Sciences, and

TOP TO BOTTOM BY ALBERTO PINTO, LISA MINGE J. B SCHMITKA



"Jeffrey [knows] when he is winning.... He will let you choose your weapon," says Wexner.

"I think we both possess the skill of seeing patterns," says Wexner. "But Jeffrey sees patterns in politics and financial markets, and I see patterns in lifestyle and fashion trends. My skills are not in investment strategy, and, as everyone who knows Jeffrey knows, his are not in fashion and design. We frequently discuss world trends as each of us sees them."

**B**y the time Epstein met Wexner, the latter was a retail legend who had built a $3 billion empire—one that now includes Victoria's Secret, Express, and Bath & Body Works—from $5,000 lent him by his aunt. "Wexner saw in Jeffrey the type of person who had the potential to realize his [Jeffrey's] dreams," says someone who has worked closely with both men. "He gave Jeffrey the ball, and Jeffrey hit it out of the park."

Wexner, through a trust, bought the town house in which Epstein now lives for a reported $13.2 million in 1989. In 1993, Wexner married Abigail Koppel, a 31-year-old lawyer, and the newlyweds relocated to Ohio; in 1996, Epstein moved into the town house. Public documents suggest that the house is still owned by the trust that bought it, but Epstein has said that he now owns the house.

Wexner trusts Epstein so completely that he has assigned him the power of fiduciary over all of his private trusts and foundations, says a source close to Wexner. In 1992, Epstein even persuaded Wexner to put him on the board of the Wexner Foundation in place of Wexner's ailing mother. Bella Wexner recovered and demanded to be reinstated. Epstein has said they settled by splitting the foundation in two.

Epstein does not care that he comes between family members. In fact, he sees it as his job. He tells people, "I am there to represent my client, and if my client needs protecting—sometimes even from his own family—then it's often better that people hate me, not the client."

"You've probably heard I'm vicious in my representation of my clients," he tells people proudly; Leah Kleman describes his haggling over art prices as something like a scene out of the movie *Mad Max: Beyond Thunderdome*. Even a former mentor says he's seen "the dark side" of Epstein, and a Bear Stearns source recalls a meeting in which Epstein chewed out a team making a presentation for Wexner as

SPOILS OF SUCCESS
*From top:* Epstein's 70-acre island, Little St. James, in the U.S. Virgin Islands—he now calls it Little St. Jeff; Epstein with President Clinton in Brunei, 2002; Leslie Wexner with his future wife, Abigail, at the 1990 C.F.D.A. Fashion Awards, in New York, 1991.

Larry Summers, Harvard's current president. Harvard law professor Alan Dershowitz says, "I'm on my 20th book.... The only person outside of my immediate family that I send drafts to is Jeffrey." Real-estate developer and philanthropist Marshall Rose, who has worked with Epstein on projects in New Albany, Ohio, for Wexner, says, "He digests and decodes the information very rapidly, which is to me terrific because we have shorter meetings."

Also on the list of admirers are former senator George Mitchell and a gaggle of distinguished scientists, most of whom Epstein has helped fund in recent years. They include Nobel Prize winners Gerald

Edelman and Murray Gell-Mann, and mathematical biologist Martin Nowak. When these men describe Epstein, they talk about "energy" and "curiosity," as well as a love for theoretical physics that they don't ordinarily find in laymen. Gell-Mann rather sweetly mentions that "there are always pretty ladies around" when he goes to dinner *chez* Epstein, and he's under the impression that Epstein's clients include the Queen of England. Both Nowak and Dershowitz were thrilled to find themselves shaking the hand of a man named "Andrew" in Epstein's house. "Andrew" turned out to be Prince Andrew, who subsequently arranged to sit in the back of Dershowitz's law class.

Epstein gets annoyed when anyone suggests that Wexner "made him." "I had really rich clients before," he has said. Yet he does not deny that he and Wexner have a special relationship. Epstein sees it as a partnership of equals. "People have said it's like we have one brain between two of us: each has a side."

( 4 )

EXHIBIT

TOP TO BOTTOM, BY LISA HINDE, SARAH KELLEN, ADAM SCULL

being so brutal as to be "irresponsible."

One reporter, in fact, received three threats from Epstein while preparing a piece. They were delivered in a jocular tone, but the message was clear: There will be trouble for your family if I don't like the article.

On the other hand, Epstein is clearly very generous with friends. Joe Pagano, an Aspen-based venture capitalist, who has known Epstein since before his Bear Stearns days, can't say enough nice things: "I have a boy who's dyslexic, and Jeffrey's gotten close to him over the years.... Jeffrey got him into music. He bought him his first piano. And then as he got to school he had difficulty ... in studying ... so Jeffrey got him interested in taking flying lessons."

Rosa Monckton recalls Epstein telling her that her daughter, Domenica, who suffers from Down syndrome, needed the sun, and that Rosa should feel free to bring her to his house in Palm Beach anytime.

Some friends remember that in the late 80s Epstein would offer to upgrade the airline tickets of good friends by affixing first-class stickers; the only problem was that the stickers turned out to be unofficial. Sometimes the technique worked, but other times it didn't, and the unwitting recipients found themselves exiled to coach. (Epstein has claimed that he paid for the upgrades, and had no knowledge of the stickers.) Many of those who benefited from Epstein's largesse claim that his generosity comes with no strings attached. "I never felt he wanted anything from me in return," says one old friend, who received a first-class upgrade.

E pstein is known about town as a man who loves women—lots of them, mostly young. Model types have been heard saying they are full of gratitude to Epstein for flying them around, and he is a familiar face to many of the Victoria's Secret girls. One young woman recalls being summoned by Ghislaine Maxwell to a concert at Epstein's town house, where the women seemed to outnumber the men by far. "These were not women you'd see at Upper East Side dinners," the woman recalls. "Many seemed foreign and dressed a little bizarrely." This same guest also attended a cocktail party thrown by Maxwell that Prince Andrew attended, which was filled, she says, with young Russian models. "Some of the guests were horrified," the woman says.

"He's reckless," says a former business associate, "and he's gotten more so. Money does that to you. He's breaking the cash he made to himself—that he would never do anything that would expose him in the

media. Right now, in the wake of the publicity following his trip with Clinton, he must be in a very difficult place."

A ccording to S.E.C. and other legal documents unearthed by *Vanity Fair*, Epstein may have good reason to keep his past cloaked in secrecy: his real mentor, it might seem, was not Leslie Wexner but Steven Jude Hoffenberg, 57, who, for a few months before the S.E.C. sued to freeze his assets in 1993, was trying to buy the *New York Post*. He is currently incarcerated in the Federal Medical Center in Devens, Massachusetts, serving a 20-year sentence for bilking investors out of more than $450 million in one of the largest Ponzi schemes in American history.

When Epstein met Hoffenberg in London in the 1980s, the latter was the charismatic, audacious head of the Towers Financial Corporation, a collection agency that was supposed to buy debts that people owed to hospitals, banks, and phone companies. But Hoffenberg began using company funds to pay off earlier investors and service a lavish lifestyle that included a mansion on Long Island, homes on Manhattan's Sutton Place and in Florida, and a fleet of cars and planes.

Hoffenberg and Epstein had much in common. Both were smart and obsessed with making money. Both were from Brooklyn. According to Hoffenberg, the two men were introduced by Douglas Leese, a defense contractor. Epstein has said they were introduced by John Mitchell, the late attorney general.

Epstein had been running International Assets Group Inc. (I.A.G.), a consulting company, out of his apartment in the Solo building on East 66th Street in New York. Though he has claimed that he managed money for billionaires only, in a 1989 deposition he testified that he spent 80 percent of his time helping people recover stolen money from fraudulent brokers and lawyers. He was also not above entering into risky, tax-sheltered oil and gas deals with much smaller investors. A lawsuit that Michael Stroll, the former head of Williams Electronics Inc., filed against Epstein shows that in 1982 I.A.G. received an investment from Stroll of $450,000, which Epstein put into oil. In 1984, Stroll asked for his money back; four years later he had received only $10,000. Stroll lost the suit, after Epstein claimed in court, among other things, that the check for $10,000 was for a horse he'd bought from Stroll. "My net worth never exceeded four and a half million dollars," Stroll has said.

Hoffenberg, says a close friend, "really liked Jeffrey.... Jeffrey has a way of getting under your skin, and he was under Hoffenberg's." Also appealing to Hoffenberg were Epstein's social connections; they included oil mogul Cece Wang (father of the designer Vera) and Mohan Murjani, whose clothing company grew into Gloria Vanderbilt Jeans. Epstein lived large even then. One friend recalls that when he took Canadian heiress Wendy Belzberg on a date he hired a Rolls-Royce especially for the occasion. (Epstein has claimed he owned it.)

In 1987, Hoffenberg, according to sources, set Epstein up in the offices he still occupies in the Villard House, on Madison Avenue, across a courtyard from the restaurant Le Cirque. Hoffenberg hired his new protégé as a consultant at $25,000 a month, and the relationship flourished. "They traveled everywhere together—on Hoffenberg's plane, all around the world, they were always together," says a source. Hoffenberg has claimed that Epstein confided in him, saying, for example, that he had left Bear Stearns in 1981 after he was discovered executing "illegal operations."

Several of Epstein's Bear Stearns contemporaries recall that Epstein left the company very suddenly. Within the company there were rumors also that he was involved in a technical infringement, and it was thought that the executive committee asked that he resign after his two supporters, Ace Greenberg and Jimmy Cayne, were outnumbered. Greenberg says he can't recall this; Cayne denies it happened, and Epstein has denied it as well. "Jeffrey Epstein left Bear Stearns of his own volition," says Cayne. "It was never suggested that he leave by any member of management, and management never looked into any improprieties by him. Jeffrey said specifically, 'I don't want to work for anybody else. I want to work for myself.'" Yet, this is not the story that Epstein told to the S.E.C. in 1981 and to lawyers in a 1989 deposition involving a civil business case in Philadelphia.

In 1981 the S.E.C.'s Jonathan Harris and Robert Blackburn took Epstein's testimony and that of other Bear Stearns employees in part of what became a protracted case about insider trading around a tender offer placed on March 11, 1981, by the Seagram Company Ltd. for St. Joe Minerals Corp. Ultimately several Italian and Swiss investors were found guilty, including Italian financier Giuseppe Tome, who had used his relationship with Seagram owner Edgar Bronfman Sr. to obtain information about the tender offer.

After the tender offer was announced, the S.E.C. began investigating trades involving St. Joe at CONTINUED ON PAGE 343

ExHiBit 20

( 5 )

contains a parody of Affleck and Matt Damon making *Good Will Hunting II*, Affleck says to Damon, "What do I keep telling you? You gotta do the safe picture, then you do the art picture. Then sometimes you gotta do the payback picture because your friend says you owe him. Then sometimes you gotta go back to the well."

"Sometimes you do *Reindeer Games*," Damon says derisively.

"That's just mean," Affleck whines.

But it's a pretty accurate description of his career to date. "Ben takes these franchise properties so he can go and experiment," says Harvey Weinstein.

"He believes in trying to stretch himself and not keep doing the same thing," observes Bruce Willis, who starred with Affleck in *Armageddon*. "He's an awesome actor, and I think he's going to do great things."

Several years ago, in a televised interview on *Inside the Actors Studio*, Affleck said that his goal was to make big commercial movies. He has since revised his ambitions. "That's an adolescent aspiration, in a way. I'd rather be in movies like *Magnolia*, which I think is a towering achievement. I'll continue to act, but I won't act in a way that requires me to hang my name out there and do a lot of publicity. I'll do character roles and focus on writing and directing. It doesn't require the same kinds of sacrifice, in terms of quality of life and personal life, and it's a more holistic approach to the process. It's become increasingly frustrating for me to have my role in the storytelling process limited to one character. You have to be respectful and judicious about

your input when it's somebody else's project."

Affleck has always impressed colleagues with his voracious appetite for information and skills. "He has made it a point to learn everything he can about how the business works—not just the craft of acting, but from the producing standpoint, from the studio standpoint," says Jon Gordon, executive vice president of production at Miramax. "He knows how deals work. It's what sets him apart. If he wanted to run a studio at some point, he could. He's about as sharp as they come."

Affleck is already juggling his acting with screenwriting and such other commitments as Project Greenlight, the contest he and Damon started to help launch the careers of young filmmakers. Affleck's friends are certain he'll be directing soon. "There's no question," Weinstein says. "Both he and Matt. I think they're going to rewrite the rules. These guys can fix anything. There'll be home runs in both instances."

But there are other thoughts tickling the back of Affleck's mind as well. A passionate liberal, he campaigned for Al Gore, cares deeply about political issues, and is extremely well informed. He entertains himself by writing imaginary political speeches in his head. He would rather discuss AIDS in Africa than his movie career.

When Lopez goes to Affleck's mother's house for dinner, Weinstein reports, "J.Lo told me that the conversation at the table is always about politics—about government initiatives, educational initiatives, what's going on in the day."

So is Affleck planning to become the liberals' answer to Ronald Reagan? He admits that he entertains the thought of someday running for Congress, at least: "I think there's a real nobility to public service. It would be fun to run on a platform I really believed in, without any of the kind of compromises people make—without being beholden to the win-at-all-costs mentality."

And the invasion of privacy would be nothing new. "What are you going to say about me that hasn't already been said? I don't cheat, I don't drink, I don't do drugs, I live a clean life," Affleck says, his eyes twinkling.

"He's only 30 years old," says Jennifer Todd, who co-produced *Boiler Room*. "He still has an enormous amount of time to do things."

Time, and drive. "I think he's incredibly hungry," says Sean Bailey, who founded the media and production company Live-Planet with Affleck, Damon, and Chris Moore. "I think the guy has very grand aspirations. I don't think he's going to be content with just being a movie star. He knows he has the potential to do very big things."

Such ambitions could be derailed by any number of miscalculations, including a private life that generates too many sensational headlines, but Affleck has a clear idea of the ultimate goal. "On my deathbed, I have to be one who looks back and feels I lived a good and substantial and meaningful life," he says.

In the meantime, however, there's a wedding to plan. □

# Jeffrey Epstein

CONTINUED FROM PAGE 305 Bear Stearns and other firms. Epstein resigned from Bear Stearns on March 12. The S.E.C. was tipped off that Epstein had information on insider trading at Bear Stearns, and it was therefore obliged to question him. In his S.E.C. testimony, given on April 1, 1981, Epstein claimed that he had found "offensive" the way Bear Stearns management had handled a disciplinary action following its discovery that he had committed a possible "Reg D" violation—evidently he had lent money to his closest friend. (In the 1989 deposition he said that he'd lent approximately $20,000 to Warren Eisenstein, to buy stock.) Such an action could have been considered improper, although Epstein claimed he had not realized this until afterward.

According to Epstein, Bear Stearns management had questioned him about the loan around March 4. The questioners, Epstein said, were Michael (Mickey) Tarnopol and

Alvin Einbender. In his 1989 deposition Epstein recalled that the partner who had made an "issue" of the matter was Marvin Davidson. On March 9, Epstein said, he had met with Tarnopol and Einbender again, and the two partners told him that the executive committee had weighed the offense, together with previous "carelessness" over expenses, and he would be fined $2,500.

"There was discussion whether, in fact, I had ever put in an airline ticket for someone else and not myself and I said that it was possible, ... since my secretary handles my expenses," Epstein told the S.E.C. In his 1989 testimony he stated that the "Reg D" incident had cost him a shot at partnership that year.

What the S.E.C. seemed to be especially interested in was whether there was a connection between Epstein's leaving and the alleged insider trading in St. Joe Minerals by other people at Bear Stearns:

Q: Sir, are you aware that certain rumors may have been circulating around your firm in connection with your reasons for leaving the firm?
A: I'm aware that there were many rumors.
Q: What were the rumors you heard?
A: Nothing to do with St. Joe.
Q: Can you relate what you heard?
A: It was having to do with an illicit affair with a secretary.
Q: Have you heard any other rumors suggesting that you had made a presentation or communication to the Executive Committee concerning alleged improprieties by other members or employees of Bear Stearns?
A: I, in fact, have heard that rumor, but it's been from Mr. Harris in our conversation last week.
Q: Have you heard it from anyone else?
A: No.

A little later the interview focuses on James Cayne:

Q: Did you ever hear while you were at Bear Stearns that Mr. Cayne may have trader or insider information in connection with St. Joe Minerals Corporation?
A: No.
Q. Did Mr. Cayne ever have any conversation with you about St. Joe Minerals?
A: No.
Q: Did you happen to overhear any conversa-

( 6 )

EX HiBiT #2

# Jeffrey Epstein

tions between Mr. Cayne and anyone else regarding St. Joe Minerals?
A: No.

And still later in the questioning comes this exchange:

Q: Have you had any type of business dealings with Mr. Cayne?
A: There's no relationship with Bear Stearns.
Q: Pardon?
A: Other than Bear Stearns, no.
Q: Have you been a participant in any type of business venture with Mr. Cayne?
A: No.
Q: Do you have any expectation of participating in any business venture with Mr. Cayne?
A: No.
Q: Have you had any business participations with Mr. Theram?
A: No; nor do I anticipate any.
Q: Mr. Epstein, did anyone at Bear Stearns tell you in words or substance that you should not divulge anything about St. Joe Minerals to the staff of the Securities and Exchange Commission?
A: No.
Q: Has anyone indicated to you in any way, either directly or indirectly, in words or substance, that your compensation for this past year or any future monies coming to you from Bear Stearns would be contingent upon your not divulging information to the Securities and Exchange Commission?
A: No.

Despite the circumstances of Epstein's leaving, Bear Stearns agreed to pay him his annual bonus—which he anticipated as being approximately $100,000.

The S.E.C. never brought any charges against anyone at Bear Stearns for insider trading in St. Joe, but its questioning seems to indicate that it was skeptical of Epstein's answers. Some sources have wondered why, if he was such a big producer at Bear Stearns, he would have given it up over a mere $2,500 fine.

Certainly the years after Epstein left the firm were not obviously prosperous ones. His luck didn't seem to change until he met Hoffenberg.

One of Epstein's first assignments for Hoffenberg was to mastermind doomed bids to take over Pan American World Airways in 1987 and Emery Air Freight Corp. in 1988. Hoffenberg claimed in a 1993 hearing before a grand jury in Illinois that Epstein came up with the idea of financing these bids through Towers's acquisition of two ailing Illinois insurance companies, Associated Life and United Fire. "He was hired by us to work on the securities side of the insurance companies and Towers Financial, supposedly to make a profit for us and for the companies," Hoffenberg reportedly told the grand jury. He also alleged that Epstein was the "technician," ex-

ecuting the schemes, although, having no broker's license, he had to rely on others to make the trades. Much of Hoffenberg's subsequent testimony in his criminal case has proven to be false, and Epstein has claimed he was merely asked how the bids could be accomplished and has said he had nothing to do with the financing of them. Yet Richard Allen, the former treasurer of United Fire, recalls seeing Epstein two or three times at the company. He and another executive say they had direct dealing with Epstein over the finances. And in his deposition of 1989, Epstein stated that he was the one who executed "all" Hoffenberg's instructions to buy and sell the stock. He called it "making the orders." He could not recall whether he had chosen the brokers used.

To win approval from the Illinois insurance regulators for Towers's acquisition of the companies, Hoffenberg promised to inject $3 million of new capital into them. In fact, in his grand-jury testimony Hoffenberg claimed that he, his chief operating officer, Mitchell Brater, and Epstein came up with a scheme to steal $3 million of the insurance companies' bonds to buy Pan Am and Emery stock. "Jeffrey Epstein and Mitch Brater arranged the various brokerage accounts for the bonds to be placed with in New York, and I think one in Chicago, Rodman & Renshaw," Hoffenberg reportedly said. Then, said Hoffenberg, while making it appear as though they were investing the bonds in much safer financial instruments, they used them as collateral to buy the stock. "Epstein was the person in charge of the transactions, and Mitchell Brater was assisting him with it in coordination on behalf of the insurance companies' money," Hoffenberg claimed at the time.

At one point, according to Hoffenberg, a broker forged the documents necessary for a $1.8 million check to be written on insurance-company funds. The check was used to buy more stock in the takeover targets. Meanwhile, in order to throw the insurance regulators off, the $1.8 million was reported as being safely invested in a money-market account.

United Fire's former chief financial officer Daniel Payton confirms part of Hoffenberg's account. He says he recalls making one or two telephone calls to Epstein (at Hoffenberg's direction) about the missing bonds. "He said, 'Oh, yeah, they still exist.' But we found out later that he had sold those assets ... leveraged them ... [and] used some margin account to take some positions in ... Emery and Pan Am," says Payton.

Epstein's extraordinary creativity was, according to Hoffenberg, responsible for the purchase by the insurance companies of a $500,000 bond, with no money down. "Epstein created a great scheme to purchase a $500,000 treasury bond that would not be shown ... [as] margined or collateralized,"

he reportedly told the grand jury. "It looked like it was free and clear but it actually wasn't," he said.

Epstein has denied he ever had any dealings with anyone from the insurance companies. But Richard Allen says he recalls talking to Epstein at Hoffenberg's direction and telling him it was urgent they retrieve the missing bonds for a state examination. According to Allen, Epstein said, "We'll get them back." He had "kind of a flippant attitude," says Allen. "They never came back."

Epstein, according to Hoffenberg, also came up with a scheme to manipulate the price of Emery Freight stock in an attempt to minimize the losses that occurred when Hoffenberg's bid went wrong and the share price began to fall. This was alleged to have involved multiple clients' accounts controlled by Epstein.

Eventually, in 1991, insurance regulators in Illinois sued Hoffenberg. He settled the case, and Epstein, who was only a paid consultant, was never deposed or accused of any wrongdoing. Barry Gross, the attorney who was handling the suit for the regulators, says of Epstein, "He was very elusive.... It was hard to really track him down. There were a substantial number of checks for significant dollars that were paid to him, I remember.... He was this character we never got a handle on. Again we presumed that he was involved with the Pan Am and Emery run that Hoffenberg made, but we never got a chance to depose him."

"From the government's discovery in the main sentencing against Hoffenberg it would seem the government was perhaps a bit lazy," says David Lewis, who represented Mitchell Brater. "They went for what they knew they could get ... and that was the fraudulent promissory notes [i.e., the much larger and unrelated part of Hoffenberg's fraud, based in New York State].... What they couldn't get, they didn't bother with."

Another lawyer involved in the criminal prosecution of Hoffenberg says, "In a criminal investigation like that, when there is a guilty plea, to be quick and dirty about it, discovery is always incomplete.... They don't have to line up witnesses; they don't have to learn every fact that might come out on cross-examination."

Epstein was involved with Hoffenberg in other questionable transactions. Financial records show that in 1988 Epstein invested $1.6 million in Riddell Sports Inc., a company that manufactures football helmets. Among his co-investors were the theater mogul Robert Nederlander and attorney Leonard Toboroff. A source close to this transaction claims that Epstein told Nederlander and Toboroff that he had raised his share of the money from a Swiss banker,

(7)    EXHIBIT 02

whose identity they could not be allowed to know. But Hoffenberg has claimed the money came from him, and Towers's financial statements for that year show a loan to Epstein of $400,000. (Epstein has said he can't remember the details and has disputed the accuracy of the Towers financial reports.)

Around the same time, Nederlander and Toboroff let Epstein come in with them on a scheme to make money out of Pennwalt, a Pennsylvania chemical company. The plan was to group together with two other parties to take a substantial declared position in the stock. According to a source, Epstein was supposed to help Nederlander and Toboroff raise $15 million. He seemed to fail to find other investors, say those familiar with the deal. (Epstein has said he was merely an investor.) He invested $1 million, which he told his co-investors was his own money. But in his 1989 deposition he said that he put in only $300,000 of his own money. Where did the rest come from? Hoffenberg has said it came from him, in a loan that Nederlander and Toboroff didn't know about.

Two things happened that alarmed Nederlander and Toboroff. After the group signaled a possible takeover, the Pennwalt management threatened to sue the would-be raiders. Epstein was reluctant initially to give a deposition about his share of the money, telling Toboroff there were "reasons" he didn't want to. Then, after the opportunity for new investors was closed, co-investors recall Epstein announcing that he'd found one at last: Dick Snyder, then C.E.O. of the publisher Simon & Schuster, who wanted to put up approximately $500,000. (Neither Epstein nor Snyder can now recall the investment. Yet in the 1989 deposition Epstein said that he had recruited Snyder, whom he had met socially, into the deal.)

According to a source, Toboroff and Nederlander told Epstein that Snyder was too late, but, without their realizing it, Hoffenberg has claimed, Snyder wrote a check to Hoffenberg and bought out some of his investment. But then Snyder wanted out.

"Nederlander started to get these irate calls from [Snyder,] who wasn't part of the deal, saying he was owed all this money," says someone close to the deal. Toboroff and Nederlander were baffled.

Eventually, a source close to Hoffenberg says, Hoffenberg paid Snyder off.

Just as Nederlander and Toboroff were growing wary of Epstein, he became increasingly involved with Leslie Wexner, whom he had met through insurance executive Robert Meister and his late wife. Epstein has told people that he met Wexner in 1986 in Palm Beach, and that he won his confidence by persuading him not to invest in the stock market, just as the 1987 crash was approaching. His story has subsequently changed. When asked if Wexner knew about his connection to Hoffenberg, Epstein said that he began working for Wexner in 1989, and that "it was certainly not the same time."

Wherever and whenever it was that Epstein and Wexner actually met, there was an immediate and strong personal chemistry. Wexner says he thinks Epstein is "very smart with a combination of excellent judgment and unusually high standards. Also, he is always a most loyal friend."



**OFFICE SPACE**
The "office" in Epstein's house. It has no computers, but it does have a desk that Epstein tells people once belonged to banker J. P. Morgan, and "the largest Persian rug you'll ever see in a private home."

Sources say Epstein proved that he could be useful to Wexner as well, with "fresh" ideas about investments. "Wexner had a couple of bad investments, and Jeffrey cleaned those up right away," says a former associate of Epstein's.

Before he signed on with Wexner, Epstein had several meetings with Harold Levin, then head of Wexner Investments, in which he enunciated ideas about currencies that Levin found incomprehensible. "In fact," says someone who used to work very closely with Wexner, "almost everyone at the Limited wondered who Epstein was; he literally came out of nowhere."

"Everyone was mystified as to what his appeal was," says Robert Morosky, a former vice-chairman of the Limited.

Much of Epstein's work is related to cleaning up, tightening budgets, and efficiencies. One person who worked for Wexner and who saw a contract drawn up between the two men says Epstein is involved in "everything, not just a here, a little there. Everything!" In addition, he says, "Wexner likes having a hatchet man.... Whenever there is dirty work to be done he'd stick Jeffrey on it.... He has a reputation for being ruthless but he gets the job done."

Epstein has evidently been asked to fire personal-staff members when needed. "He was that mysterious person that everyone was scared to death of," says a former employee.

Meanwhile, he is also less than popular with some people outside Wexner's company with whom he now deals. "He 'inserted' himself into the construction process of Leslie Wexner's yacht.... That resulted in litigation down the road between Mr. Wexner and the shipyard that eventually built the vessel," says Lars Forsberg, a lawyer whose firm at the time, Dickerson and Reily, was hired to deal with litigation stemming from the construction of Wexner's *Limitless*—at 315 feet, one of the largest private yachts in the world. Evidently, Epstein stalled on paying Dickerson and Reily for its work. "It's probably once or twice in my legal career that I've had to sue a client for payment of services that he'd requested and we'd performed ... without issue on the performance," says Forsberg. In the end the matter was settled, but Epstein claims he now has no recollection of it.

The incident is one of a number of disputes Epstein has become embroiled in. Some are for sums so tiny as to be baffling; for instance, Epstein sued investment adviser Herbert Glass, who sold him the Palm Beach house in 1990, for $13,444—Epstein claimed this was owed him for furnish-

removed by Glass.

In 1998 the U.S. Attorney's Office sued Epstein for illegally subletting the former home of the deputy consul general of Iran to attorney Ivan Fisher and others. Epstein paid $15,000 a month in rent to the State Department, but he charged Fisher and his colleagues $20,000. Though the exact terms of the agreement are sealed, the court ruled against Epstein.

Wexner offers some insight into his friend's combative style. "Many times people confuse winning and losing," Wexner says. "Jeffrey has the unusual quality of knowing when

ExHiBiT #2 Two

CREDITS

# Jeffrey Epstein

he is winning. Whether in conversations or negotiations, he always stands back and lets the other person determine the style and manner of the conversation or negotiation. And then he responds in their style. Jeffrey sees it in chivalrous terms. He does not pick a fight, but if there is a fight, he will let you choose your weapon."

One case is rather more serious. Currently, Citibank is suing Epstein for defaulting on loans from its private-banking arm for $20 million. Epstein claims that Citibank "fraudulently induced" him into borrowing the money for investments. Citibank disputes this charge.

The legal papers for another case offer a rare window into Epstein's finances. In 1995, Epstein stopped paying rent to his landlord, the nonprofit Municipal Arts Society, for his office in the Villard House. He claimed that they were breaking the terms of the lease by not letting his staff in at night. The case was eventually settled. However, one of the papers filed in this dispute is Epstein's financial statement for 1988, in which he claimed to be worth $20 million. He listed that he owned $7 million in securities, $1 million in cash, zero in residential property (although he told sources that he had already bought the home in Palm Beach), and $11 million in other assets, including his investment in Riddell. A co-investor in Riddell says: "The company had been bought with a huge amount of debt, and it wasn't public, so it was meaningless to attach a figure like that to it … the price it cost was about $1.2 million." The co-investors bought out Epstein's share in Riddell in 1995 for approximately $3 million. At that time, when Epstein was asked, as a routine matter, to sign a paper guaranteeing he had access to a few million dollars in case of any subsequent disputes over the sale price, Wexner signed for him. Epstein has explained that this was because the co-investors wanted an indemnity against being sued by Wexner. One of the investors calls this "bullshit."

Epstein's appointment to the board of New York's Rockefeller University in 2000 brought him into greater social prominence. Boasting such social names as Nancy Kissinger, Brooke Astor, and Robert Bass, the board also includes such pre-eminent scientists as Nobel laureate Joseph Goldstein. "Epstein was thrilled to be elected," says someone who knows him.

After one term Epstein resigned. According to *New York* magazine, this was because he didn't like to wear a suit to meetings. A spokesperson for the Rockefeller board says Epstein left because he had insufficient time to commit; a board member recalls that he

was "arrogant" and "not a good fit." The spokesperson admits that it is "infrequent" for board members not to be renominated after only one term.

Still, the recent spate of publicity Epstein has inspired does not seem to have fazed him. In November he was spotted in the front row of the Victoria's Secret fashion show at New York's Lexington Avenue Armory; around the same time the usual coterie of friends and beautiful women were whisked off to Little St. James (which he tells people has been renamed Little St. Jeff) for a long weekend.

Thanks to Epstein's introductions, says Martin Nowak, the biologist finds himself moving from Princeton to Harvard, where he is assuming the joint position of professor of mathematics and professor of biology. Epstein has pledged at least $25 million to Harvard to create the Epstein Program for Mathematical Biology and Evolutionary Dynamics, and Epstein will have an office at the university. The program will be dedicated to searching for nature's algorithms, a pursuit that is a specialty of Nowak's. For Epstein this must be the summit of everything he has worked toward: he has been seen proudly displaying Harvard president Larry Summers's letter of commitment as if he can't quite believe it is real. He says he was reluctant to have his name attached to the program, but Summers persuaded him. He rang his mentor Wexner about it, and Wexner told him it was all right.

An insatiable, restless soul, always on the move, Epstein builds a tremendous amount of downtime into his hectic work schedule. Yet there is something almost programmed about his relaxation: it's as if even pleasure has to be measured in terms of self-improvement. Nowak says that, when he goes to stay with Epstein in the Caribbean, they'll get up at six and, as the sun rises, have three-hour conversations about theoretical physics. "Then he'll go off and do some work, re-appear, and we'll talk some more."

Another person who went to the island with Epstein, Maxwell, and several beautiful women remembers that the women "sat around one night teasing him about the kinds of grasping women who might want to date him. He was amused by the idea. … He's like a king in his own world."

Many people comment there is something innocent, almost childlike about Jeffrey Epstein. They see this as refreshing, given the sophistication of his surroundings. Alan Dershowitz says that, as he was getting to know Epstein, his wife asked him if he would still be close to him if Epstein suddenly filed for bankruptcy. Dershowitz says he replied, "Absolutely. I would be as interested in him as a friend if we had hamburgers on the boardwalk in Coney Island and talked about his ideas." □

## FASHION

**Cover:** Ben Affleck's Double RL T-shirt from Double RL, N.Y.C. and LA, or go to www.polo.com, for Levi's jeans, call 800-USA-LEVI, Deborah Waknin for Art Mix (the Agency)

**Page 96:** Chrome Hearts shirt from Chrome Hearts, N.Y.C., or call 212-327-0707, for Ray-Ban sunglasses, call 888-LUXOTTICA.

**Page 123:** Peter Cincotti's Emporio Armani shirt from Emporio Armani boutiques nationwide; Ralph Lauren suspenders from selected Polo Ralph Lauren stores; Kim Meehan for Walter Schupfer Management.



**Page 140:** Peter Cincotti's shirt by Thomas Pink; suit by Giorgio Armani; tie by DKNY; Brioni coat by special order from selected Brioni stores.
**Page 151:** Lev Glazman and Alina Roytberg styled by Jane Herships.

**Page 160:** Styled by Angela Groff for Ennis, Inc.
**Page 214:** For June Havoc's Gina Simonelli Designs scarf, available by special order, call 978-499-2915.



**Page 220:** Bernadette Peters's Donna Karan New York dress from Donna Karan New York stores nationwide and Bergdorf Goodman, N.Y.C.; Paul Smith Women coat from Henri Bendel, N.Y.C., and Traffic, L.A.; Chanel jewelry and gloves from Chanel boutiques nationwide, or call 800-550-0005; Narciso Rodriguez shoes from Jill Kohl, Santa Monica, Calif., and Capitol, Charlotte, N.C.; Lambertson Truex handbag by special order from Bergdorf Goodman, N.Y.C.; Ghurka luggage from Ghurka, N.Y.C., or call 800-587-1584.

**Page 223:** Agnes Bruckner's Tom Ford for Yves Saint Laurent Rive Gauche dress from Yves Saint Laurent Rive Gauche boutiques, N.Y.C. and Houston.

**Page 226:** Dyan Cannon styled by Linda Medvene, top and pants by Dolce & Gabbana, from Dolce & Gabbana, Beverly Hills; jewelry by Wendy Walker, from Wendy Walker, L.A., shoes by Jimmy Choo, from Jimmy Choo, Beverly Hills.

**Pages 276–77:** Ben Affleck's Guess shirt from Guess stores nationwide, or go to www.guess.com, Versace boots from Versace boutiques worldwide, or go to www.versace.com, or call 888-3VERSACE



**Pages 278–79:** Double RL T-shirts from Double RL, NYC and LA, or go to www.polo.com, Chrome Hearts long-sleeved shirt from Chrome Hearts, N.Y.C., or call 212-327-0707; for Ray-Ban sunglasses, call 888-LUXOTTICA.

**Page 281:** Tommy Hilfiger jacket from Tommy Hilfiger stores worldwide, or call 800-TOMMY4U, Double RL T-shirt from Double RL, NYC and LA, or go to www.polo.com, for Levi's jeans, call 800-USA-LEVI

( 9 )   EXHiBiT #3 Two

# MINTZ & FRAADE, P.C.

## COUNSELORS AT LAW
### 488 MADISON AVENUE
### NEW YORK, NEW YORK 10022

TELEPHONE
(212) 486-2500

TELECOPIER
(212) 486-0701

OF COUNSEL
JAY D. FISCHER
EDWARD G. KRAMER
KEVIN J. McGRAW
ARTHUR L. PORTER, JR.
JON M. PROBSTEIN
SEYMOUR REITKNECHT
I. FREDERICK SHOTKIN

July 1, 2011

Ms. Williams, Assistant to
Preet Bharara, US Attorney
Southern District of New York
One Saint Andrews Plaza
New York, New York 10007

Re: Jeffrey Epstein

Dear Ms. Williams:

This letter is being sent on behalf of Steven Hoffenberg. We have enclosed a "Jeff Epstein Investor Audit Project", which has been prepared by Steven Hoffenberg, who requested that we send it to you to provide to Mr. Bharara.

If you have any questions, please contact the undersigned.

Very truly yours,

Mintz & Fraade, P.C.

By _____
Alan P. Fraade

EX HIBIT 3

PAGE 1 of 5

CC: Mr. Steven Hoffenberg
APF/hm

N:\M&F\ADMIN2\APF\Jeff Epstein Investor Audit Project Ltr.doc

## JEFF EPSTEIN INVESTOR AUDIT PROJECT

1. The currency **future** contracts **copy**, are **not** provided to each investor, by Epstein.

2. **Currency** is a **commodity**, as defined under, the **Commodity Exchange** Act, hereinafter **CEA**.

3. Each currency transaction, for the **investor(s)**, are placed in needed valid **counterparty**, in the **bank**.

4. The **bank** counterparty, **trade(s)** the investor currency account(s).

5. Each investor **currency account**, must be **listed** by the **bank**, in the **name of each investor**.

6. Epstein **conceal(s)**, the investor required **name**, from the **bank** currency trading account(s).

7. Epstein is **not** the valid investor counterpařy, that must **trade**, for each investor account.

8. The investor account, will **not** take the physical delivery, of the **trading currency**.

9. **Commodity Futures Trading Commission**, may open the investigation in currency investor trading violation(s), by Epstein.

10. **Commodity Futures Trading Commission vs International Foreign Currency Inc** Etal 334 F.Supp 2d 305 (EDNY 2004), show(s) the investor currency basic trading.

11. The investor **fund(s)**, are deposited in, the Epstein account(s), **not** the investor currency account(s), operated by the **bank** currency trader.

12. Epstein, **not the bank**, has authority, in the investor funds.

EXHIBIT 3                    PAGE 2 OF 5

13. **Violation(s)** in the investor currency account, may show up at, the bank currency trading **accounts**.

14. Epstein operate(s) **alone**, the **bank** currency trading accounts, **concealing** that evidence, from the **investors**.

15. Each investor **audit**, in the bank currency trading accounts, will show, the **violation(s)**, by Epstein.

16. The investor **contract(s)** with Epstein, will show the **road map**, in the Epstein **violation(s) of Federal law**.

17. The Hoffenberg collection assistance, with the investors, will produce, the Epstein **violation(s)**, in Federal law.

18. The **Commodity Futures Trading Commission**, will act, in the Epstein **turnover** of account evidence, for each **investor**, if needed.

19. Hoffenberg will **assist**, in the mandated **Collection Audit**, in each investor **account**.

20. The Collection Investor Audit, will be performed by **expert(s)**, in this investment.

21. Hoffenberg can **assist** in picking the investor **collection audit experts**, In addition to the audit work process.

22. Epstein stated in the **media** that Epstein alone, operate(s), the Investor Currency Trading strategies, like **Madoff**.

23. Epstein alone **structure(s)**, the investor currency trading account, profit and loss, like **Madoff**.

24. The Epstein investor **solicitation fraud**, will show how, the investor Epstein **contract**, prove(s) the Epstein investor fraud, **scheme**.

25. Epstein violate(s) the **CEA** anti fraud provision(s), with each

EX HIBIT 3                    PAGE 3 OF 5

investor account, Epstein margin credit from the **bank** trading the currency, in the Epstein **scheme**.

26. The Epstein investor **bad faith**, extreme fraud scheme, **convert(s)** the massive **bank** margin credit account, in the Epstein **profit**, that defraud(s) each investor account.

27. The **bank** major margin credit account, provide(s). Epstein with the **fund(s)**, that Epstein **convert(s)**, from each **investor**, into the Epstein account currency trading **profit(s)**.

28. The Epstein investor **bad faith scheme**, remove(s) from each investor currency trading account, the bank **major margin trading credit** with **no** material disclosure, to the investors.

29. Epstein stated in the **Media**, that Epstein is **paid** a flat fee, from each investor account.

30. The **flat fee** Epstein statement, from each investor account charge, show(s) the Epstein **fraud**, bad faith, by **converting** the investor **bank** margin credit **account**, into the Epstein account trading use.

31. The Epstein trading profit(s), **come(s) from,** the investor looted defrauded **bank**, margin trading **credit**, for each **investor**, that Epstein loot(s) in his trading accounts, from each investor account profit.

32. The Epstein investor **contract(s)**, **conceal(s)** and defraud(s), each investor in the **bank** margin trading credit.

33. The Epstein **extraordinary bank margin credit**, that Epstein **loots**, from each investor **account**, provide(s) the Epstein **profit**, in violation of Federal law. **Investor Epstein Contract Fraud Scheme.**

EXHIBIT 3          (3)      PAGE 4 OF 5

*BILLIONAIRE*
*JEFF EPSTEIN*
*CRIME(S) ARE LIKE MADOFF CRIMES*

# DealB%k

# Pursuing Madoff, Long Before His Ponzi Scheme Collapsed

**By PETER LATTMAN**

In 2000, Harry M. Markopolos made a presentation to a senior enforcement lawyer at the Securities and Exchange Commission. The topic: Bernard L. Madoff Securities, an investment business with remarkably steady returns. He offered possible explanations for the firm's uncanny success, including an explosive one.

"The entire fund is nothing more than a Ponzi scheme," wrote Mr. Markopolos, then a Boston money manager, in his submission to the agency.

Eight years later, Mr. Madoff confessed.

Among the more astonishing subplots of the Madoff saga is the tale of Mr. Markopolos's efforts to expose the fraud and the S.E.C.'s bungled attempts to uncover it.

It is no wonder that Hollywood took an interest in his story. "Chasing Madoff," a documentary opening in theaters on Friday, chronicles Mr. Markopolos's quest. The movie, which was produced, written and directed by Jeff Prosserman, is based on the 2010 memoir "No One Would Listen."

In an interview this week, Mr. Markopolos, 54, who calls himself a whistleblower specialist, discussed the film and what he was up to these days.

**Q.** *How did this documentary get made?*

**A.** In the months after Bernie turned himself in, I got 30 movie offers. Half were from screenwriters and movie studios. The other half were from documentary filmmakers. It came down to personal relationships. A producer had grown up with my lawyer, and Jeff Prosserman was his young protégé. Jeff wanted to do the film and contacted the producer. The rest is history.

**Q.** *The film recreates scenes in which you're carrying guns, checking for bombs under your car and wearing bulletproof vests. You seemed paranoid that Madoff or his people were going to kill you.*

**A.** Well, it's not paranoia. Do you do white-collar fraud investigations? I do. Do F.B.I. agents carry guns? They do. Why? Just in case, and that's why I carry the gun. Bernie was playing a very dangerous game. When I spoke to the F.B.I. agent in charge of the case he told me, "Harry, for that kind of money, so many billions, bad things happen to people, and you're very lucky."

**Q.** *What about when you're lurking in the shadows during an Eliot Spitzer*



CHESTER HIGGINS JR./THE NEW YORK TIMES

"Chasing Madoff," a documentary opening in theaters on Friday, chronicles Harry M. Markopolos's efforts to expose Bernard L. Madoff's fraud.

speech at the John F. Kennedy library in Boston and then put on a pair of gloves to hand over a Madoff file to a Spitzer aide?

**A.** Yeah, I didn't want any fingerprints on that one. That was an anonymous submission. I had twins about to be born, so I was afraid. Spitzer was rushing out through the back door to catch a ride to the airport, so I don't know that he ever received those documents. I talked to Eliot over cocktails a couple weeks ago. He says he didn't. Together, we could've changed history.

**Q.** *Cocktails with Spitzer? Are you two pals?*

**A.** I don't know about pals. We met backstage last month at the after party on the Bill Maher show. He said he'd like to get together. I'd love to. As fellow white-collar fraud investigators, we have a lot in common. He is the best

crime fighter of our generation and was the last best hope in this case.

**Q.** *What would you say about the state of the S.E.C. today? It's made headlines again about its document destruction policies.*

**A.** It's embarrassing, and the S.E.C. has to stop shooting themselves in the foot at every opportunity. They need to start doing big cases. I think they're capable of it and proved that with the Goldman Sachs $550 million settlement. They sent hundreds of people away to become certified fraud examiners. So they actually realize that they're in the fraud-fighting business and need to stop frauds before they blow up, and that's a sea change for them.

**Q.** *Was there anything that disappointed you about the documentary?*

**A.** Yes. In the movie, my kid said that the S.E.C. was bad and should go to jail.

But they weren't corrupt. They were systemically incompetent, which is actually far worse.

**Q.** *What's it feel like being famous for ...*

**A.** The biggest failed investigation in history? It's tough. No one likes to lose.

**Q.** *So what frauds are you exposing these days?*

**A.** The ones I can talk about? I've uncovered that two custody banks, Bank of New York and State Street, were stealing hundreds of millions each year from pension funds in the currency markets by backdating trades and choosing improper prices. [Bank of New York and State Street have denied these allegations, which are the subject of civil lawsuits filed by a whistle-blower group in several states.]

**Q.** *Have you tried to contact Mr. Madoff since his arrest? As a fraud investigator isn't there anything you could learn from him?*

**A.** I have not bothered to contact Mr. Madoff, nor will I. In his jailhouse interviews, he goes out of the way to say how much he hates me, which is the highest possible praise I can receive as a certified fraud examiner.

**Q.** *How much money have you made from your role in the Madoff scandal?*

**A.** Oh, I got a huge book advance of $43,600. The book seems to be doing well. It's in its fourth printing, but I've gotten no royalties. I don't understand the royalty statements.

**Q.** *Maybe you should investigate your publisher.*

**A.** Yeah, I always wonder about that. The book advance was actually $300,000, but we split it. I had a literary agent, a ghostwriter who helped me, and we split it among the team. It took a year of my life, so how smart was I? You don't write a book for money. I don't think that you're in journalism for the money.

**Q.** *I'm not. What about the documentary?*

**A.** We got an even bigger sum. I think it was $6,000 that we divided a number of ways. I think we just used it for legal fees for a Hollywood movie that we hope comes out in a few years.

**Q.** *So who would you want to play you?*

**A.** I wouldn't get to pick that. I happen to like Christian Bale, but it could be anybody. It doesn't matter. Pee-wee Herman would be fine.

EXHIBIT 3        PAGE 5 of 5

**17**

New York Post, Friday, January 25, 2008   nypost.com

# TYCOON PERVED ME AT 14

## $50M suit hits NY creep over mansion 'massage'



Patrick McMullan

**SLEAZE:** Jeffrey Epstein molested a girl procured for him by Haley Robson (left), the Florida lawsuit claims.

By DAREH GREGORIAN

A young alleged victim of Manhattan moneyman Jeffrey Epstein's "sexual preference and obsession for underage minor girls" sued yesterday, claiming her life went spinning into "a downward spiral" after he abused her.

In a $50 million federal lawsuit, the Florida girl says she was 14 when Epstein preyed upon her at his West Palm Beach mansion and caused her to "suffer severe and permanent traumatic injuries."

"The allegations that a man of tremendous wealth, power and influence used his position to trap young girls for his sexual pleasure is reprehensible," said Jeffrey Herman, the lawyer for the girl identified only as "Jane Doe."

"It's really victimized her and her whole family."

Doe is at the center of a sensational criminal case against Epstein that is pending in West Palm Beach, where police charge that the billionaire regularly paid young women to give him massages while he masturbated and sometimes groped them.

Epstein is expected to be sentenced to 18 months in prison when he pleads guilty in March to a single charge of soliciting an underage prostitute.

One of Epstein's lawyers, Lilly Ann Sanchez, said, "We are dismayed, but not surprised, by the filing ... The lawsuit confirms what we have always believed — that the allegations are driven by financial motivation."

Herman said the allegations are driven by Epstein having had "a 14-year-old girl up in his massage room."

The suit says Epstein has "assaulted girls in Florida, New York and on his private island, known as Little St. James, in St. Thomas."

Jane Doe says she was recruited by a college student named Haley Robson, who allegedly sought poor, underage girls for Epstein. They would be enticed by $200 to $300 per "massage" session, "and were perceived as less likely to complain to authorities if allegations of improper conduct were made."

The girl "fell into Epstein's trap" in early 2005, when Robson brought her to his estate, the suit says. She was allegedly led up to the massage room, and was alone in the room when Epstein arrived wearing only a towel. He then lay down naked on the massage table.

Epstein ordered the girl to strip to her underwear, then sexually assaulted her, the suit says.

She was paid $300 by Epstein, and Robson was paid $200 by Epstein for bringing the girl, the suit says.

Herman said his clients, including Jane Doe's father and stepmother, are suing for money "because that's all they can sue for. If there was a magic wand that could take this all away, they would prefer that."

Sanchez said Epstein was duped into having an encounter with the girl because she'd told Epstein she was 18, and she represented herself as being 18 on her MySpace page.

"That's all spin to me. It doesn't change the facts of the case," Herman said.

The suit is the second sex-assault suit to be filed against Epstein, a former teacher at the prestigious Dalton School on the Upper East Side.

*dareh.gregorian@nypost.com*

New York Post

**STEVEN JUDE HOFFENBERG**
Chairman & CEO (1975-1993)
Towers Financial Corporation
305 East 40th Street, Suite 8A
New York, New York 10016
Phone: (212) 949-1935

**RE:** GUARANTEED COLLECTION CORPORATION'S JOINT VENTURE WITH
SOME THREE HUNDRED (300) SMALL COLLECTION AGENCIES

**INTRODUCTION INTO THE MR. HOFFENBERG PAST OWNERSHIP
OF TOWERS FINANCIAL CORPORATION HEREINAFTER, TFC, WHICH
WAS DEPOSITING 1½ BILLION DOLLARS PER YEAR IN 1992-1993**

**1.** - TFC acted as a Collection Agency with their in-house
legal department staffed by collection attorneys from the
TFC inception when Mr. Hoffenberg formed TFC in 1975. Mr.
Hoffenberg was the controlling share holder of TFC from
it's inception in 1975, and then ongoing to April 1993.
In addition, TFC provided their 27,000 clients with
collection agency assistance, and litigation assistance to
recover their past due account claims. TFC provided their
clients with the purchase of their past due claims, or
financing for the client's account past-due claims.

**2.** - In 1986 TFC became a non-reporting public corporation
when Mr. Hoffenberg took over a non-operating, and non
reporting public corporation. Thereafter, TFC with the TFC
operating corporations sold some $650 Millions Dollars in
stock notes and bond securities on Wall Street in the
capital markets. Mr. Hoffenberg did a joint-venture
agreement with a securities broker dealer corporation in
1987. That securities firm sold the above $650 Million
Dollars in TFC stock notes and bonds with the assistance of
other contracted securities broker dealer corporations. · In

EX H I B I T Y          -1-

1993 and 1994 TFC filed all of it's operating corporations into their chapter 11 bankruptcy proceedings. The bankruptcy filings were caused by the filed litigation against TFC and Mr. Hoffenberg with other persons who were co-defendants in the Fraud lawsuit filed by the United States Securities and Exchange Commission (SEC). The SEC claimed that TFC had overvalued their assets under Fraud when TFC sold the above $650 Million Dollars in securities.

## TFC COLLECTION OPERATIONS AND ACCOUNT CLAIMS
## FINANCE AND PURCHASE PROGRAMS FOR THE TFC CLIENTS

3.  -   TFC collection agency account claims recovery business services over 27,000 clients in the HealthCare and Corporate Industries. TFC provided their clients with collection account claims recovery assistance and/or litigation assistance in the recovery of the TFC clients past-due account claims. TFC's in-house legal department was staffed by expert collection attorneys who filed some five hundred (500) lawsuits per week to recover the client account past-due claims.

4.  - TFC provided their clients with the financing for their past-due account claims and/or the purchase of the past-due account claims. In addition, TFC did provide their clients with financing for all of their account claims and other assets. At the time of the TFC chapter 11 bankruptcy filing in 1993, the TFC corporations were then depositing 1½ Billion Dollars per year.

EX HiBiT 4

**5.** - TFC had built a nationwide sales force of account executives who assisted clients in every city in America. In addition, TFC built a nationwide telemarketing operation that provided client appointments for the TFC account executives.

## THE COLLECTION OPERATIONS ASSISTED CLIENTS IN THE HEALTH CARE AND CORPORATE INDUSTRIES IN AMERICA AND AROUND THE WORLD

**6.** - TFC collection claims operations serviced some 27,000 clients in America and around the world. TFC was depositing some 1½ Billion Dollars per year from all of its operations on or about 1992-1993.

## THE HEALTH CARE CLIENTS

**7.** - The clients were all types of Health Care providers such as hospitals, nursing homes, medical clinics, and other Health Care Providers.

## THE HEALTH CARE CLIENT ACCOUNT CLAIMS DEBTORS

**8.** - The Health Care client account claims debtors were insurance companies, Medicaid, Medicare, Blue Cross, Blue Shield, Health Maintenance Organizations, HMO, Unions and Third Party Corporations that paid the Health Care benefits for many corporations under the Corporate Employees Health Care Benefit Coverage Programs. Recovery by collection and/or litigation was made from the above Health Care debtors.

EXHIBIT 4

-3-

## THE CORPORATE CLIENTS ACCOUNT CLAIMS DEBTORS

**9.** - The corporate clients were each and every type of corporation that provided credit to other corporations. In some client corporations, the claims account debtors were consumers. Recovery by collection and/or litigation was made from every type of corporate debtor in America and around the world.

## THE NEW GUARANTEED COLLECTION CORPORATION GUARANTY OF RECOVERY CLIENT PAST-DUE ACCOUNT CLAIMS PROGRAMS

**10.** - Each small collection agency staff will now sell our client guaranty of past-due account claims recovery programs with all of the client collection programs set forth in this document.

## GUARANTEED COLLECTION CORPORATION HEREINAFTER GCC PROVIDES CLIENTS WITH THEIR GUARANTY OF RECOVERY COLLECTION PROGRAMS FOR THE CLIENT PAST-DUE ACCOUNT CLAIM DEBTORS

**11.** - GCC provides clients with the most **powerful collection assistance programs available today.** Each GCC client has the right to use our guaranty of past-due collection account claim debtors recovery program(s). GCC provides the guaranty recovery programs that **stops our clients loss** on their past due account claims recovery. **GCC underwrites** the level of recovery that each client will use to stop their loss on their past due account claims recovery. These powerful programs allows GCC clients to **project and know** the amount they will recover from their

*EXHIBIT 4*   -4-

past due account claims.

## OVER TEN THOUSAND (10,000) SMALL COLLECTION AGENCY OWNERS UNDERSTAND THE NEW GCC BACK OFFICE COLLECTION PROGRAMS THAT WILL CHANGE THEIR SMALL COLLECTION AGENCY BUSINESS WITH THE USE OF EVERY COLLECTION ACCOUNT CLAIMS PROGRAM SET FORTH HEREIN

12. - GCC will now form a joint venture agreement with over three hundred (300) small collection agency owners. Each joint venture agreement will be different based on the benefits to GCC from each small collecion agency partnership. The GCC **back office operations** will assist the clients in all of the above collection finance and guaranty account claims recovery programs. The small collection agency will act as a GCC sales office that are on computer link with the GCC back office operations. All of the above collection with litigation and finance client client assistance programs will be performed in the GCC back office operations. The small collection agency staff will sell the above client programs.

Kindly call Steven Jude Hoffenberg at the above phone number to review the GCC client recovery programs and the small collection agency joint venture partnership benefits.

**SPECIAL NOTE: NEGATIVE DISCLOSURE.** This document makes **no offer** or binding legal representations. The reading of this document can only be used to open communications with GCC. Each party must thereafter be assisted by their attorney who **must understand** the **full history** of TFC and Mr. Hoffenberg. Each element of the small collection agency GCC agreement must be reviewed by their attorney.

$Ex$H$iBiT$ $y$

# CONSOLIDATED FINANCIAL HIGHLIGHTS



## " TOWERS FINANCIAL CORPORATION "

### PUBLIC WALL STREET NATIONAL COLLECTION AGENCY AND FACTOR

(In thousands, except per share data)

| | 1992 | 1991 | 1990 |
|---|---|---|---|
| Accounts Receivable Under Contract | $1,450,000 | 800,200 | 291,565 |
| Total Assets | $684,442 | 513,623 | 195,562 |
| Shareholders' Equity | $25,481 | 20,078 | 13,422 |
| Net Income | $5,403 | 4,256 | 3,903 |
| Earnings Per Share | $1.08 | .91 | .86 |
| Average Common Shares Outstanding | 5,000 | 5,000 | 4,600 |



**ACCOUNTS RECEIVABLE UNDER CONTRACT**

$2 billion

$1 billion, 450 million

$800 million

EXHIBIT 4

$292 million

$183 million

'89    '90    '91    '92 (est)    '93 (est)



THIS ANNOUNCEMENT APPEARS AS
A MATTER OF RECORD ONLY

July 19, 1990

# $56,500,000

## TOWERS HEALTHCARE RECEIVABLES FUNDING CORPORATION
## TWO-YEAR 1990 BONDS - RATED AA
## BACKED BY HEALTHCARE RECEIVABLES
## INTEREST RATE - 10.20%
### (Issuer)

## TOWERS FINANCIAL CORPORATION
### (Servicer)



**TFC**
**TOWERS
FINANCIAL
CORPORATION**

417 FIFTH AVENUE, NEW YORK, NY 10016 (212) 696-0505

EXHIBIT 4

THIS ANNOUNCEMENT APPEARS AS
A MATTER OF RECORD ONLY

November 27, 1990

# $41,500,000

## TOWERS HEALTHCARE RECEIVABLES
## FUNDING CORPORATION - II
## THREE-YEAR 1990 BONDS - RATED AA
## BACKED BY HEALTHCARE RECEIVABLES
## INTEREST RATE - 9.75%
(Issuer)

## TOWERS FINANCIAL CORPORATION
(Servicer)



417 FIFTH AVENUE, NEW YORK, NY 10016 (212) 696-0505

EXHIBIT 4

## STEVEN AND LISA HOFFENBERG

305 East 40th Street
Apartment 8A
New York, New York. 10016
(917) 796-4755


May 11, 2008


Warden J. Grondolsky
Fort Dix Prison
P.O. Box 38
Fort Dix, New Jersey 08640

Re: MASSIVE DAMAGE TO OVER **200,000** HOFFENBERG RESTITUTION VICTIMS BY
    OBSTRUCTING HOFFENBERG COURT ACCESS IN THE UNLAWFUL SOLITARY
    ISOLATION PREVENTING PAYMENT OF **$475** MILLION DOLLAR RESTITUTION.

Dear Warden Grondolsky,

Steven Jude Hoffenberg 35601-054 , my husband  is deprived court access daily in solitary
isolation. Therein the following violations  of law are taking place daily:

1. All of the Hoffenberg legal files are SEIZED since **3-18-08** by unit manager Herbik.

2. Attorney Richard Barbuto **(914) 643-6301** legal calls are OBSTRUCTED by Mr. Herbik since
**3-18-08.**

3. Pencils and Paper with Law Library Use are deprived daily in solitary.

Mr. Hoffenberg, the former owner of "The New York Post" newspaper, built the largest
collection agency in America. Therein B.O.P. Policy number **P5380.08** Financial Responsibility
Program at page **1** demands a diligent effort in providing Mr. Hoffenberg daily court access  in
solitary.


Thank You,

*Mrs. Lisa T. Hoffenberg* (signature)

Mrs. Lisa T. Hoffenberg

Cc: Media
    Richard Barbuto, Esq.
    Mr. Bill Burnside for the Restitution Victim's B.O.P. Litigation


EXHIBIT 6

# STEVEN AND LISA HOFFENBERG

305 East 40th Street
Apartment 8A
New York, New York. 10016
(917) 796-4755


May 11, 2008


Warden J. Grondolsky
Fort Dix Prison
P.O. Box 38
Fort Dix, New Jersey 08640

Re: MASSIVE DAMAGE TO OVER **200,000** HOFFENBERG RESTITUTION VICTIMS BY
    OBSTRUCTING HOFFENBERG COURT ACCESS IN THE UNLAWFUL SOLITARY
    ISOLATION PREVENTING PAYMENT OF **$475** MILLION DOLLAR RESTITUTION.

Dear Warden Grondolsky,

Steven Jude Hoffenberg **35601-054** , my husband is deprived court access daily in solitary
isolation. Therein the following violations of law are taking place daily:

1. All of the Hoffenberg legal files are SEIZED since **3-18-08** by unit manager Herbik.

2. Attorney Richard Barbuto **(914) 643-6301** legal calls are OBSTRUCTED by Mr. Herbik since
**3-18-08.**

3. Pencils and Paper with Law Library Use are deprived daily in solitary.

Mr. Hoffenberg, the former owner of "The New York Post" newspaper, built the largest
collection agency in America. Therein B.O.P. Policy number **P5380.08** Financial Responsibility
Program at page **1** demands a diligent effort in providing Mr. Hoffenberg daily court access in
solitary.


Thank You,

*Mrs. Lisa Hoffenberg*

Mrs. Lisa T. Hoffenberg

Cc: Media
    Richard Barbuto, Esq.
    Mr. Bill Burnside for the Restitution Victim's B.O.P. Litigation


## EXHIBIT 6

**Administrative Remedy No. 657306-A1**
**Part B - Response**


This is in response to your Central Office Administrative Remedy
Appeal in which you claim you were never notified of your
Central Inmate Monitoring (CIM) assignment of Separation.

As noted by the Regional Director, you were notified of your CIM
classification on July 19, 2001.  We concur with the Regional
Director's response.

Your appeal is denied.


_____        _____
June 29, 2012                   Harrell Watts, Administrator
        Date                    National Inmate Appeals


EX HiBiT    7



EX HIBIT 8

**U.S. Department of Justice**
Federal Bureau of Prisons

*→ TORT INJURY DAILY NON STOP, ←*

# Program Statement

*BY THE CENTRAL INMATE*
*MONITORING STATE*
*BOP OFFICE*
*IN*

*" THE RESTITUTION*
*MANDATE "*

OPI: CPD
NUMBER: 5380.07
DATE: 1/3/2000
SUBJECT: Financial Responsibility
Program, Inmate.

RULES EFFECTIVE: 1/27/2000

---

1. [<u>PURPOSE AND SCOPE</u> §545.10.  The Bureau of Prisons encourages each sentenced inmate to meet his or her legitimate financial obligations.  As part of the initial classification process, staff will assist the inmate in developing a financial plan for meeting those obligations, and at subsequent program reviews, staff shall consider the inmate's efforts to fulfill those obligations as indicative of that individual's acceptance and demonstrated level of responsibility.  The provisions of this rule apply to all inmates in federal facilities, except: Study and observation cases, pretrial detainees, and inmates in holdover status pending designation.]

*→ TORT INJURY IN THE BELOW STATUTES,*
*NON STOP*

The Victim and Witness Protection Act of 1982, the Victims of Crime Act of 1984, the Comprehensive Crime Control Act of 1984, and the Federal Debt Collection Procedures Act of 1990 require a diligent effort on the part of all law enforcement agencies to collect court-ordered financial obligations.

2. **SUMMARY OF CHANGES**.  Significant changes in this revision include:

- Unit Team discretion in postponing a newly committed Federal inmate's participation in the Inmate Financial Responsibility Program (IFRP) until the first program review.

- Outlines expiration dates for financial obligations.

- A commissary spending limitation for IFRP "REFUSE" status inmates of at least $25 per month, excluding purchases of

*Exhibit 9     Prose Plaintiff*

*[handwritten: CENTRAL INMATE MONITORING]*

**HOFFENBERG, Steven**
Reg. No. 35601-054
Appeal No. 654698-R1
Page One

*[handwritten: "BOA STAFF" CONTINUING "]*
*[handwritten: RESTITUTION STATUTE LAW]*
*[handwritten: VIOLATION(S)"]*

**Part B - Response**  *[handwritten: TORT INJURY]*

You appeal the decision of the Warden at FCI Fort Dix in relation to your restitution. You contend the response was maliciously fabricated regarding your financial responsibility obligation. You demand the Warden vacate her September 9, 2011, response to your BP-9.

As a law enforcement agency, the Bureau of Prisons (BOP) is required to put forth a diligent effort to collect court-ordered financial obligations. The BOP has established procedures to encourage inmates to contribute toward court-ordered financial obligations while incarcerated pursuant to Program Statement 5380.08, IFRP. Although participation is voluntary, encouraging payment of court-ordered financial obligations is consistent with promoting responsibility in inmates. Inmates who choose not to participate demonstrate poor responsibility and are held accountable for their inactions. Participation and/or progress in this area are reviewed each time staff assesses an inmate's demonstrated level of responsible behavior.

A review of your appeal reveals you were sentenced in the Southern District of New York. In case number 1:95CR00321-001, you were ordered to pay a $50.00 felony assessment. In case number (S)1:94CR00213-001, you were ordered to pay a $200.00 felony assessment, $1,000, 000.00 in fines and restitution in the amount of $475,157,340.00. The felony assessments have expired; however, the balance on the fine remains $1,000.000.00, and the balance on the restitution is $475,157,190.00. You refused to make payments toward your financial obligations and have been in FRP Refuse status continuously since May 2005. There have been no recent changes to your FRP status nor have you provided documentation of any court-ordered amendments to your financial obligation. As indicated by the Warden, you have refused to establish a financial plan to make payment toward your financial obligation and are appropriately placed you in IFRP Refuse status. The BP-9 response, and the institution's action, is appropriate and in compliance with policy. Accordingly, your appeal is denied.

If you are dissatisfied with this response, you may appeal to the General Counsel, Federal Bureau of Prisons. Your appeal must be received in the Administrative Remedy Section, Office of General Counsel, Federal Bureau of Prisons, 320 First Street, N.W., Washington, D.C. 20534, within 30 calendar days of the date of this response.

Date: October 17, 2011

J. L. NORWOOD
Regional Director

*[handwritten: Exhibit 9]*

**Administrative Remedy Number 536859-A1**
**Part B - Response**

You contend staff have committed violations of the law and policy
with respect to documentation regarding your refusal to
participate in the Inmate Financial Responsibility Program
(IFRP).  You request to receive monetary compensation in the
amount of $20 billion.

Our review of this matter reveals both the Warden and Regional
Director have adequately addressed your concerns.  Program
Statement 5280.07, Inmate Financial Responsibility Program
(IFRP), establishes the procedure by which an inmate may make
efforts toward meeting their criminal monetary penalties and
legitimate financial obligations.  Payment amounts are based on
a formula contained within this Program Statement, and consider
all funds received from all sources.  The courts have upheld the
authority of the Bureau of Prisons to collect court-ordered
financial obligations through the IFRP and have continually held
that the IFRP procedures are lawful and Constitutional.

When you were sentenced, the court imposed assessments totaling
$250, a fine of $1 million, and restitution in the amount of
$475,157,340.  These criminal monetary penalties were ordered due
immediately.  Although the assessments have expired, the fine and
restitution amount remain due, and we construe them to be payable
via the IFRP.  Review of the record reveals you have refused to
make payment toward these amounts and have been in IFRP refuse
status since May 19, 2005.  Your refusal has been appropriately
documented in your central file.  Staff actions in this matter
are consistent with the requirements of applicable Bureau of
Prisons' policy.

Inmate participation in the IFRP is completely voluntary, but
failure to make satisfactory progress toward meeting financial
obligations may result in the limitation of certain privileges
reflective of a demonstration of poor responsibility.

Regarding your request for monetary compensation, such is not
available via the Administrative Remedy process.  You must submit
a claim pursuant to the appropriate mechanism, such as the
Federal Tort Claims Act, if you seek monetary compensation.

Your appeal is denied.

_[handwritten annotation: THIS RESPONSE VIOLATE(S) THE RESTITUTION STATUTES IN THE ABOVE POLICY]_

October 22, 2009
Date

Harrell Watts, Administrator
National Inmate Appeals

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

---

Type or use ball-point pen. If attachments are needed, submit four copies One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: HOFFENBERG STEVEN JUDE    3560105Y    5812    FORT DIX
      LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

**Part A - REASON FOR APPEAL** REMEDY IS $20 BILLION DOLLAR FEDERAL LITIGATION AGAINS
THE USA/BOP/NAMED BOP STAFF, SAID SUIT WILL SHOW
TORT, PRIVACY ACT, BIVENS STAFF ALL ONGOING VIOLATION,
ONGOING VIOLATIONS OF (7) SEVEN FEDERAL RESTITUTION
AND FINE COURT ORDERS, UNDER US PHILLIPS 303 F3d
548, FEDERAL DEBT COLLECTION PROCEDURES ACT. BOP
ONGOING DELIBERATELY FABRICATED BOP RECORDS
IN ORDER TO FILE FALSE ADVERSE DETERMINATIONS
6-28-09 BY "FRAUD + DECEIT"    JUDE 12

DATE                                    SIGNATURE OF REQUESTER

**Part B - RESPONSE**

---

DATE

**ORIGINAL: RETURN TO INMATE**

GENERAL COUNSEL 536859-A1

CASE NUMBER: _____

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
          LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

DATE                                    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)

**Administrative Remedy No. 654698-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy Appeal
in which you claim the Warden and Regional Director's responses are
fraudulent.  You further contend that staff are not bound to follow the
policy regarding the Inmate Financial Responsibility Program (IFRP).  You
state you have litigation proceeding on this matter for tort injury damages.

Our review of this matter reveals that both the Warden and the Regional
Director have adequately addressed your concerns.  Program Statement
5280.08, Inmate Financial Responsibility Program (IFRP), establishes the
procedure by which an inmate may make efforts toward meeting their criminal
monetary penalties and legitimate financial obligations.  Payment amounts
are based on a formula contained within this Program Statement.  The courts
have upheld the authority of the Bureau of Prisons to collect court-ordered
financial obligations through the IFRP and have continually held that the
IFRP procedures are lawful and Constitutional.

When you were sentenced, $250.00 in felony assessments, restitution in the
amount of $475,157,340.00, and a $1,000,000.00 fine were imposed.  The
felony assessments have expired, but you still owe a balance of
$475,157,190.00 on the restitution and $1,000,000.00 on the fine.  The
Bureau of Prisons considers that your court-ordered criminal penalties are
subject to payment via the IFRP in accordance with Program Statement
5380.08.  Program Statement 5380.08 states "Payments may be made from
institution resources or non-institution (community) resources."  We
concur with institution staff's determination that you should participate
in the IFRP.  You have been in IFRP Refuse status since 2005.  Staff have
worked with you to ensure you have had ample opportunity to make payments
on your court-ordered fine and restitution.  Despite these efforts, you
continue to avoid making the IFRP payments.  Until such time as you agree
to resume making payments, you shall remain in IFRP Refuse status.

Inmate participation in the IFRP is completely voluntary, but failure to
make satisfactory progress toward meeting financial obligations may result
in the limitation of certain privileges reflective of a demonstration of
poor responsibility.  We find no evidence that the responses of the Warden
and Regional Director are fraudulent.  You provide no credible evidence
to reach a conclusion to the contrary.

Your appeal is denied.


May 29, 2012
Date

Harrell Watts, Administrator
National Inmate Appeals

EXHIBIT 10

**U.S. Department of Justice**

**Central Office Administrative Remedy Appeal**

Federal Bureau of Prisons   10/28/11

---

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: HOFFENBERG STEVEN JUDE          3560/054          5812          FCI FORT DIX
     LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

**Part A - REASON FOR APPEAL** SUPPLEMENT THE PENDING HOFFENBERG 10-17-2011 TORT CLAIM, IN THE "WASHINGTON DC VENUE" FOR $20 BILLION DOLLARS. "DEMAND" THAT ATTORNEYS KENNY + ZOLDAK MUST "VACATE," THE ATTACHED FRAUDULENT, BP9, AND BP10, ADVERSE COVERUP, TWO RETIRED → DENIALS ←, SAID ILLEGAL DENIALS, COVERUP, CONCEAL, THE INMATE → "ACTUAL INJURY," IN THE BP9 CLAIMS!!! THAT THE PRISON UNIT TEAM → STAFF STATED, IN THE "AUGUST 29 2011 PROGRAM REVIEW," THAT THE STAFF → REFUSED TO FOLLOW, THE "RESTITUTION STATUTES LAW," ON THE BOP RESTITUTION POLICY 5380.07 COVER PAGE, THAT THE UNIT TEAM STAFF, ARE "NOT BOUND," IN THE ABOVE RESTITUTION BOP POLICY,

10-28-2011 "STATUTES LAW,"
    DATE          JUDE AS      SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

MAY 07 2011

Administrative Remedy
Federal Bureau of Prisons

EXHIBIT 10

---

    DATE

ORIGINAL: RETURN TO INMATE

**Part C - RECEIPT**

    GENERAL COUNSEL

CASE NUMBER: 654698-A1

CASE NUMBER: _____

Return to: _____
    LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

    DATE          SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

U.S. Department of Justice

Federal Bureau of Prisons

*Federal Medical Center, Devens*

---

P.O. Box 880
Ayer, MA 01432

June 21, 2002

The Honorable John F. Kerry
One Bowdoin Square
Tenth Floor
Boston. MA 02114
Attn: Roger Lau

Re:  HOFFENBERG, Steven
     Reg. No. 35601-054

Dear Senator Kerry:

This is in response to your letter to Kathleen Hawk Sawyer, Director of the Bureau of Prisons, dated May 24, 2002, which was forwarded to me for response. You received a letter from Attorney David Grossack, dated May 6, 2002, concerning his client, Mr. Steven Hoffenberg. Mr. Hoffenberg is currently incarcerated at the Federal Medical Center (FMC) Devens, Massachusetts. Mr. Grossack claims that his client is forbidden to make any telephone calls to his legal counsel.

Per Program Statement 5264.07, <u>Telephone Regulations for Inmates</u>, dated January 31, 2002, it states, "The Bureau provides each inmate with several methods to maintain confidential contact with his or her attorney. For example: inmate-attorney correspondence is covered under the special mail provisions; private inmate-attorney visits are provided; and the inmate is afforded the opportunity to place an occasional unmonitored call to his or her attorney. Based on these provisions, frequent confidential inmate-attorney calls should be allowed only when an inmate demonstrates that communication with his or her attorney by other means is not adequate."

I have repeatedly communicated the above information with Mr. Grossack through correspondence after he has requested Mr. Hoffenberg be given unlimited legal telephone calls. Specifically, I have advised him that if his client demonstrates that communication with his attorney by correspondence, visiting, or normal telephone use is inadequate, then reasonable telephone access will be granted. Furthermore, inmates at FMC Devens are given 300 minutes per calendar month to make telephone calls that may be used for any purpose at the inmate's discretion. Thus, the inmate may use this time to contact anyone on his telephone list, including his attorney.

Exhibit 11
Prose Plaintiff

I am aware that Mr. Grossack's client has been provided with three legal telephone calls since his arrival at FMC Devens. In addition, I am also aware that Mr. Grossack visited Mr. Hoffenberg on May 17, 2002. As noted above, Mr. Grossack has been advised that he can communicate with his client through other methods. To date, it has not been shown by Mr. Grossack's client that communication cannot be established by other means.

I trust this information is responsive to your request. If you have additional questions or concerns, please contact me at (978) 796-1100.

Sincerely,

David L. Winn
Warden

Exhibit  11



U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution
P.O. Box 38
Fort Dix, New Jersey 08640

September 12, 2008

Mr. R. Lawrence Barbuto, Esq.
45 Radnor Avenue
Croton-on-Hudson, New York 10520

*FROM*
*WARDEN AT*
*FORT DIX PRISON*

RE: HOFFENBERG, Steven
    Register Number 35601-054

Dear Mr. Barbuto:

This is in response to your letter dated August 18, 2008.  You write
on behalf of your client, Steven Hoffenberg, 35601-054, an inmate
currently incarcerated at Federal Correctional Institution (FCI), Fort
Dix, New Jersey.  Your client seeks an inquiry into the possibility
that recent events including his assignment to the Food Service work
detail reflect moves that are <u>retaliation for restitution efforts.</u>
You add that inmate Hoffenberg has been denied healthcare and reaffirm
the continued need to permit inmate Hoffenberg to make legal telephone
calls.

A review of this matter reveals Steven Hoffenberg is serving a 240
month sentence for Mail Fraud; Conspiracy; Conspiracy To Obstruct
Security Procedures; and Income Tax Evasion.  He was designated to FCI
Fort Dix, NJ, on March 18, 2008, and has an October 12, 2013,
projected release date via Good Conduct Time.

Our records reveal inmate Hoffenberg is assigned to regular duty work
status with medical restrictions and has been cleared for Food Service
work.  As early as April 4, 2008, inmate Hoffenberg was assigned to
the Food Service work detail.  On April 6, 2008, he was placed in the
Special Housing Unit (SHU) and released from SHU on May 7, 2008.  On
May 16, 2008, he was re-assigned to the Food Service work detail in
accordance with the needs of the institution.  Should inmate
Hoffenberg have a medical concern which he believes should preclude
him from the Food Service work detail, he has daily access to the
institution's Health Services department where he is afforded routine
diagnostic and support services. *ALLO   LEGAL CALLS OBSTRVETED*

Additionally, pursuant to Bureau of Prisons Program Statement 5264.08,
<u>Inmate Telephone Regulations</u>, page 11, "frequent confidential
<u>inmate-attorney calls</u> should be allowed only when an inmate
demonstrates communication with his or her attorney by other means is
not adequate."  This includes <u>imminent court deadlines.</u>  To date,
inmate <u>Hoffenberg has not provided his Unit Team with documentation to</u>
support that an eminent court deadline exists with regard to his

*61*

*EX HiBiT 18 "*

obligation for restitution. According to Program Statement 5380.08 Inmate Financial Responsibility Program, page 4, "When an inmate has a financial obligation, unit staff shall help that inmate develop a financial plan and shall monitor the inmate's progress in meeting that obligation." Our records show that as of May 18, 2005, Mr. Hoffenberg has refused to participate in the Inmate Financial Responsibility Program as recommended by his Unit Team. He has been assigned "Refuse" status five (5) times during this period of incarceration. According to the Schedule of Payments in his Judgement in a Criminal Case, "Payment of the total fine and other criminal monetary penalties shall be due as follows: in full immediately."

I trust this information has addressed your concerns.

Sincerely,

J. Grondolsky,
Warden

" EXHIBIT 6 "



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Medical Center, Devens*

*P.O. Box 880*
*Ayer, MA 01432*

February 6, 2002

RECEIVED

FEB 1 1 2002

Baise & Miller, P.C.

David G. Zanardi
Baise & Miller P.C.
1020 19th Street, N.W.
Suite 400
Washington, D.C. 20036

RE:  Hoffenberg, Steven
     Reg. No.: 35601-054

Dear Mr. Zanardi:

This is in response to your letter, dated January 23, 2002, concerning the above-named inmate, who is currently incarcerated at the Federal Medical Center, Devens, Massachusetts. You requested that Mr. Hoffenberg's telephone restriction be waived and that he be granted unlimited telephone access in order to resolve a $475 million court-ordered restitution. You stated that this matter alone will require him to converse with upwards of 20 financial services corporations, attorneys, broker-dealers, and other individuals on an almost daily basis.

On Monday, February 4, 2002, we met with Mr. Hoffenberg to explain that, in accordance with Bureau of Prisons policy and procedures, we will not waive his telephone restriction and afford him unlimited telephone access. At this time, I have found no compelling circumstances that would demonstrate that this communication cannot be accomplished by methods other than normal methods. If your client is not satisfied with this decision, he may appeal using the Administrative Remedy Process found in Program Statement 1330.13.

I trust that this is responsive to your request.

Sincerely,

David L. Winn
Warden

*This letter violates the B.O.P. Restitution policy*

CC:  Peter Antononops, Esquire
     Baise & Miller P.C.

**HOFFENBERG, STEVEN**
Registration No. 35601-054
Letter of December 4, 2008

In your letter you request legal phone calls.

With regard to your legal phone calls, a legal phone call can be granted only if an imminent court deadline exists.  If this is the case, please provide your unit manager with a deadline from the court as the legal office cannot provide you with legal phone calls.

I trust this addresses your concerns.


N. McFarland
Attorney

Date 12/5/08

ABOVE  VIOLATES  LAW  28 CFR 540.103



**U.S. Department of Justice**

Federal Bureau of Prisons

Federal Correctional Institution

Post Office Box 38

Fort Dix, New Jersey 08640

April 10, 2008

R. Lawrence Barbuto, Esquire
45 Radnor Avenue
Croton-on-Hudson, NY 10520

    Re:  Inmate Steven Hoffenberg
         Register No. 35601-054

Dear Mr. Barbuto:

Our office is in receipt of your facsimile, dated April 9, 2008, in
which you request a telephone call with Mr. Hoffenberg to discuss
his restitution..

Pursuant to Bureau of Prisons Program Statement 5264.07, <u>Telephone
Regulations for Inmate</u>, frequent confidential inmate-attorney calls
should be allowed only when an inmate demonstrates that he cannot
accomplish his communication through inmate-attorney correspondence
or private inmate-attorney visits, or that an imminent court
deadline exists.  <u>See 28 C.F.R. 540.103</u>.  Accordingly, your request
for an inmate-attorney call is denied at this time.

                              → / MISSTATED ←

Please feel free to communicate directly with your client through
the means referenced above.  If a legal visit is desired, or if an
imminent court deadline is established, the inmate should contact
his unit team to make arrangements.

I trust this has been responsive.

Sincerely,

*Nicole McFarland*

Nicole McFarland
Attorney Advisor

                    " ABOVE LETTER

         → MIS STATES "←

CODE OF FEDERAL REGULATIONS

4                        → 28 CFR 540.103 ←
  EXHIBIT 14

                INMATE LEGAL CALLS

THE WALL STREET JOURNAL.    TUESDAY, JANUARY 28, 2003 C7

# SEC Aims to Make Violators Pay Up

### By Deborah Solomon

WASHINGTON—Securities regulators say state laws and the time-consuming effort involved in forcing securities-law violators to pay their debts are hampering efforts to collect monies to repay defrauded investors, and they need help in securing the funds.

In the wake of corporate scandals that have cost investors hundreds of billions of dollars, the Securities and Exchange Commission is asking Congress for the authority to hire private-collection attorneys and to exclude securities cases from state laws that often shield property assets. The SEC also wants monetary penalties that violators pay to go toward compensating investors.

The Sarbanes-Oxley Act, which proposed new regulations to improve corporate accountability and financial reporting, directed the SEC to put ill-gotten gains that it collects into restitution funds to aid victims of securities fraud. In the past, most funds the SEC collects have gone into the U.S. Treasury.

The SEC said in a report on compensation funds required under Sarbanes-Oxley that its efforts to collect money had been hampered by legal limitations and complex financial transactions that often shield the true value of a defendant's assets.

The collection of illegal gains has long been an issue for the SEC, which was faulted last year by the General Accounting Office for failing to collect much of the money that securities-law violators were ordered to pay.

The SEC orders "disgorgement" from those who are found to have violated certain securities laws. The money is supposed to refund investors and recover "ill-gotten gains" so violators don't profit from breaking the law.

The report, released yesterday, outlined how most of the disgorgement that was ordered comes from just a handful of defendants—many of whom don't pay. Of the 207 defendants who were found to have committed fraud during securities offerings, four were ordered to pay $529 million—just under half of all disgorgement ordered by the SEC. None of the four have paid, according to the report.

The SEC said it could hire private collection attorneys, who could devote the time needed to collecting the debts.

| FRI | WK AGO |
|-----|--------|
| 0.16 | 0.96 |
| -0.05 | -3.55 |
| -0.22 | -2.55 |
| -0.72 | -2.67 |
| -1.50 | -2.05 |
| 2.09 | -1.99 |
| -1.14 | -1.84 |
| -0.72 | -1.84 |
| -0.88 | -1.63 |
| -0.49 | -1.63 |
| 2.97 | -1.51 |
| -0.53 | -1.51 |
| 7.18 | -1.49 |
| -1.26 | -1.47 |
| 2.75 | -1.46 |